2025-2090

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## GIORGIO FOODS, INC.,

Plaintiff-Appellant,

v.

## UNITED STATES, PROCHAMP B.V.,

Defendants-Appellees,

Appeal from the United States Court of International Trade
in Case No. 1:23-cv-00133, Judge M. Miller Baker.

## PRINCIPAL BRIEF OF PLAINTIFF-APPELLANT
GIORGIO FOODS, INC.

JOHN M. HERRMANN
PAUL C. ROSENTHAL
JOSHUA R. MOREY
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, DC 20007
(202) 342-8400

Counsel to Plaintiff-Appellant

November 10, 2025

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

**Case Number** 2025-2090

**Short Case Caption** Giorgio Foods, Inc. v. United States

**Filing Party/Entity** Plaintiff-Appellant Giorgio Foods, Inc.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 11/10/2025

Signature: /s/ John M. Herrmann

Name: John M. Herrmann

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☑ None/Not Applicable |
| Giorgio Foods, Inc. | N/A | N/A |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

☐ Additional pages attached

Form 9 (p. 3)
March 2023

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑   None/Not Applicable             ☐   Additional pages attached

|  |  |  |
|--|--|--|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below)   ☑   No   ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable             ☐   Additional pages attached

|  |  |  |
|--|--|--|
|  |  |  |
|  |  |  |

# Table of Contents

**Page**

STATEMENT OF RELATED CASES .................................................................1

JURISDICTIONAL STATEMENT .......................................................................1

STATEMENT OF THE ISSUES...........................................................................2

STATEMENT OF THE CASE...............................................................................2

    I.     DECSISIONS THAT ARE THE SUBJECT OF THIS APPEAL .......2

    II.    THE BASIS FOR COMMERCE'S INITIAL SELECTION OF GERMANY.......................................................................................4

         A.    Background on Comparison Market Selection.........................4

         B.    Background on Commerce's Model Match..............................7

         C.    Commerce Selected Germany As The Comparison Market...................................................................................8

         D.    The CIT's First Opinion and Order ......................................20

         E.    Commerce's Remand Determination.....................................23

         F.    The CIT's Second Opinion and Order...................................26

SUMMARY OF THE ARGUMENT ....................................................................27

ARGUMENT .......................................................................................................31

    I.     COMMERCE'S SELECTION OF GERMANY AS THE COMPARISON MARKET IS UNLAWFUL...................................31

         A.    Commerce's Balancing of Product Weights and Sales Volumes Is Contrary to the Statute and Not Supported By Substantial Evidence...............................................................33

B.    Commerce and the CIT Failed to Account Appropriately for Commerce's Admittedly Erroneous Findings Regarding Sales Channels and Customer Types ..................... 41

C.    The Record Does Not Support Prochamp's Reported Volume of Preserved Mushroom Sales in Germany .............. 46

D.    Commerce's Selection of Germany Is Not Insulated from Challenge During an Administrative Proceeding or Judicial Review ........................................................................ 52

II.    CONCLUSION AND RELIEF SOUGHT ......................................... 56

Pursuant to Federal Circuit Rule 25.1(e)(1)(B), this brief contains confidential material that has been omitted. The material omitted on pages 9, 11, 14-15, 18-19, 24-25, 31, 33-34, 36, 43, 47, 49, 51-52, and Attachment 1 is the mandatory respondent, Prochamp B.V.'s ("Prochamp") customer names, confidential sales information that would reveal customer information, as well as numerical data on sales volumes and mix of sales types. This information was redacted by Prochamp in its questionnaire responses in the underlying investigation and the Department of Commerce in its decision memoranda as confidential.

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*An Giang Fisheries Imp. & Exp. Joint Stock Co.,*
  287 F. Supp. 3d 1361 (Ct. Int'l Trade 2018) ....................................35

*Bebitz Flanges Works Private Ltd. v. United States*,
  433 F. Sup. 3d 1309 (Ct. Int'l Trade 2020) ......................................35

*Giorgo Foods, Inc. v. United States*,
  Ct. No. 23-00133, Slip Op. 24-79 (Ct. Int'l Trade July 17, 2024)
  (Appx00031-00059) ("*Giorgio I*") .............................................*passim*

*Giorgo Foods, Inc. v. United States*,
  Ct. No. 23-00133, Slip Op. 25-90 (Ct. Int'l Trade July 16, 2025)
  (Appx00099-00112) ("*Giorgio II*") ............................................*passim*

*La Molisana S.p.A. v. United States*,
  138 F.4th 1353 (Fed. Cir. 2025)........................................................7

*NTN Bearing Corp. v. United States*,
  74 F.3d 1204 (Fed. Cir. 1995) ..........................................................54

*OSI Pharms., LLC v. Apotex Inc.*,
  939 F.3d 1375 (Fed. Cir. 2019) ................................................... 50-51

*Shenzhen Xinboda Indus. Co. v. United States*,
  Consol. Ct. No. 16-00116, Slip Op. 2017-160,
  2017 Ct. Intl. Trade LEXIS 166 (Dec. 5, 2017) ...............................54

*Stupp Corp. v. United States*,
  413 F. Supp. 3d 1326 (Ct. Int'l Trade 2019) ....................................54

*Viraj Forgings, Ltd. v. United States*,
  350 F. Supp. 2d 1316 (Ct. Int'l Trade 2004) .............................. 37-38

## Statutes and Regulations

19 U.S.C. § 1516a(b)(1)(B)(i) ................................................................53

19 U.S.C. § 1516a(b)(2)(A)(i) ............................................................ 53-54

19 U.S.C. § 1677(16) ...................................................................7, 28, 34

19 U.S.C. § 1677(16)(A) .....................................................................7, 39

19 U.S.C. § 1677(35)(A) ........................................................................4

19 U.S.C. § 1677b(a)(1)(B)(i) ..............................................................4, 53

19 U.S.C § 1677b(a)(1)(B)(ii) ....................................................... 4, 5-6, 49

19 U.S.C. § 1677b(a)(1)(C)(i) ..................................................................4

19 U.S.C. § 1677b(a)(1)(C)(ii) ..............................................................4, 5

19 U.S.C. § 1677b(a)(1)(C)(iii) .............................................................4, 5

19 U.S.C § 1677b(a)(4) .........................................................................4

28 U.S.C. § 1295(a)(5) ..........................................................................1

28 U.S.C. § 1581(c) .............................................................................1

19 C.F.R. § 351.404(b) ..................................................................... 5-6

19 C.F.R. § 351.404(e)............................................................ 6, 37-38, 50

# Administrative Determinations

*Certain Preserved Mushrooms from the Netherlands:*
*Preliminary Affirmative Determination of Sales at Less Than Fair*
*Value, Postponement of Final Determination, and Extension of*
*Provisional Measures*, 87 Fed. Reg. 66,265
(Dep't Commerce Nov. 3, 2022) (Appx004077-4080)
("*Preliminary Determination*") and accompanying *Prelminary*
*Decision Memorandum* ("*PDM*") (Appx04024-04041)............................*passim*

*Decision Memorandum for the Final Affirmative Determination in the*
*Less-Than-Fair-Value Investigation of Certain Preserved*
*Mushrooms from the Netherlands*
(Dep't Commerce Mar. 20, 2023) (Appx05064-05140)
*("Final Decision Memorandum")*................................................................*passim*

*Final Results of Redetermination Pursuant to Court Remand;*
*Giorgio Foods, Inc. v. United States,* Ct. No. 23-00133
(Dep't Commerce Nov. 14, 2024) (Appx00062-00098)
("*Remand Redetermination*") ..................................................................*passim*

*Final Results of Redetermination Pursuant to Court Remand;*
*Stupp Corporation et al. v. United States,*
Consol. Court No. 15-00334
(Dep't Commerce May 2, 2019) *("Stupp I Remand")* ......................................54

*Final Results of Redetermination Pursuant to Court Remand;*
*Stupp Corporation et al. v. United States,*
Consol. Court No. 15-00334
(Dep't Commerce Jan. 14, 2020)......................................................................54

Memorandum from Allison Hollander to Alex Villanueva
re: *Common Alloy Aluminum Sheet from Bahrain – Selection of an*
*Appropriate Third Country Market* (Dep't Commerce
June 24, 2020) (ACCESS barcode: 3990601-01) ................................................6

Memorandum to Abdelali Elouaradia re: *Less-Than-Fair-Value*
*Investigation of Raw Honey from Argentina: Selection of*
*Appropriate Third Country Market* (Dep't Commerce
Aug. 11, 2021) (ACCESS barcode: 4151668-01) .......................................6, 40

Memorandum to Melissa G. Skinner re: *2018-2019 Administrative Review of the Antidumping Duty Order on Welded Line Pipe from the Republic of Turkey; Selection of an Appropriate Third Country Market* (Dep't Commerce Apr. 16, 2020) (ACCESS barcode: 3966047-01) ........................................................................6

Memorandum to Jill E. Pollack re: *Certain Frozen Warmwater Shrimp from India; Selection of an Appropriate Third Country Market* (Dep't Commerce Nov. 30, 2020) (ACCESS barcode: 4059889-01). ................................................................. 6-7

Appellant Giorgio Foods, Inc. ("Giorgio") submits this brief to contest certain aspects of the U.S. Court of International Trade's ("CIT") opinions and orders in *Giorgio Foods, Inc. v. United States*, CIT Ct. No. 23-00133.

## STATEMENT OF RELATED CASES

In accordance with Rule 47.5 of the Rules of this Court, counsel for Giorgio makes the following statement:

1. No other appeal in or from the same civil action or proceeding in the lower court or body was previously before this Court or any other appellate body.

2. Giorgio is not aware of any related cases currently pending before this Court.

## JURISDICTIONAL STATEMENT

Giorgio appeals the final judgment of the U.S. Court of International Trade ("CIT") in *Giorgio Foods, Inc. v. United States*, CIT Ct. No. 23-00133, in which the court reviewed the U.S. Department of Commerce's (hereinafter "Commerce") final determination of less-than-fair-value in its investigation of certain preserved mushrooms ("preserved mushrooms") from the Netherlands pursuant to the jurisdictional grant found in 28 U.S.C. § 1581(c). The CIT initially remanded Commerce's final determination and subsequently sustained Commerce's first redetermination pursuant to remand. Pursuant to Fed. R. App. P. 4(a)(1)(B), Giorgio timely filed its Notice of Appeal on September 8, 2025. This Court has jurisdiction to review the CIT's final judgment as provided in 28 U.S.C. § 1295(a)(5).

## STATEMENT OF THE ISSUES

1. In the underlying investigation and again in its first redetermination pursuant to remand, Commerce unlawfully selected Germany as the comparison market for purposes of determining normal value for mandatory respondent Prochamp B.V. ("Prochamp").

## STATEMENT OF THE CASE

## I.    DECSISIONS THAT ARE THE SUBJECT OF THIS APPEAL

This appeal arises out of the U.S. Department of Commerce's ("Commerce") less-than-fair-value investigation of certain preserved mushrooms ("preserved mushrooms") from the Netherlands, the U.S. Court of International Trade's ("CIT") partial remand of that determination, Commerce's first redetermination pursuant to court remand ("*Remand Redetermination*"), and the CIT's decision to sustain Commerce's *Remand Redetermination*. The CIT's opinion and order in *Giorgio Foods, Inc. v. United States*, CIT Ct. No. 23-00133, Slip Op. 24-79 (Ct. Int'l Trade July 17, 2024) (Appx00031-00059) ("*Giorgio I*") sustained certain aspects of Commerce's decision to select Germany as the comparison market for purposes of determining normal value. Specifically, the CIT held that Commerce's finding that the "'slight difference in product weights' that supported using France as the comparison market did not 'outweigh the significantly larger overall quantity'" was supported by substantial evidence. Appx00046-00047. The CIT, however,

remanded for Commerce to reconsider its finding that Prochamp sold a "significantly larger overall quantity" of mushrooms in Germany, as opposed to France or Israel, because Commerce's decision rested on a speculative assumption that was not supported by substantial record evidence. Appx00049-00050.

On remand, Commerce reopened and placed on the record new information that it asserted in its *Remand Redetermination* supports the agency's finding that Prochamp sold a significantly larger quantity of sales of preserved mushrooms for consumption in Germany than Prochamp sold for consumption in other potential comparison markets. *See, e.g.*, Appx00073-00080. The CIT's opinion and order in *Giorgio Foods, Inc. v. United States*, CIT Ct. No. 23-00133, Slip Op. 25-90 (Ct. Int'l Trade July 16, 2025) ("*Giorgio II*") sustained Commerce's *Remand Redetermination*. Appx00099-00112. The CIT determined that evidence placed on the record by Commerce on remand supported the agency's determination that the volume of German sales was the largest of Prochamp's third-country markets. Appx00108.

Giorgio challenges the CIT's opinion and orders in (1) *Giorgio I*, in which the CIT sustained in part Commerce's factual findings and conclusions for selecting Germany as the comparison market; and (2) *Giorgio II*, in which the CIT sustained Commerce's finding that the volume of Prochamp's sales of preserved mushrooms

for consumption in Germany was larger than the volume of its sales to any other comparison market.

## II. THE BASIS FOR COMMERCE'S INITIAL SELECTION OF GERMANY

### A. Background on Comparison Market Selection

Commerce calculates a "dumping margin" by comparing "the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise." 19 U.S.C. § 1677(35)(A).

Commerce typically calculates normal value based on

> the price at which the foreign like product is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price.

19 U.S.C. § 1677b(a)(1)(B)(i). However, if "the foreign like product is not sold (or offered for sale) for consumption in the exporting country," or "the aggregate quantity (or, if quantity is not appropriate, value) of the foreign like product sold in the exporting country is insufficient to permit a proper comparison with the sales of the subject merchandise to the United States,"[1] and if certain conditions are met, Commerce may rely on "the price at which the foreign like product is so sold (or

---

[1]    19 U.S.C. § 1677b(a)(1)(C)(i)-(ii).

offered for sale) for consumption in a country other than the exporting country or the United States," or constructed value.  19 U.S.C § 1677b(a)(1)(B)(ii), (a)(4).

Commerce normally considers "the aggregate quantity (or value) of the foreign like product sold in the exporting country" to be "insufficient" under 19 U.S.C. § 1677b(a)(1)(C)(ii), "if such quantity (or value) is less than 5 percent of the aggregate quantity (or value) of sales of the subject merchandise to the United States."  19 U.S.C. § 1677b(a)(1)(C)(iii); *see also* 19 C.F.R. § 351.404(b).

Moreover, Commerce may rely on "the price at which the foreign like product is so sold (or offered for sale) for consumption in a country other than the exporting country or the United States," pursuant to 19 U.S.C § 1677b(a)(1)(B)(ii), if "such price is representative," "the aggregate quantity (or, if quantity is not appropriate, value) of the foreign like product sold by the exporter or producer in such other country is 5 percent or more of the aggregate quantity (or value) of the subject merchandise sold in the United States or for export to the United States," and Commerce "does not determine that the particular market situation prevents a proper comparison with the export price or constructed export price."  19 U.S.C. § 1677b(a)(1)(B)(ii)(I)-(III).

If more than one third country satisfies the criteria set forth in 19 U.S.C. § 1677b(a)(1)(B)(ii), Commerce selects a third-country market based on the following criteria:

1. The foreign like product exported to a particular third country is more similar to the subject merchandise exported to the United States than is the foreign like product exported to other third countries;

2. The volume of sales to a particular third country is larger than the volume of sales to other third countries; and

3. Such other factors as the Secretary considers appropriate.

19 C.F.R. § 351.404(e).

Commerce's "practice is to consider all of the criteria" under 19 C.F.R. § 351.404(e) "when determining the appropriateness of a third-country comparison market," and only if "all other factors are equal" will Commerce "select the largest third-country market by volume." Memorandum from Allison Hollander to Alex Villanueva re: *Common Alloy Aluminum Sheet from Bahrain – Selection of an Appropriate Third Country Market*, at 3 (Dep't Commerce June 24, 2020) (ACCESS barcode: 3990601-01); Memorandum to Abdelali Elouaradia re: *Less-Than-Fair-Value Investigation of Raw Honey from Argentina: Selection of Appropriate Third Country Market*, at 6 (Dep't Commerce Aug. 11, 2021) (ACCESS barcode: 4151668-01); *see also* Memorandum to Melissa G. Skinner re: *2018-2019 Administrative Review of the Antidumping Duty Order on Welded Line Pipe from the Republic of Turkey; Selection of an Appropriate Third Country Market*, 3 (Dep't Commerce Apr. 16, 2020) (ACCESS barcode: 3966047-01); Memorandum to Jill E. Pollack re: *Certain Frozen Warmwater Shrimp from India; Selection of an*

*Appropriate Third Country Market*, 3 (Dep't Commerce Nov. 30, 2020) (ACCESS barcode: 4059889-01).

## B. Background on Commerce's Model Match

Before calculating a dumping margin, Commerce must identify a suitable "foreign like product" under 19 U.S.C. § 1677(16) to compare with a foreign producer's U.S. sales of merchandise within the scope of an investigation. The statute provides a three-part hierarchy for determining the "foreign like product" beginning with the "subject merchandise and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person." 19 U.S.C. § 1677(16)(A). To determine whether merchandise sold in a comparison market is identical, "Commerce uses a model-match methodology that considers the physical characteristics of the relevant products to create control numbers ('CONNUMs'), which it assigns to the products to categorize them for comparison." *La Molisana S.p.A. v. United States*, 138 F.4th 1353, 1356 (Fed. Cir. 2025) (citing *Goodluck India Ltd. v. United States,* 11 F.4th 1335, 1338 n.1 (Fed. Cir. 2021)).

In this case, Commerce's questionnaire instructed respondents to

> Assign a control number to *each unique product* reported in the section B sales data file. *Identical products should be assigned the same control number* in each record in every file in which the product is referenced (*e.g.,* products with identical physical characteristics reported in the

> foreign market sales file and the U.S. market sales file
> should have the same control number).

Appx00191 (emphasis added). Further, following a period set aside by Commerce for interested parties to comment on the relevant product characteristics for the investigation (in which Giorgio was the only party to submit comments), Commerce placed a memorandum on the record identifying the relevant product characteristics for reporting sales of subject merchandise in the U.S. and comparison markets. Appx00305-00308. These product characteristics were listed in their order of importance from highest to lowest as follows: (1) container type; (2) net drained weight of the mushrooms in each container; (3) mushroom style; (4) certified organic; (5) product labeling; and (6) packing solution. Appx00306-00307.

### C. Commerce Selected Germany As The Comparison Market

On April 20, 2022, Commerce initiated a less-than-fair value investigation of preserved mushrooms from the Netherlands. Appx00122-00126.

On May 17, 2022, Commerce selected Prochamp as one of two respondents for mandatory investigation. Appx00145-00151.

Commerce's antidumping questionnaire instructed Prochamp to determine whether its home market (or any third-country market) is "viable" for purposes of calculating normal value. Appx00288. Commerce's questionnaire indicated that if the volume of Prochamp's home market sales (*i.e.*, sales in the Netherlands) was

close to the viability threshold, Prochamp should "contact the official in charge by no later than fourteen calendar days after the issuance of this questionnaire." Appx00169. Prochamp did not contact Commerce regarding the viability of its sales in the Netherlands within fourteen days as directed by Commerce's questionnaire.

On June 21, 2022, 33 days after Commerce issued its initial questionnaire, Prochamp informed Commerce that its "volume of home market sales of the foreign like product during the POI is less than five percent of the volume of United States sales of the subject merchandise," asserting that it had [ # ] sales of the foreign like product in the home market. Appx00319, Appx00347-00348.

Prochamp also identified its three largest third-country markets, and the associated volume of sales to each country as follows:

| Market | Quantity in Kgs. |
|---|---|
| United States | [ sales volume ] |
| Germany | [ sales volume ] |
| Israel | [ sales volume ] |
| France | [ sales volume ] |

Appx00348.

Prochamp also asserted that "Germany is the most appropriate third-country market for determining the normal value" because "the product sold to the USA and Germany are the same" and "the channel of export/distribution i.e. all sales are made to unaffiliated customers in both the countries." Appx00319-00320.

In addition, Prochamp claimed that it identified the destination of its sales to various markets based on:

- "{T}he destination port/port of delivery" as set forth on the commercial invoices for sales in the U.S., French, and Israeli markets; and

- The customer's address and packaging of the product, instead of the port of destination, for the German market because "the sales to Germany are mostly on Free Carrier (FCA) incoterms" and Prochamp delivers the merchandise in the Netherlands.

Appx00318.

Commerce issued a supplemental questionnaire requesting additional information from Prochamp regarding the physical characteristics and channels of distribution of its third-country market sales. Appx00868-00871. Regarding its channels of distribution, Prochamp claimed that "the sales made to the USA and Germany are directly to unrelated customers," but that its sales to "Israel and France" are "through an unaffiliated agent." Appx00879.

Prochamp also identified the percentage of sales to the United States and to each of the three third-country markets that met the various product characteristics identified by Commerce. Appx00880-00884. For the first characteristic – container type – because Prochamp reported that its sales to all countries were in steel cans, this characteristic did not differentiate the potential comparison markets. Appx00880. Prochamp also reported limited differences with respect to the third

through sixth most important product characteristics – *i.e.*, mushroom style, certified organic, product labeling, and packing solution characteristics among the three comparison markets.    Appx00881-00884.    For the second most important characteristic – the net drained weight of preserved mushrooms in each container – Prochamp reported that its U.S. sales and sales to France involved cans containing [ # ] ounces < [ # ] ounces [ # ] ounces < [ # ] ounces of mushrooms. Appx00880-00881.  With respect to sales from Germany, however, less than [ # ] percent of Prochamp's sales volume involved cans with a net drained weight of [ # ] ounces < [ # ] ounces, only [ # ] percent of Prochamp's sales volume involved cans with a net drained weight of [ # ] ounces < [ # ] ounces, and the remainder of Prochamp's German sales were in containers with a net drained weight that did not correspond with the net drained weight of any U.S. sales. Appx00880-00881.   Thus, Prochamp's response demonstrated there would be limited direct matches between its German and U.S. sales based on the Commerce Department's second most important product characteristic used for matching sales.

On June 30, 2022, Giorgio submitted comments to Commerce explaining why Prochamp's methodology for determining the quantity and value of its sales to Germany and the United States was contrary to Commerce's practice.  Appx00886-00892.  With respect to Prochamp's methodology for identifying German sales, Giorgio pointed out that the statute requires normal value to be based on sales of the

product "for consumption in the exporting country," and that relying on the customer address and language on the label may not satisfy this criterion. Appx00889-00893. Importantly, Prochamp's German customer took custody of the merchandise in the Netherlands and record information indicated the merchandise might not be sold for consumption in Germany. Appx00890-00891, Appx00918-00921. Moreover, German is the official language of several countries throughout Europe, so the fact that German is the (or a) language on the label is not determinative of the country in which the preserved mushrooms were ultimately consumed. Appx00892, Appx00915-00917.

On July 5, 2022, Giorgio submitted additional comments to Commerce addressing Prochamp's comparison market questionnaire response demonstrating that France – not Germany, as alleged by Prochamp – was the most appropriate comparison market based on the comparability of the physical characteristics of the preserved mushrooms that Prochamp sold in the United States and France, as well as the lack of comparability of the second most important physical characteristic for Prochamp's sales of preserved mushrooms in the United States and Germany. Appx00940-00943. Giorgio also reiterated that given the unique sales channel, Prochamp's method for identifying the volume and value of sales to Germany– *i.e.*, relying on the customer address and language on the label – undermined the reliability of the volume of sales to Germany reported by Prochamp and further

undermined Prochamp's contention that Commerce should rely on its sales to Germany to determine normal value. Appx00943-00944.

On July 11, 2022, Commerce issued a supplemental questionnaire instructing Prochamp to provide additional information about how it determined the quantity and value of its sales to the various markets. Appx00951-00952.

Before responding to Commerce's July 11 supplemental questionnaire, and before Commerce selected the comparison market, Prochamp filed its response to Section B of Commerce's questionnaire (*i.e.*, information on sales used to determine normal value) and supplied Commerce with information only on sales in its preferred comparison market (*i.e.*, Germany). Appx00967. In its response, Prochamp stated it had "discovered" that certain sales it previously believed were sold for consumption in Germany were ultimately destined to another country and submitted a revised quantity and value chart for its sales of preserved mushrooms in Germany. Appx00967, Appx01026-01028.

On August 1, 2022, Prochamp responded to Commerce's July 11 supplemental questionnaire and in doing so again "found that the product" initially reported as sold to Germany "was delivered to other countries as well." Appx02552. As a result, Prochamp submitted another revised quantity and value chart, this time reducing the volume of sales to Germany by almost half and increasing the volume of sales to other third-country markets as follows:

| Market | Quantity (in kgs.) |
|--------|--------------------|
| United States | [ sales volume ] |
| Germany | [ sales volume ] |
| France | [ sales volume ] |
| Israel | [ sales volume ] |

Appx02562-02563.

On August 25, 2022, Prochamp responded to another supplemental questionnaire in which Commerce instructed Prochamp to update its response concerning the physical characteristics and channels of distribution of its preserved mushroom sales to third-country markets, based on the revised quantities and values. Appx03078-03083. Prochamp's revisions to the quantity and value had little impact on previously reported percentages of merchandise sold in each market that met product characteristics one (container type), three (style), four (certified organic), five (label), and six (solution). Appx03079, Appx03081-03083. With respect to the second most important characteristic – net drained weight – Prochamp indicated that [ # ] percent of its U.S. sales were made in cans containing [ # ] ounces < [ # ] ounces of mushrooms, that [ # ] of its preserved mushroom sales to Germany or Israel involved cans containing that volume of mushrooms, and that [ # ] percent of its sales to France were made at this weight. Appx03079-03080. Moreover,

[  #  ] percent of Prochamp's preserved mushroom sales in Germany had a net drained weight of [  #  ] ounces < [  #  ] ounces, but Prochamp made [  #  ] sales of preserved mushrooms to the United States in cans that contained that volume of mushrooms. *Id.* Further, the remaining [  #  ] percent of Prochamp's sales of preserved mushrooms to the United States involved cans containing [  #  ] ounces < [  #  ] ounces of preserved mushrooms, and a mere [  #  ] percent of Prochamp's preserved mushroom sales in Germany involved that same can size, whereas [  #  ] percent of Prochamp's preserved mushroom sales in France involved cans containing that volume of mushrooms. *Id.*

In sum, due to the mix of Prochamp's preserved mushroom sales in the various markets under the second most important CONNUM characteristic, only approximately [  #  ] kilograms of Prochamp's preserved mushroom sales in Germany were direct matches with Prochamp's U.S. sales. In contrast, nearly all of the [  #  ] kilograms of Prochamp's preserved mushroom sales in France were direct matches with Prochamp's sales of preserved mushrooms to the United States.

It bears noting that out of the 190 days Commerce had to complete its preliminary determination under the statute, by August 26, 2022 (the date on which Commerce selected Germany as the appropriate comparison market for Prochamp, *see* Appx03084-03090)), 127 of those days (or two-thirds of the time accorded

Commerce to complete its preliminary determination[2]) had passed without the agency selecting a comparison market. However, the day after Prochamp submitted its updated analysis of the physical characteristics of its sales to third-country markets based on its revised sales volumes, Commerce selected Germany as the appropriate third-country market. Commerce explained its determination as follows:

> Germany constitutes the appropriate comparison market for Prochamp because the market is viable, Prochamp's sales to Germany are similar to the products that Prochamp sold to the U.S. market during the POI, Germany provides the largest volume of the {merchandise under consideration ("MUC")}, and sales are made through the most similar channel of distribution and to the most similar type of customers when compared to the French and Israeli markets.

Appx03090.

On August 31, 2022, Giorgio filed comments with Commerce demonstrating that its analysis was not supported by record evidence. Appx03092-03101. First, Giorgio demonstrated the record established Prochamp had again significantly overstated the volume of its sales to Germany by relying on the language on the label to determine country of consumption. Appx03092-03095. Second, Giorgio again

---

[2] *See Certain Preserved Mushrooms from the Netherlands: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 87 Fed. Reg. 66,265 (Dep't Commerce Nov. 3, 2022) ("*Preliminary Determination*") (Appx04406-04409) and accompanying *Preliminary Decision Memorandum* (Appx04353-04370).

pointed out that based on the reported physical characteristics of merchandise sold in the United States and the relevant third-country markets, France was the superior choice. Appx03096-03101. Importantly, Giorgio demonstrated that Commerce's conclusion in the third-country selection memo that the larger overall quantity of preserved mushrooms sold to the German market outweighs differences in product weights was mathematically wrong. Appx03099-03101. Third, Giorgio also demonstrated that Prochamp's claim (and Commerce's reliance on Prochamp's claim) that its German sales were sold through the most similar channel of distribution was also wrong, because Prochamp's purported "German" sales were sold through a unique sales channel whereby they were delivered to the customer's warehouse in the Netherlands and then distributed to other countries. Appx03101. Thus, all the reasons Commerce relied on to support its selection of Germany as the third-country comparison market for determining normal value were not supported by record evidence.

Commerce did not respond to Giorgio's August 31 comments and did not instruct Prochamp to submit a database containing information on its sales of preserved mushrooms in France.

In comments filed with Commerce in advance of the preliminary determination, Giorgio again explained why Prochamp's German sales volume was significantly overstated and why Commerce's decision to select Germany as the

most appropriate third-country market was not supported by record evidence. Appx04294-04302. Commerce did not address any of the arguments raised by Giorgio in the decision memorandum accompanying its preliminary determination. Appx04353-04370.

Following Commerce's preliminary determination, Giorgio submitted pre-verification comments urging Commerce officials to verify the volume of sales that Prochamp reported as involving merchandise consumed in Germany. Appx04587-04590.

On January 11, 2023, Commerce released a report summarizing its on-site verification of Prochamp's sales information that included a discussion of Prochamp's attempts to determine the destination of the preserved mushroom sales it identified as involving product sold for consumption in Germany. Appx05240-05243. Commerce's report notably confirmed that Prochamp marked sales to [customer name] (hereinafter "German Customer 1") as German sales, but Prochamp did not possess any information to confirm that its sales to German Customer 1, which were delivered in the Netherlands, involved products that were actually consumed in Germany. Appx05241 ("Prochamp has no actual knowledge of the eventual destination of the product within {German Customer 1's} own distribution chain, or that it even left the Netherlands, much less where the product was sold for retail and ultimately consumed."). Moreover, Commerce's verification report confirmed that

"virtually all [ country ] language labels for {German Customer 1's} [ brand name ] brand contained a label code identifying the product as [ country codes ] *Id.* As such, Prochamp's [ country ]-language label demonstrated that the product was intended for retail sale in the [ country ] or [ country ] markets, but Commerce's verification report stated that "the label alone did not distinguish sales intended for the [ country ] market from those going to the [ country ] market." *Id.* Further, during their verification of information placed on the record by Prochamp, Commerce officials "scrutinized the accompanying sales and transport documentation, including that provided to Prochamp by {German Customer 1}, as well as correspondence related to relevant sales to test whether there is any disambiguation for sales or portions of a sale destined" for markets where preserved mushrooms with [ country ]-language labels might be sold. Appx05242. Based on this analysis, Commerce's verification report states that the [ coutry ] and [ country ] markets are the likely countries of consumption, but Prochamp "did not offer information to disambiguate between the two." *Id.*

In addition to confirming that Prochamp's claimed sales volume to Germany was significantly overstated due to the fact that some of that volume was destined for and consumed in the [ country ] market, the Commerce officials conducting the verification also identified certain sales that were unambiguously sold to markets

other than Germany and, thus, wrongly reported by Prochamp as involving German sales. *Id.*

Giorgio again challenged Commerce's selection of Germany as the appropriate third-country market in its administrative case brief. Appx05322-05323, Appx05341-05347. In reaching its final determination, Commerce reasserted that its selection of Germany as the appropriate third-country market was correct based on the record that existed at the time of its selection, as well as the record at the conclusion of the investigation. *See Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Certain Preserved Mushrooms from the Netherlands* (Mar. 20, 2023) ("*Final Decision Memorandum*") at Comment 9 (Appx05393-05469).

**D. The CIT's First Opinion and Order**

Giorgio challenged Commerce's selection of Germany as the comparison market at the CIT, arguing that each of Commerce's stated bases for selecting Germany as the comparison market was not supported by substantial evidence. *First*, Giorgio argued that Commerce's explanation that it "must identify a viable and appropriate third country as a concrete basis for normal value early in a proceeding" cannot insulate the agency's determination from reconsideration when new facts or arguments are presented during administrative proceedings – or from subsequent judicial review after the conclusion of the administrative proceedings.

*See* Pl. Giorgio's Mem. of Law in Supp. Pl.'s Mot. for J. Upon the Agency R. (Nov. 22, 2023) filed in *Giorgio Foods, Inc. v. United States*, CIT Ct. No. 23-00133 ("Pls. 56.2 Brf.") (ECF Nos. 24-25) at 35-41. The CIT considered this argument, but determined that despite "the Department's stated reluctance {} to revisit that finding in its final determination . . . the agency went ahead—even if grudgingly {}—and *did* reconsider that conclusion on the merits." Appx00045.

*Second*, Giorgio argued that Commerce's determination that the larger overall quantity of preserved mushrooms Prochamp sold to the German market outweighs the difference in product characteristics is mathematically wrong and not supported by substantial evidence. Pls. 56.2 Brf. at 44-49. The CIT rejected this argument, focusing instead on Commerce's finding that "products sold in each of the third-country markets *all appear to be very similar.*" Appx00046 (emphasis in original). Applying the substantial evidence standard of review, the CIT held that Commerce "reasonably determined that the significantly larger volume of German sales . . . more than offset the *overall* slight difference in product similarity that pointed toward using France as a comparison market." *Id.* (emphasis in original).

*Third*, Giorgio argued that Commerce's reliance on Prochamp's "statement" (*i.e.*, not documentary evidence or an evaluation of the record) that "the sales channels and type of customer in Germany is most similar to the sale channel and type of customer in the United States" was also not supported by substantial

evidence.  Pls. 56.2 Brf. at 50-54. The CIT rejected this argument in a footnote

stating that:

> the agency agreed with the {Giorgio} {} but explained that
> mistake was at most corroborative rather than
> determinative. As Commerce's balancing of product
> similarity versus sales volume was plainly dispositive, this
> asserted error was at most harmless.

Appx00048 at n.13.

*Fourth*, Giorgio argued the record did not support the German sales volume

Prochamp identified, and that Commerce relied on in balancing the evidence. *See*

Pls. 56.2 Brf. at 54-56.  The CIT agreed that Commerce's determination was not

supported by substantial evidence.  The CIT faulted Commerce for its assumption

that "a multinational retailer that received Prochamp's mushrooms outside of

Germany ultimately resold *all* of them in that country," when the record indicated

that the retailer's purchases may have been sold to consumers outside of Germany

and did not contain the actual number of German sales.  Appx00050 (emphasis in

original).  Further, the CIT concluded that this error "matter{ed}" because

> Commerce's choice of comparison market rested entirely
> on its conclusion that Prochamp's '*significantly* larger
> overall quantity' of sales in Germany for consumption
> 'outweigh{ed}' the 'slight difference' in product
> similarity that otherwise pointed toward using France.

*Id.* (emphasis in original).

The CIT, therefore, remanded Commerce's final determination and directed the agency to reconsider "its finding that Prochamp sold a 'significantly larger overall quantity' of mushrooms in 'the German market' than in France or Israel." Appx00060 (Order at 1, July 17, 2024, ECF No. 44); *see also* Appx00049-00051.

## E. Commerce's Remand Determination

Commerce interpreted the CIT's remand instructions as requiring the agency

> to quantify and account for the portion of the German market total which may reasonably reflect this heretofore unquantified amount of non-German consumed sales and evaluate whether Commerce's conclusions regarding Germany's relative advantage in size to other potential third-country markets remain supported with the non-German consumption accounted for and removed from the total.

Appx00074.

Because the record lacked information on the downstream distribution activities of Prochamp's customer, Commerce placed on the record:

- Information on the total number of stores operated in Germany and Austria by Prochamp's largest customer (*i.e.*, German Customer 1);

- Population data for Germany and Austria;

- Information on consumption of fresh mushrooms (*i.e.*, not preserved mushrooms) in Germany and Australia; and

- Information on French speaking populations outside of France.

Appx00075, Appx05849-05850.

In addition, Commerce invited the parties to submit new factual information responsive to the "narrow purpose" for which the agency reopened the record, *i.e.*, to address the CIT's concerns that "the German third country data being inclusive of at least some sales which may have been consumed not in Germany." Appx05849.

To that end, Prochamp placed on the record correspondence with German Customer 1 and [ customer name ] (hereinafter "German Customer 2"), as well as information from the website of [ customer name ] (hereinafter "German Customer 3") indicating its countries of operation. Appx05914-05916, Appx05931-05937, App05945-05959. Giorgio did not place new factual information on the record, because Giorgio did not have information to quantify and differentiate German Customer 1's sales for consumption in Germany versus other countries.

Relying on this new information, Commerce "approximate{d}" the quantity and value of preserved mushrooms Prochamp sold for consumption in Germany and Austria. Appx00076. Commerce determined that the total volume of mushrooms sold by Prochamp to German Customer 1 for consumption in Austria to be "approximately 10 percent" of total sales of German language-labeled mushrooms, because (1) German Customer 1 operates 255 stores in Austria (7.28 percent of the company's total number of stores in Austria and Germany) and 3,250 stores in Germany (92.72 percent of the total number of stores in Austria and Germany); (2) the population of Austria during the period of investigation was 9.72 percent of the

population of Germany during that time; and, (3) Austria's fresh mushroom consumption in 2021 was 18,179 metric ton or 10.38 percent of Germany's 157,000 metric consumption of fresh mushrooms.  Appx00076.

Commerce then determined Prochamp's sales for consumption in Germany to be [  #  ] kilograms by: (1) reducing the total volume of Prochamp's sales to German Customer 1 by 10 percent; and (2) removing certain [ brand name ] sales to German Customer 2, because correspondence Prochamp submitted on remand indicated the product may have been distributed in an unspecified amount to another third-country.  Appx00077. Based on Commerce's estimate, the revised volumes of Prochamp's sales to its three largest third-country markets were as follows:

| Market | Quantity (in kgs.) |
|---|---|
| United States | [ sales volume ] |
| Germany | [ sales volume ] |
| France | [ sales volume ] |
| Israel | [ sales volume ] |

Commerce characterized its calculation as "conservative" because it removed 10 percent of German Customer 1's sales, not just those with the "DE/AT" (or Germany/Austria) label, and because the agency presumed all sales of [ brand name ] mushrooms to German Customer 2 were distributed for consumption in

another third country.  Appx00078.  Commerce continued to rely on Germany as the comparison market because the revised volume of Prochamp's sales to the German market under Commerce's analysis on remand remained larger than the volume of its sales to France, and nearly double that reported for Israel.  Appx00080.

Commerce also asserted that information on Prochamp's sales of preserved mushrooms in France, while not subject to "comparable scrutiny" as the German market sales information, included (1) sales with an "NL/BE" label likely indicating consumption in French-speaking areas of Belgium and the Netherlands, (2) sales to a Monaco-based company based on that company's name with the Monaco incorporation acronym "SAM" (Société Anonyme Monégasque), and (3) sales to French Overseas Territories not consumed in mainland France.   Appx00078.  Commerce rejected France as a comparison market country.  Appx00078-00079.

F.     The CIT's Second Opinion and Order

The CIT held that Commerce's "finding that the German market was the largest by volume" is supported by substantial record evidence.  *Giorgio II*, Slip Op. 25-90 at 9 (Appx00108).  The CIT found that Commerce's "estimate" of preserved mushrooms sold for consumption in Germany "was purposely conservative."  *Id.* at 10 (Appx00109).   The Court found that Commerce's remand determination "provided a 'better explanation' that move{d} its decision out of the realm of 'mere speculation.'"  *Id.*

-26-

The Court rejected Giorgio's argument that Commerce's "estimate" continued to be based on "speculation" stating that "{t}he new data, and the agency's reasonable inferences from them, support its decision." *Id.* at 11 (Appx00110).

The Court also rejected Giorgio's challenge to Commerce's statements regarding French sales volumes because Commerce relied on the unadjusted French sales volumes in reaching its determination on remand that the German comparison market remained superior to France. *Id.* at 12 n.6 (Appx00111).

This appeal followed.

## SUMMARY OF THE ARGUMENT

Commerce provided four reasons for selecting Germany as the comparison market:

(1) the volume of Prochamp's German sales was larger than Prochamp's sales to other third-country markets;

(2) the greater volume of Prochamp's sales to Germany outweighed a greater similarity in product matches between Prochamp's French and U.S. sales;

(3) Prochamp's German and U.S. sales channels and customers were most similar compared to other third-country markets; and

(4) Commerce is required to select a comparison market early in the proceeding.

Each basis is not supported by substantial evidence and otherwise not in accordance with law.

*First*, the crux of Commerce's selection of Germany as the comparison market is the agency's finding that the greater volume of Prochamp's German sales outweighs the greater product similarity between Prochamp's French and U.S. sales. Commerce and the CIT, however, applied the wrong standard in relying on Commerce's finding that Prochamp's sales to all markets appeared to be very similar. The statute explicitly provides a preference for "identical" (not "similar") matches between a respondent's U.S. and comparison market sales. *See* 19 U.S.C. § 1677(16). Moreover, the purpose of Commerce selecting a comparison market is to find a market that has the possibility of providing the most robust dumping analysis vis-à-vis identical matches in the U.S. and comparison markets. The record demonstrates that France offered a much greater volume of sales that match Prochamp's U.S. sales. As a result, Commerce's weighing of the volume and product similarity of Prochamp's comparison market sales is unreasonable.

*Second*, in its *Final Decision Memorandum*, and in its brief to the CIT, Commerce admitted that its initial finding that Prochamp's German and U.S. sales channels and customers were more similar than Prochamp's French and U.S. sales channels and customers was wrong. However, after correctly admitting that Prochamp's German sales channels and customers were not like Prochamp's U.S.

sales channels and customers, Commerce failed to make the additional finding that Prochamp's U.S. and French sales channels and customers were similar. Commerce's failure to account for this evidence makes its determination unlawful, and the CIT's determination that Commerce's error was harmless incorrect.

*Third*, most of Prochamp's German sales were made under unique sales terms and were delivered to German Customer 1 in the Netherlands. Prochamp reported that it had no insight into whether the merchandise at issue in these sales even left the Netherlands, but assumed the sales involved merchandise that was consumed in Germany because the labels on the preserved mushroom containers were printed using the German language. The record, however, established that German is an official language of several European countries, and that Prochamp's labels to this customer indicated the merchandise was sold in at least one country other than Germany. The CIT correctly remanded Commerce's final determination and instructed the agency to reconsider its reliance on Prochamp's German sales volume because the volume was based on mere speculation and assumptions that were not supported by record evidence. Commerce and Prochamp placed new information on the record on remand, but none of the evidence directly establishes that Prochamp's sales to this customer involved merchandise that was consumed in Germany. Indeed, certain evidence established that Prochamp's sales to another German customer were for consumption in another third country. The CIT

incorrectly determined that the evidence placed on the record, which was all general in nature and did not concern Prochamp's actual sales, was sufficient to support Commerce's finding that the volume of Prochamp's German sales was significantly larger than Prochamp's sales to other third-country markets.

*Fourth*, Commerce's attempt to insulate its selection of a comparison market from reconsideration or from subsequent judicial review based on its claim that it must select a comparison market early in the proceeding is contrary to the standard of review. Giorgio challenged Commerce's selection of Germany as the most appropriate comparison market on four separate occasions during the administrative proceedings. As Giorgio urged, Commerce could have at any time during the administrative proceedings instructed Prochamp to submit a database identifying Prochamp's sales for consumption in France to preserve the issue for reconsideration following the agency's preliminary determination. The agency, however, failed to do so. Regardless of whether this Court considers Commerce's analysis in the final determination to constitute a reconsideration – or simply a continuation of Commerce's initial selection, the agency's decision is unlawful.

# ARGUMENT

## I.  COMMERCE'S SELECTION OF GERMANY AS THE COMPARISON MARKET IS UNLAWFUL

In its initial comparison market selection memorandum, and again in its *Final Decision Memorandum*, Commerce selected Germany as the comparison market.  In it is initial selection memorandum, Commerce analyzed the volume of Prochamp's sales to Germany, France, and Israel, and compared Prochamp's breakdown of sales in each market by product characteristics.  Appx03087-03090.  Commerce found that while Prochamp's sales to France have the most similar product characteristics with U.S. sales, "the products sold in each of the third-country markets all appear to be very similar to the MUC."  Appx03088.  Further, Commerce characterized the differences in products amongst the countries as [ confidential description ] and concluded these differences did not "outweigh{}" the larger volume of preserved mushrooms that Prochamp sold to the German market.  *Id.*

Commerce also considered Prochamp's statement that its "sales channels and type of customer in Germany is similar to the sales channel and type of customer in the United States," and determined that Germany was the appropriate comparison market because "Germany provides the most robust data and most similar channel of distribution and customer type when compared to the French and Israeli markets." Appx03088-03089.

In its *Final Decision Memorandum*, Commerce added to its explanation that it "must identify a viable and appropriate third country as a concrete basis for normal value early in a proceeding" and claimed that "petitioner {did} not clearly identify the appropriate remedy it now seeks in the final determination proceeding." Appx05466-05467. Commerce also stated that it was "not revisiting its comparison market viability determination for Prochamp, consistent with its practice." Appx05467.

Commerce, however, then stated that "the record continue{d} to support {its} selection of Germany" as the comparison market. *Id.* Commerce acknowledged certain shortcomings in its initial analysis including in its characterization of the magnitude of the difference between the countries with respect to their respective ability to offer matches to U.S. sales and Prochamp's reported sales channels and types of customers, but the agency found that each of these circumstances was "not determinative." Appx05468.

Each of the bases Commerce relied on in the investigation for selecting Germany as the comparison market is not supported by substantial evidence or is otherwise contrary to law.

### A. Commerce's Balancing of Product Weights and Sales Volumes Is Contrary to the Statute and Not Supported By Substantial Evidence

After correctly finding that "Prochamp's sales to France have the" most similar product characteristics "to match with U.S. sales," Commerce erroneously concluded that "the record reflects that the products sold in each of the third-country markets all appear to be very similar to the MUC" and that differences in product characteristics are outweighed by the larger volume of preserved mushrooms sold to the German market. Appx03088, Appx05468. Commerce's own memorandum demonstrates that Commerce's analysis is mathematically wrong, and Giorgio provides additional analysis below demonstrating the significant impact Commerce's failed analysis had on the agency's dumping analysis in this investigation.

*First*, as set forth in Commerce's comparison market selection memorandum, [ # ] percent of Prochamp's U.S. sales had a net drained weight of [ # ] ounces < [ # ] ounces. Appx03087. Prochamp, however, made [ # ] German sales of preserved mushrooms with a net drained weight in this range, meaning that [ # ] German sales match with the vast majority of Prochamp's U.S. sales with respect to the second most significant model match characteristic. *Id.* In contrast, [ # ] percent of Prochamp's French sales had a net drained weight of [ # ] ounces < [ # ] ounces, meaning that unlike Prochamp's German sales, there are robust and

identical matches between Prochamp's French sales and the vast majority of its U.S. sales. *Id.* Furthermore, the remaining [ # ] percent of Prochamp's U.S. sales have a net drained weight of [ # ] ounces < [ # ] ounces. *Id.* While only [ # ] percent of Prochamp's German sales had a net drained weight of [ # ] ounces < [ # ] ounces, [ # ] percent of Prochamp's French sales of CPMs were in this range. *Id.*

Accordingly, based on the second most important product matching characteristic, it was clear that a maximum of [ # ] percent of Prochamp's German sales (representing approximately [ # ] kilograms) could be identically matched with Prochamp's U.S. sales, assuming all other CONNUM characteristics were identical.[3] In contrast, more than [ # ] percent of Prochamp's French sales could have been matched identically with Prochamp's U.S. sales, accounting for more than [ # ] kilograms of Prochamp's sales of preserved mushrooms in France. Commerce's characterization of this difference as [ confidential description ] is clearly erroneous, contrary to the statute's preference for identical matches (19 U.S.C. § 1677(16)), and no reasonable mind could reach Commerce's conclusion that the

---

[3]   Notably, the approximately [ # ] kilograms figure is based on the [ # ] kgs. volume of German sales that Prochamp reported in its August 1, 2022 supplemental questionnaire response, which the CIT found was not supported by substantial evidence, and which Commerce revised downwards to [ # ] kgs. in its remand determination. *See* Appx03086, Appx00077. Thus, an even smaller volume of Prochamp's sales to Germany likely constitute an identical match with its U.S. sales.

volume of Prochamp's preserved mushrooms sales in Germany outweighed differences in product characteristics when simple math demonstrates otherwise. *See An Giang Fisheries Imp. & Exp. Joint Stock Co.*, 287 F. Supp. 3d 1361, 1376 n.25 (Ct. Int'l Trade 2018) (Commerce abuses its discretion when its decision "'is clearly unreasonable, arbitrary, or fanciful . . . is based on an erroneous conclusion of law . . . rests on clearly erroneous fact findings{,} or follows from a record that contains no evidence on which the {agency} could rationally base its decision'") (citing *Gerritsen v. Shirai*, 979 F.2d 1524, 1529 (Fed. Cir. 1992)); *Bebitz Flanges Works Private Ltd. v. United States*, 433 F. Sup. 3d 1309, 1316 (Ct. Int'l Trade 2020) ("Commerce's exercise of its discretion, however, must be reasonable in light of its statutory obligations.") (citing *Sterling Fed. Sys., Inc. v. Goldin*, 16 F.3d 1177, 1182 (Fed. Cir. 1994) (noting that the agency abuses its discretion when its decision is "clearly unreasonable, arbitrary, or fanciful")).

In its final determination, Commerce continued to rely on this incorrect analysis, explaining that "any such overstatement" regarding the difference in similarity of the products sold in U.S. and German markets

> was not determinative and does not conflict with the conclusion that the record reflects that the products sold in each of the third-country markets for this characteristic all appear to be very similar to the MUC.

Appx05468.  Nearly the entire basis for Commerce's selection of Germany as the third-country comparison market was that the volume of German sales outweighed the similarity of U.S. and French products, so it is unclear how Commerce's weighing of these factors "was not determinative." *Id*.

*Second*, the impact of Commerce's erroneous selection of Germany as the comparison market on the agency's dumping calculation (and ultimate exclusion of Prochamp from the *Order*) was enormous.  As Giorgio argued to Commerce, both before and after the agency selected Germany as the comparison market, relying on German sales would result in very limited matches with Prochamp's U.S. sales of preserved mushrooms and, therefore, an absence of a robust dumping analysis.  *See*, *e.g.*, Appx00940-00944, Appx03096-03101.  This is, indeed, what happened.

As shown in the chart at *Attachment 1 hereto*,[4] there is only **[  #   ]** CONNUM sold in both the U.S. and German markets that represented **[  #   ]** percent of Prochamp's U.S. sales and **[  #  ]** percent of Prochamp's German sales.  *See Attachment 1*.  As a result, Commerce compared the remaining U.S. CONNUMs that did not have identical matches with: (1) prices for a non-identical German

---

[4]    Attachment 1 summarizes information contained in the confidential electronic data files accompanying the Commerce Department's final determination concerning Prochamp and was also included as Attachment 1 to Giorgio's 56.2 brief filed in *Giorgio Foods, Inc. v. United States*, CIT Ct. No. 23-00133 (ECF Nos. 24-25).

CONNUM that were adjusted for differences in merchandise ("DIFMER") based on costs; or (2) constructed value because the difference in prices between the U.S. CONNUMs and the non-identical German CONNUM were too great to rely on a DIFMER adjustment. *See Attachment 1*. Ultimately, the agency reached a negative determination of dumping with respect to Prochamp without comparing Prochamp's U.S. sales prices to actual prices in any market, despite the existence of such prices in France. If Commerce had selected France as the comparison market, it would have had robust and identical comparisons for *all* U.S. CONNUMs, and a determination of dumping by Prochamp (or lack thereof) would have been supported by record evidence. As the record stands, however, Commerce's selection of Germany as the third-country comparison market undermined the agency's dumping analysis and masked any actual dumping, as there were no identical normal value comparisons for most of Prochamp's U.S. sales.

In *Giorgio I*, the CIT focused on Commerce's conclusion that "products sold in each of the third-country markets *all appear to be very similar*," but the fact that the products are similar misses the point. Appx00046 (emphasis in original). The CIT has previously explained that:

> Given {the} seriatim instruction, 19 C.F.R. § 351.404(e) has a descending hierarchy of criteria from which Commerce must select the appropriate third country comparison market. Here Commerce did not try to work its way through the enumerated hierarchy of the regulation

and its failure to do so lead {sic} to absurd results.[8] Commerce deviated from the canons of statutory construction and based its third country selection on the second enumerated criteria without indicating whether it considered the other enumerated criteria in making its determination. Commerce thus has failed to provide a reasonable explanation of its analysis. This issue is remanded to Commerce to provide a full explanation of its reasoning and the criteria it examined in selecting Germany as the comparison market.

---

[8] For example, if the court were to follow Commerce's reasoning of selecting the appropriate third country based upon the volume of sales without considering the similarity of merchandise sold in both potential comparison markets (as seems to be suggested by Commerce's explanation), *then this approach could lead to the comparison of products that are either entirely dissimilar or dissimilar enough that all matches would be based upon constructed value rather than on a price to price basis after adjusting for DIFMER. This would run contrary to the logic of 19 C.F.R. § 351.404(e).*

*Viraj Forgings, Ltd. v. United States*, 350 F. Supp. 2d 1316, 1324 & n.8 (Ct. Int'l Trade 2004) (internal citation omitted) (emphasis added). The concern expressed by the CIT in *Viraj* is exactly what occurred here – a lack of robust identical comparisons between Prochamp's sales of preserved mushrooms in Germany and the United States. *See Attachment 1.*

The CIT's analysis of this issue and Commerce's determination appear to misunderstand the purpose of CONNUM-matching. Commerce's questionnaire plainly instructs the respondent to:

> Assign a control number to each unique product reported in the section B sales data file. *Identical products* should be assigned the *same control number* in each record in every file in which the product is referenced (e.g., products with identical physical characteristics reported in the foreign market sales file and the U.S. market sales file should have the same control number).

Appx00191 (emphasis added). In short, for a product to be considered "identical," it must be identical with respect to all physical characteristics.

Indeed, the statute sets forth a clear preference for matching a "foreign like product" that is "identical" to the merchandise sold in the United States for purposes of calculating dumping margins. 19 U.S.C. § 1677(16)(A) (identifying "merchandise which is identical in physical characteristics" as the first category of merchandise that Commerce should use for the "foreign like product"). Thus, the CIT's and Commerce's conclusion that the fact that "products sold in each of the third-country markets all appear to be *very similar*" supports selecting Germany as the comparison market is contrary to the statutory preference for "*identical*" merchandise and demonstrates that Commerce's determination is unsupported by substantial record evidence.

In addition, Commerce's and the CIT's reliance on the fact that products sold in each market are "similar" ignores that the product matching characteristics identified by the agency at the outset of its investigation are hierarchical. Prochamp's sales in Germany provided limited matches for the second most important characteristic – the net drained weight of the mushrooms in each container. In similar circumstances, Commerce has determined that a third-country comparison market in which there are greater similarities in product matching characteristics relative to U.S. sales is the more appropriate choice relative to a potential third-country comparison market that has a larger volume of sales than the alternative comparison market.

For example, in an antidumping investigation involving raw honey from Argentina, Commerce selected Japan as the third-country comparison market, even though the respondent had a higher volume of sales to Belgium and the respondent's sales to Belgium were "equally similar . . . in terms of four of the five product characteristics." Memorandum to Abdelali Elouaradia from Eva Kim re: *Less-Than-Fair-Value Investigation of Raw Honey from Argentina: Selection of Appropriate Third Country Market*, at 6-8 (Dep't Commerce Aug. 11, 2021) (ACCESS barcode: 4151668-01). In selecting Japan as the appropriate comparison market, Commerce specifically noted that based on the greater similarity of a single product characteristic, the respondent's "sales to Japan are more likely to yield more matches

to its U.S. sales than its sales to Belgium or France." *Id.* at 7. The same circumstances are present here. Commerce's weight of the evidence is contrary to the purpose of the comparison market selection, which involves identifying a country with sales that will match U.S. sales and yield accurate and reliable dumping margin calculations.[5] Thus, Commerce's and the CIT's reliance on the fact that that "products sold in each of the third-country markets all appear to be very similar," (Appx00046) is contrary to the statute's preference for "identical" merchandise, Commerce's administrative practice, and the record.

## B. Commerce and the CIT Failed to Account Appropriately for Commerce's Admittedly Erroneous Findings Regarding Sales Channels and Customer Types

In selecting Germany as the third-country comparison market, Commerce also relied on "Prochamp{'s} state{ment}" (*i.e.*, not documentary evidence or an evaluation of the record) that

> the sales channel and type of customer in Germany is the
> most similar to the sales channel and type of customer in
> the United States, as the sales in Germany and the United

---

[5] In some cases where Commerce's CONNUM includes many product characteristics, the agency may focus its data collection for purposes of its comparison market selection analysis on only a handful of those characteristics. In those circumstances, it may be appropriate for Commerce to weigh the volume of sales more heavily in selecting a comparison market, as complete information on available matches is not available to the agency. In this case, however, Commerce collected data on all six of the product characteristics and, therefore, its conclusion that a larger volume of German sales provides more robust data than the volume of French sales is simply wrong and cannot be considered reasonable, even under the substantial evidence standard of review.

States are made directly to unrelated customers, whereas in Israel and France, Prochamp sold the subject merchandise through an unaffiliated agent, which further supports the selection of Germany as the appropriate comparison market.

Appx03088. The record, however, does not support Commerce's reliance on Prochamp's statement – either at the time of the third-country selection or at the time of the agency's final determination.

Prochamp asserted in its response to the Commerce's Section A questionnaire that "Germany is the most appropriate third-country market for determining the normal value" because "the channel of export/distribution i.e. all sales are made to unaffiliated customers in both the countries." Appx00320. The record, however, demonstrates that Prochamp's German sales were unique and quite different from sales to the U.S. and all other markets.

In explaining how Prochamp identified the destination of its sales to the U.S. and third-country markets (other than Germany), Prochamp relied on "the destination port/port of delivery" as set forth on the commercial invoices. Appx00318. Prochamp, however, could not rely on this same methodology to identify its German sales because "the sales to Germany are mostly on Free Carrier (FCA) incoterms" and Prochamp delivered the merchandise in the Netherlands. *Id.* As a result, Prochamp relied on the customer's address and packaging of the product, instead of the port of destination, to identify its sales to the German market. *Id.*

Notably, in a supplemental questionnaire, Commerce instructed Prochamp to breakdown its sales to each market by channel of distribution – *i.e.*, retailer, reseller, or distributor.  Appx02552-02553.  This information could have yielded important information from which Commerce could have drawn conclusions about whether Prochamp's preserved mushrooms were sold for consumption in particular countries or were distributed to other countries for retail sale, but Prochamp withheld this information from Commerce and did not provide a response to Commerce's question. Appx02552-02553, Appx02562-02563.

Moreover, Prochamp delivered a substantial majority of claimed German sales to German Customer 1 in the Netherlands.  Appx04445-04452 (showing that [ # ] percent of Prochamp's sales were to German Customer 1 and marked with FCA sales terms).  German Customer 1 subsequently distributed these products to other countries, as Commerce verified.   Appx02875-02879, Appx05241-05242. These same circumstances do not apply to Prochamp's U.S. sales, which were both delivered to, and sold within, the United States.  Appx01284-01286.

In addition, despite Prochamp's initial claim that it did not use selling agents for its U.S. sales, Prochamp subsequently reported that it "pays commission{s} "to the selling Agent or Intermediaries" for sales made to certain of its customers. Appx01304.  As a result, the fact that Prochamp's sales in France are both direct to unaffiliated customers and through selling agents reflect greater similarities to

Prochamp's U.S. sales, which involve both channels, than to its German sales, which do not involve any selling agents. Prochamp reported its use of selling agents for its U.S. sales to Commerce on July 18, 2022 (Appx01304), more than a month before Commerce's third-country comparison market decision, which relied on Prochamp's incorrect statements that the sales channels for its U.S. sales were more similar to the sales channels for its German sales than to the sales channels for its sales in other third-country markets.

In its final determination, Commerce stated that its original reliance on Prochamp's statement concerning sales channels was

> not determinative, {} merely provided additional corroboration for the selection of Germany and the later revision did not result in the record supporting that another proposed third country market to be more similar than Germany with respect to sales channel and type of customer.

Appx05468. Moreover, in its response brief filed with the CIT, Commerce stated explicitly that the similarities and differences between Prochamp's sales channels in the various comparison markets were not relied on by the agency to support Commerce's selection of Germany. *See* Defendant United States' Opposition to Plaintiff's Rule 56.2 Motion for Judgment Upon the Agency Record, CIT Ct. No. 23-00133 (Jan. 22, 2024) at 55-56 (asserting that "Commerce's selection of Germany rests on other bases").

Commerce's admission to the CIT is significant because it clarifies that in selecting Germany as the comparison market, Commerce did not rely on Prochamp's self-serving statement that the German and U.S. sales channels were similar. Commerce's admission, however, presents an even greater problem that the CIT overlooked. Specifically, in *Giorgio I*, the CIT acknowledged Commerce's retraction of its statements regarding sales channels and customer types in a footnote that states:

> the agency agreed with {Giorgio} {} but explained that mistake was at most corroborative rather than determinative. As Commerce's balancing of product similarity versus sales volume was plainly dispositive, this asserted error was at most harmless.

Appx00048 at n.13.

The CIT's finding that Commerce's error is harmless ignores an important aspect of the error. While Commerce acknowledged that its initial finding regarding sales channels and customer types no longer favored selecting Germany, the agency never considered that the record established that U.S. and French channels and customer types were more similar, and that this factor supported selecting France as the comparison market. In short, Commerce and the CIT both appeared to consider this error harmless and the factor neutral after Commerce disclaimed its initial finding. To the contrary, however, the factor was not neutral and instead supported the selection of France as the most appropriate comparison market. The record

established that France provides matches for the primary CONNUMs that Prochamp sold in the United States at much greater volumes than Germany *and* has sales channels and customer types that are more similar to Prochamp's U.S. sales channels and customer types.

### C. The Record Does Not Support Prochamp's Reported Volume of Preserved Mushroom Sales in Germany

In selecting Germany as the third-country comparison market, Commerce also rejected Giorgio's argument that Prochamp's reported volume of sales to Germany was not reliable. Appx03089. Specifically, Commerce stated that "there is no record evidence that sales to Germany were not consumed in the German market." *Id.* Commerce's statement was wrong at the time it selected Germany as the third-country market, and Commerce confirmed as much during its on-site verification.

After Prochamp revised its reported volume of preserved mushroom sales to Germany downward twice, reducing the reported sales volume by nearly half, the record still demonstrated that even Prochamp's revised, claimed volume of sales to Germany remained overstated. In particular, Commerce's sales verification report confirmed that Prochamp treated its sales to German Customer 1 as sales to Germany, but

> Prochamp has no actual knowledge of the eventual destination of the product within {German Customer 1}'s own distribution chain, or that it even left the Netherlands,

much less where the product was sold for retail and ultimately consumed.

Appx05241.  Commerce officials also verified that while

> virtually all [ country ] language labels for {German Customer 1's} [ brand name ] brand contained a label code identifying the product as [ country code ], thus identifying that the label was intended for [ country ]-language retail display in either the [ countries ] market. Therefore, the label alone did not distinguish sales intended for the [ country ] market from those going to the [ country ] market.

*Id.*  In addition, Commerce officials also identified certain sales that were unambiguously sold to another country and, thus, were wrongly treated by Prochamp as sales to Germany.  Appx05242.

Giorgio identified these same issues in comments submitted to Commerce on August 31, 2022, based on information Prochamp submitted to Commerce prior to the agency's selection of Germany as the third-country comparison market. Appx03092-03096.  Thus, Commerce's statement in the third-country selection memorandum that "there is no record evidence that sales to Germany were not consumed in the German market," was (and is) wrong.  Appx03089.

In *Giorgio I*, the CIT agreed that Commerce's determination was not supported by substantial evidence.  The CIT faulted Commerce for its assumption that "a multinational retailer that received Prochamp's mushrooms outside of Germany ultimately resold *all* of them in that country," when the record indicated

that the retailer's purchases may have been sold to consumers outside of Germany and did not contain the actual volume of German sales. *Giorgio Foods I*, Slip Op. 24-79 at 20 (Appx00050) (emphasis in original). The CIT remanded Commerce's final determination and directed the agency to reconsider "its finding that Prochamp sold a 'significantly larger overall quantity' of mushrooms in 'the German market' than in France or Israel." Appx00060 (Order at 1, July 17, 2024, ECF No. 44); *see also Giorgio Foods I*, Slip Op. 24-79 at 19-21 (Appx00049-00051).

As addressed above, Commerce reopened the record on remand and identified new information that the agency relied on to estimate the volume of Prochamp's sales for consumption in Germany. In *Giorgio II*, the CIT found that Commerce's "estimate" of preserved mushrooms sold for consumption in Germany "was purposely conservative," and that Commerce's remand determination "provided a 'better explanation' that move{d} its decision out of the realm of 'mere speculation.'" *Giorgio II*, Slip Op. 25-90 at 10 (Appx00109).

Contrary to the CIT's decision in *Giorgio II*, the additional information Commerce and Prochamp placed on the record on remand, namely (1) the number of stores operated by German Customer 1 in Germany and Austria, (2) information on the population of Germany and Austria, (3) data on German and Austrian fresh mushroom consumption, and (4) correspondence between Prochamp and its customers, does not answer the question Commerce sought to answer – what

quantity of Prochamp's preserved mushrooms were sold or offered for sale in Germany. In Germany, unlike other markets, Prochamp made sales "mostly on Free Carrier (FCA) incoterms" and delivered merchandise in the Netherlands. Appx00318. Of Prochamp's reported German sales, [ # ] percent were to German Customer 1, and all were marked with FCA sales terms. Appx04445-04452. Although preserved mushrooms may be sold or offered for sale in German Customer 1's stores located in both Germany and Austria, Commerce's *Remand Redetermination* commits a logical error by generalizing the number of German Customer 1's stores to the quantity of Prochamp's preserved mushrooms sold or offered for sale to German Customer 1 in Germany and Austria, when Austrian stores may stock preserved mushrooms in higher quantities compared to German ones and *vice versa*. Significantly, the record contains no information on the volume of preserved mushroom consumption in either country, and Commerce simply extrapolated based on information concerning fresh mushroom consumption. Likewise, and for the same reason, Commerce erred in generalizing population and fresh mushroom consumption data to German Customer 1's sales of *preserved* mushrooms in those two countries.[6] Commerce's simplistic calculation that the

---

[6] Further, actual consumption is not the lodestar of 19 U.S.C. § 1677b(a)(1)(B)(ii). The statute refers to the country in which product is "sold" or "offered for sale" for consumption. *Id.*

volume of mushrooms sold by Prochamp to German Customer 1 is "approximately ten percent" of the total sales of German-labeled mushrooms rests on inconclusive information and a faulty premise.

The e-mail correspondence from Prochamp's German Customers 1 and 2 is similarly inconclusive. Appx05856-05858, Appx05873-05879. The correspondence does not establish any timeframe for these sales and are generally too vague to establish the volume of Prochamp's sales during the period of investigation that were sold for consumption in Germany. *Id.*

Commerce *is* correct that, absent "downstream distribution and sales information," quantification of Prochamp's sales or offers for sale for consumption in Germany is not possible, given the nature of Prochamp's sales into that market (*i.e.*, "mostly" FCA sales). Appx00083. Commerce is incorrect, however, that requiring such information sets an "unrealistic standard," when Commerce's regulations *also* direct the agency to consider product similarities, volumes of sales, and other factors in selecting between third-country market data. Appx00086; 19 C.F.R. § 351.404(e). The CIT overlooked Commerce's errors and should have concluded that the record remains devoid of information regarding the downstream distribution activities of German Customer 1 and rejected Commerce's approximation of the volume of mushrooms sold by Prochamp to German Customer 1 as speculative and not supported by substantial evidence. *See OSI Pharms., LLC*

*v. Apotex Inc.*, 939 F.3d 1375, 1382 (Fed. Cir. 2019) ("'Mere speculation' is not substantial evidence.'") (quoting *Intell. Ventures I LLC v. Motorola Mobility LLC*, 870 F.3d 1320, 1331 (Fed. Cir. 2017)).

Even if Commerce's approximated volume of Prochamp's German sales is reasonable, the smaller volume of German sales identified in the remand redetermination further demonstrates that the difference in sales volumes between the French and German markets does not outweigh the much greater percentage of identical matches between preserved mushrooms that Prochamp sold in the United States and France, as well as the more similar French and U.S. sales channels and customer types.

Lastly, contrary to Commerce's implications in the *Remand Redetermination*, the same issues that undermine the reliability and appropriateness of the German comparison market data are not present in the French data. Appx00079. Although some of Prochamp's sales to German Customer 1 had country codes NL/BE indicating sales to the "Netherlands" or "Belgium," not "France," only [ # ] percent of the volume reflected on purchase orders identified those country codes. Appx02880-02884. On the other hand, [ # ] percent of Prochamp's sales has the product codes DE/AT, indicating potential sales for consumption in Austria or Germany. Appx02875-02879. While Prochamp made sales to Germany largely under the FCA incoterm, its sales to France were sold to end users and through

selling agents. Appx00879. Because of this difference in commercial terms, Prochamp has more insight into the downstream distribution of its preserved mushrooms in the French market than its sales in Germany, and Commerce was in a position to more precisely identify those sales to France for purposes of selecting a comparison market.[7] As such, the record establishes that French comparison market data do not suffer from the same problems as the German sales database.

### D. Commerce's Selection of Germany Is Not Insulated from Challenge During an Administrative Proceeding or Judicial Review

The agency's selection of a comparison market for determining normal value is not insulated from reconsideration when new facts or arguments are presented during administrative proceedings – or from subsequent judicial review after the conclusion of the administrative proceedings. Giorgio challenged Commerce's selection of Germany as the most appropriate comparison market on four separate occasions during the administrative proceedings: (1) immediately after the agency announced its decision to rely on Germany as the comparison market (Appx03092-03101), (2) approximately one month later, in comments filed in advance of

---

[7] Indeed, there is no evidence that sales of French-labeled products to a Monaco-based company (as indicated by the suffix SAM or Société Anonyme Monégasque) and to French Overseas Territories were consumed other than in France. Setting aside that Commerce identified no evidence that French-labeled sales to a Monaco-based company were not consumed in France, the total volume of these sales is only **[ # ]** percent of the volume reflected on purchase orders. Appx02880-02884.

Commerce's preliminary determination (Appx04294-04301), (3) again after Commerce's preliminary determination, Giorgio urged Commerce to verify factual information submitted by Prochamp related to the comparison market selection factors – and in particular the volume of sales that Prochamp claims to have sold in Germany during the period of investigation (Appx04587-04590), and (4) in Giorgio's administrative case brief. Appx05341-05346.

Commerce's claim that Giorgio failed to identify an "appropriate remedy" in its case brief challenging Commerce's selection was entirely of the agency's own making – and not for a lack of Giorgio exhausting its administrative remedies. At any time during the administrative proceedings, Commerce could have instructed Prochamp to submit a database identifying Prochamp's sales for consumption in France to preserve the issue for reconsideration following the agency's preliminary determination. Commerce, however, chose not to do so, contrary to Giorgio's multiple requests that the agency gather from Prochamp information on its sales of preserved mushrooms in other potential comparison markets.

The applicable standard of review requires the CIT and this Court to "hold unlawful any determination, finding, or conclusion" that is "unsupported by substantial evidence on the record." 19 U.S.C. § 1516a(b)(1)(B)(i). The record includes "a copy of all information presented to or obtained by" Commerce "during the course of the administrative proceeding." 19 U.S.C. § 1516a(b)(2)(A)(i).

Commerce cannot limit the Court's authority to review a decision by claiming the existence of an established practice to issue a decision early in the administrative proceeding. The agency's findings of fact must be supported by substantial evidence, including evidence that fairly detracts from those findings, regardless of when that evidence came before the agency during the investigation. *See NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995) ("preliminary determinations are 'preliminary' precisely because they are subject to change.") (quoting *Civil Aeronautics Bd. v. Delta Air Lines, Inc.,* 367 U.S. 316, 321 (1961)); *see also Shenzhen Xinboda Indus. Co. v. United States*, Consol. Ct. No. 16-00116, Slip Op. 2017-160 at 19-20, 2017 Ct. Intl. Trade LEXIS 166, at *24-25 (Dec. 5, 2017).[8]

---

[8]    *Stupp I* and *Stupp II* also do not support Commerce's claim of the existence of an established practice that the agency is not required to revisit a comparison market selection. Appx05467 (citing *Final Results of Redetermination Pursuant to Court Remand; Stupp Corporation et al. v. United States*, Consol. Court No. 15-00334 (Dep't Commerce May 2, 2019) and *Final Results of Redetermination Pursuant to Court Remand; Stupp Corporation et al. v. United States*, Consol. Court No. 15-00334 (Dep't Commerce Jan. 14, 2020)). The CIT rejected Commerce's explanation in *Stupp I Remand* that it is required to determine home market viability early in the proceeding, noting that Commerce itself has recognized that although it would prefer to decide whether a respondent's home market is viable early in the proceeding, it may sometimes need to delay or reconsider its determination. *Stupp Corp. v. United States*, 413 F. Supp. 3d 1326, 1332 (Ct. Int'l Trade 2019) *("Stupp I")* (citing *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,358 (Dep't Commerce May 19, 1997)). The CIT also explained that "it would be unreasonable for Commerce to refuse to revisit its viability determination when it determines that the components of its prior determination were incorrect" and that "{f}ailing to reconsider viability in such cases would render judicial review meaningless." *Id.* Thus, the CIT rejected Commerce's explanation that it can ignore new facts that

(cont'd on next page)

In *Giorgio I*, the CIT acknowledged "the Department's stated reluctance {}
to revisit" its comparison market selection in its final determination, but essentially
held that any error Commerce committed was harmless because "the agency went
ahead—even if grudgingly {}—and *did* reconsider that conclusion on the merits."
Appx00045 (emphasis in original). Contrary to the CIT's analysis, however,
Commerce explicitly stated in its final decision memorandum that "Commerce is not
revisiting its comparison market viability determination for Prochamp, consistent
with {its} practice." Appx05467. Commerce's final decision memorandum merely
claims that several aspects of its initial selection of Germany were "not
determinative" and then asserts that the volume of German sales supports the
selection of Germany as the comparison market.

Regardless of whether this Court considers Commerce's analysis in the final
determination to constitute a reconsideration – or simply a continuation of
Commerce's initial selection, as discussed above, the agency's decision was not
supported by substantial evidence at the time the agency selected Germany, nor is it
presently supported by substantial evidence.

---

undermine an earlier determination due to the agency's preference for deciding early
in the proceeding.

## II.    CONCLUSION AND RELIEF SOUGHT

For the reasons discussed above, Giorgio respectfully urges this Court to determine that the Commerce's final determination, the CIT's opinion and order in *Giorgio I*, Commerce's *Remand Redetermination*, and the CIT's opinion and order *Giorgio II* are not supported by substantial evidence and are not otherwise in accordance with law.  Giorgio, therefore, urges this Court to remand Commerce's final determination and the *Remand Redetermination* with instructions to reconsider its determination as set forth above, and to instruct the Commerce Department to collect data on Prochamp's French sales.

Respectfully submitted,

/s/ John M. Herrmann
JOHN M. HERRMANN
PAUL C. ROSENTHAL
JOSHUA R. MOREY
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, DC 20007
(202) 342-8400

Counsel to Giorgio Foods, Inc.

Dated: November 10, 2025

# ATTACHMENT 1

**THE CONFIDENTIAL ATTACHMENT IS NOT SUSCEPTIBLE TO SUMMARIZATION AND THEREFORE IS NOT PROVIDED WITH THIS NONCONFIDENTIAL VERSION**

**ADDENDUM**

| Tab No. | Description | ECF/Record No. | Bates Range |
|---|---|---|---|
| 1 | *Giorgio Foods, Inc. v. United States*, Slip Op. 24-79 (July 17, 2024) | ECF No. 43 | Appx00031-00059 |
| 2 | Remand Scheduling Order (July 17, 2024) | ECF No. 44 | Appx00060-00061 |
| 3 | *Final Results of Redetermination Pursuant to Court Remand; Giorgio Foods, Inc. v. United States*, Ct. No. 23-00133 (Dep't Commerce Nov. 14, 2024) | RPR 10, RCR 6 | Appx00062-00098 |
| 4 | Judgment (July 16, 2025) | ECF No. 65 | Appx00099 |
| 5 | *Giorgio Foods, Inc. v. United States*, Slip Op. 25-90 (July 16, 2025) | ECF No. 66 | Appx00100-00112 |
| 6 | *Memorandum from USDOC, Re: Less-Than-Fair-Value Investigation of Certain Preserved Mushrooms from the Netherlands: Selection of Appropriate Third Country Market* (Aug. 26, 2022) | PR 121, CR 75 | Appx03084-03090 |

# ADDENDUM

**TAB 1**

**<u>Giorgio Foods, Inc. v. United States</u>, Slip Op. 24-79 (July 17, 2024)**

**Appx00031-00059**

**Slip Op. 24-79**

**UNITED STATES
COURT OF INTERNATIONAL TRADE**

**Court No. 23-00133**

GIORGIO FOODS, INC.,

*Plaintiff,*

v.

UNITED STATES,

*Defendant,*

and

PROCHAMP B.V.,

*Defendant-Intervenor.*

Before: M. Miller Baker, Judge

**OPINION**

[The court sustains Commerce's final determination in part and remands for further proceedings.]

Dated: July 17, 2024

*John M. Herrmann*, *Paul C. Rosenthal*, and *Joshua R. Morey*, Kelley Drye & Warren LLP, Washington, DC, on the briefs for Plaintiff.

*Brian M. Boynton*, Principal Deputy Assistant Attorney General; *Patricia M. McCarthy*, Director; *Tara K. Hogan*, Assistant Director; and *Daniel Bertoni*, Trial Attorney, Commercial Litigation Branch, Civil

Division, U.S. Department of Justice, Washington, DC, on the brief for Defendant. Of counsel for Defendant was *Alexander Fried*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, Washington, DC.

*Lizbeth R. Levinson*, *Brittney R. Powell*, and *Alexander D. Keyser*, Fox Rothschild LLP, Washington, DC, on the brief for Defendant-Intervenor.

*Baker*, Judge: In this case, a domestic producer challenges the Department of Commerce's finding that a Dutch competitor did not dump mushrooms in the U.S. market. For the reasons explained below, the court sustains that determination in part and remands for reconsideration in part.

## I

In an antidumping investigation, Commerce must determine whether imported goods are sold in the United States at "less than fair value." 19 U.S.C. § 1677b(a). The Tariff Act of 1930, as amended, directs the Department to measure "fair value" by making a "fair comparison" between the "export price or constructed export price and normal value." *Id.*

"Normal value" is at issue here. In most antidumping duty cases, that term refers to, in relevant part, "the price at which the foreign like product is first sold . . . *for consumption* in the exporting country."

*Id.* § 1677b(a)(1)(B)(i) (emphasis added). In other words, the agency must calculate the sales price to consumers in the home market. *See Smith-Corona Grp. v. United States*, 713 F.2d 1568, 1573 (Fed. Cir. 1983) (explaining that "[t]he home market sales method is preferred" for ascertaining normal value).

When there are no home-market sales or if such transactions amount to less than five percent of the product's purchases in the United States, 19 U.S.C. § 1677b(a)(1)(C)(i)–(ii), Commerce uses an alternative method to determine normal value. In those circumstances, the Department will examine "the price at which the foreign like product is . . . sold (or offered for sale) *for consumption*" in a third country, *id.* § 1677b(a)(1)(B)(ii) (emphasis added), subject to various conditions, *see id.* § 1677b(a)(1)(B)(ii)(I)–(III).[1]

The statute does not speak to what happens if more than one country satisfies those conditions. A regulation provides that in such cases, Commerce "generally will select the third country based on" certain "criteria." 19 C.F.R. § 351.404(e). The Department weighs product similarity, *id.* § 351.404(e)(1), sales volume,

---

[1] If Commerce finds that no third country provides an appropriate comparison market, it may determine normal value using "constructed value." *See id.* § 1677b(a)(4); *see also* 19 C.F.R. § 351.405.

*id.* § 351.404(e)(2), and "[s]uch other factors as . . . appropriate," *id.* § 351.404(e)(3).[2]

---

[2] The CIT has previously construed 19 C.F.R. § 351.404(e) as having "a descending hierarchy of criteria from which Commerce must select the appropriate third country comparison market." *Viraj Forgings, Ltd. v. United States*, 350 F. Supp. 2d 1316, 1324 (CIT 2004). The court respectfully disagrees. That the regulation merely contains a "seriatim," *id.*, list of relevant considerations does not imply any ranking. To the contrary, the prefatory language—"generally will select based on"—suggests a balancing of factors rather than any hierarchy.

Indeed, the CIT's earlier decision in the same litigation recognized that the regulation directs the agency to weigh the enumerated benchmarks: "The comments to the 1997 regulations in *Antidumping Duties; Countervailing Duties*, 62 Fed.Reg. 27,296, 27,358 (May 19, 1997), explain that '. . . not all of the three criteria [in 19 C.F.R. § 351.404(e)] need be present in order to justify the selection of a particular market, and . . . *no single criterion is dispositive*.'" *Viraj Forgings, Ltd. v. United States*, 283 F. Supp. 2d 1335, 1344–45 (CIT 2003) (emphasis in original). Thus, "Commerce is not required to choose the appropriate comparison market *solely* because the goods are identical, any more than it is required to choose the appropriate comparison market *solely* because the market is the largest available." *Id.* at 1345 (emphasis in original). As this case illustrates, the Department might reasonably conclude in certain circumstances that substantially greater sales volume (or some other relevant consideration) may outweigh marginal differences in product similarity.

As with other aspects of its investigation, in determining a suitable third-country comparison market, Commerce has no subpoena power. To "deter[] . . . noncompliance" with agency data requests, the statute authorizes the Department to impose a "built-in [tariff] increase" in certain circumstances. *F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000). When either "necessary information is not available on the record," 19 U.S.C. § 1677e(a)(1), or an interested party withholds requested information, fails to provide it by the applicable deadline or in the form and manner requested, significantly impedes the proceeding, or provides information that cannot be verified, *id.* § 1677e(a)(2), the agency "shall, subject to [19 U.S.C. § 1677m(d)], use the facts otherwise available" to make its determination, *id.* § 1677e(a). In short, if any one of these specified conditions exists, and as qualified by § 1677m(d),[3] the agency must look beyond the information provided by the respondent. Only *if* Commerce does so, and if it also finds that the interested party failed to cooperate to the best of its ability, may the Department opt to apply an adverse inference in

---

[3] This provision requires notice and an opportunity to cure in certain circumstances. *See* 19 U.S.C. § 1677m(d).

selecting from the facts otherwise available. *Id.* § 1677e(b)(1)(A).[4]

## II

At the request of Giorgio Foods, Inc., a domestic producer, Commerce opened an antidumping investigation into mushrooms[5] imported from the Netherlands. Appx10555–10559. The Department selected Prochamp B.V., one of that country's two largest exporters to the United States, as a mandatory respondent. Appx1691.

---

[4] Litigants and the agency often blur together this two-step process of applying facts otherwise available with an adverse inference by using the shorthand "adverse facts available" or "AFA." *See, e.g., Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1336–39 (CIT 2020).

[5] Adopting agency bureaucratese, the parties refer to mushrooms as "CPMs," jargon not generally known by the trade bar, much less educated lay readers. The court again reminds litigants that plain English is easier to read—and thus more persuasive, presumably the intended goal—than "obscure acronyms . . . *made up for a particular case . . . .*" *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1321 (D.C. Cir. 2014) (Silberman, J., concurring) (emphasis added); *cf. AsymaDesign, LLC v. CBL & Assocs. Mgmt., Inc.*, 103 F.4th 1257, 1261 (7th Cir. 2024) (Easterbrook, J.) ("Judges are long-term consumers of lengthy texts. To present an argument to such people, counsel must make the words easy to read and remember.").

As relevant here, the agency's questionnaire asked Prochamp to disclose six product characteristics, one of which was net drained weight. Appx10899–10902. It also instructed the company to report its home-market and foreign sales. Appx10754–10756. If the former were less than five percent of its U.S. transactions, the company was to contact the Department within 14 days. Appx10755.

Almost three weeks after that deadline, Prochamp informed Commerce that its home-market sales were below that five percent threshold and submitted data for what it said were its largest third-country markets—in alphabetical order, France, Germany, and Israel. Appx1735. The company urged the Department to select Germany as the comparison market. Appx1707.

Giorgio argued that France was the most appropriate comparison market because Prochamp's exports to that country most closely resembled those sold in the U.S. The American company also maintained that its Dutch competitor's reporting of German sales was unreliable. Appx2610–2614.

Early in its investigation, Commerce chose Germany. Appx1000. In doing so, it explained that its "practice is to consider all of the criteria under 19 CFR 351.404(e) when determining the appropriateness of a third-country comparison market." Appx1002. "If all

other factors are equal," the Department will "select the largest third-country market by volume." *Id.*

Regarding the regulation's first factor, product similarity, Commerce found that the mushrooms exported to all three candidate countries were identical as to three of the six relevant physical characteristics and very similar with respect to two others. Appx1003–1004. As for the remaining attribute, "the products sold in France are the *most similar* to [those] sold in the United States in terms of net drained weight." Appx1003 (emphasis added).[6] But weighing all six criteria, "the record reflects that the products sold in each

---

[6] Commerce inexplicably treated identical information as confidential on the next page of its memorandum. *See* Appx1004 ("[W]e find that Prochamp's sales to France have the [[most similar product weights]] to match with U.S. sales.") (double-bracketed words redacted in original). The court fails to see how such a relative comparison qualifies as "business proprietary information" under the relevant agency regulation. *See* 19 C.F.R. § 351.105(c). And even if this comparison otherwise so qualified, the Department waived the protection by disclosing it on the preceding page. *Cf. Jiangsu Alcha Aluminum Co. v. United States*, Ct. No. 22-00290, Slip Op. 24-77, at 6 n.3, 2024 WL 3372922, at *2 n.3 (CIT July 11, 2024) (noting that parties can "waive[] any confidentiality claim by referring to [assertedly business proprietary information] in their public briefs and in open court") (citing Fed. Cir. R. 25.1(c)). This opinion therefore does not treat the agency's comparison of product similarity as confidential.

of the third-country markets all appear to be very similar" to the mushrooms sold in the U.S. Appx1004.

As to the regulation's second factor, sales volume, Commerce determined that Prochamp sold a "[[significantly larger]] overall quantity"[7] of mushrooms in "the German market" than in France or Israel. *Id.* Balancing the first two regulatory criteria, the Department found that the "slight difference in product weights" favoring France did not offset the greater German sales. *Id.*

Finally, the Department rejected Giorgio's objections to Prochamp's German sales data, which were preponderantly based on sales to a single multinational retailer. The American company complained that its Dutch competitor wrongly proffered product

---

[7] Commerce redacted the double-bracketed words from its public decision, but the court declines to do so because a mere comparison does not qualify as business proprietary information. *See* note 6. Moreover, "[t]he public's right of access to judicial records is a fundamental element of the rule of law." *Binh Hoa Le v. Exeter Fin. Corp.*, 990 F.3d 410, 417 (5th Cir. 2021) (quoting *In re Leopold*, 964 F.3d 1121, 1123 (D.C. Cir. 2020)). It does not matter that the parties agreed to seal information ineligible for such protection from disclosure because "courts are duty-bound to protect public access to judicial proceedings and records." *Id.* As with product similarity, this opinion does not treat the Department's comparison of relative sales volume as confidential.

label language (German) and the customer's corporate address (the same) as support for evidence of sales *to consumers* in Germany.[8] Appx1005. Dismissing those concerns, Commerce found no indication that mushrooms sold to the retailer were not in turn resold to German consumers. *Id*.[9]

At verification, however, the Department concluded that Prochamp's sales to a multinational German retailer did not necessarily translate into *consumer* purchases in that country. Appx10073–10074. In particular, the agency found that the mushrooms were delivered to the retailer's warehouse *outside* of Germany, Appx10071–10072, and "[t]he documentation confirmed that" Germany and one *other* Deutsch-speaking country "are the likely countries of consumption but did not offer information to disambiguate the two," Appx10073. But Commerce assessed that, despite a few discrepancies, its review "did not generally conflict with Prochamp's assertion that the identification of German language label products sold to German [retailer] customers was the best possible way to

---

[8] Outside of Deutschland, German is an official language of Austria, Belgium, Liechtenstein, Luxembourg, and Switzerland. *See* https://worldpopulationreview.com/country-rankings/german-speaking-countries.

[9] Commerce also found that Germany had the "most similar channel of distribution and customer type when compared to the French and Israeli markets," Appx1004–1005, "which further support[ed]" the agency's choice, Appx1004.

identify products likely to be" purchased by consumers in that country. Appx10073.

In its final determination, Commerce found that "the record continue[d] to support [its] selection of Germany as the appropriate third country market . . . ." Appx1081; *see also* Appx1082 ("[W]e do not find that the record as further developed compels reconsideration of our finding that the products sold in Germany are sufficiently comparable to the products sold in the United States . . . , and Germany provides the most robust data when compared to the French and Israeli markets.").[10]

Regarding product similarity, the Department found that the difference in weight—one of the six relevant attributes—between Prochamp's French and German exports (with the former more closely resembling the company's U.S. sales) was not "determinative." Appx1082. That difference did "not conflict with the conclusion that the record reflects that the products sold in each of the third-country markets for this

---

[10] Before doing so, the agency took a swipe at Giorgio's persistence in challenging the selection of Germany, asserting that "reconsideration would [not] be administrable at the final stage of this investigation even if Commerce were to agree that the basis for this initial determination was unsupported." Appx1081.

characteristic all appear to be very similar" to the mushrooms sold to American customers. *Id.*

As to whether Prochamp's German sales exceeded those in France and Israel, the Department acknowledged that the company's database only showed sales to a multinational retailer that could just as easily have been "distributed to other German-speaking countries for final consumption." Appx1064. Thus, the actual number of sales to consumers in Germany was unknowable. Even so, the company cooperated with the investigation and could not provide any more specific information about the end destination of mushrooms sold to the retailer. *Id.* And there was no evidence that "suggested German consumption was unlikely or more likely in a non-German market." Appx1064. As a result, "the German market . . . offer[ed] the largest and most robust database from which to determine [normal value]." Appx1082.[11]

_____

[11] The Department also acknowledged that the record as further developed "did not support" its earlier conclusion that Prochamp's sales channels and customer type in Germany buttressed the selection of that country. Appx1082; *see also* note 9. All the same, "this additional finding was . . . not determinative, and merely provided additional corroboration for the selection of Germany." Appx1082. The revised record did not suggest "that another proposed third country market [was] more similar than Germany with respect to sales channel[s] and type of customer." *Id.*

Finally, Commerce declined Giorgio's request to apply facts otherwise available with an adverse inference as to Prochamp's reporting of financial information and third-country sales. As to the former, the Department found that Dutch law exempted the company—a member of a corporate family—from preparing stand-alone statements. Appx1051. Consequently, the agency could not "fault Prochamp for not providing a document that it does not have, nor was it obligated to have." *Id*. Similarly, Commerce refused to criticize the company for not providing internal financial statements, reasoning that they were not created using generally accepted accounting principles and in any event were consistent with the parent's statements. *Id*.

As to third-country sales, Commerce found that there were a few discrepancies in Prochamp's reporting, but the company corrected them and cooperated with all supplemental information requests. Appx1059. Regarding the tardiness in notifying the agency that the company's home-market sales fell below the statutory threshold, the Department explained that it was excusable because the company may not yet have "resolve[d] the issue" of such sales. Appx1060. In any event, the failure to make that notification did not impede the investigation. *Id*.

For the foregoing and other reasons, Commerce ultimately assigned Prochamp a dumping rate of zero. Appx1272.

### III

Invoking jurisdiction conferred by 28 U.S.C.
§ 1581(c), *see* ECF 10, ¶ 2, Giorgio brought this suit
under 19 U.S.C. §§ 1516a(a)(2)(A)(i)(II) and (a)(2)(B)(i)
to challenge Commerce's final determination, *see id.*
Prochamp intervened to support the government.
ECF 17. Giorgio then moved for judgment on the
agency record (ECF 25); the government (ECF 28) and
Prochamp (ECF 34) opposed, and Giorgio replied
(ECF 37). The court decides the motion on the papers.

In § 1516a(a)(2) actions such as this, "[t]he court
shall hold unlawful any determination, finding, or con-
clusion found . . . to be unsupported by substantial ev-
idence on the record, or otherwise not in accordance
with law." 19 U.S.C. § 1516a(b)(1)(B)(i). That is, the
question is not whether the court would have reached
the same decision on the same record—rather, it is
whether the administrative record as a whole permits
Commerce's conclusion.

> Substantial evidence has been defined as more
> than a mere scintilla, as such relevant evidence
> as a reasonable mind might accept as adequate
> to support a conclusion. To determine if substan-
> tial evidence exists, we review the record as a
> whole, including evidence that supports as well
> as evidence that fairly detracts from the sub-
> stantiality of the evidence.

*Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (cleaned up); *see also SSIH Equip. S.A. v. U.S. Int'l Trade Comm'n*, 718 F.2d 365, 382 (Fed. Cir. 1983) (if the Department makes a choice between "two fairly conflicting views," the court may not substitute its judgment even if its view would have been different "had the matter been before it *de novo*") (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

## IV

Giorgio accuses Commerce of two administrative law sins, one of commission and the other of omission. First, the company argues that the Department's selection of Germany as the comparison market is not supported by substantial evidence. ECF 25, at 2–3. Second, it asserts that the agency's refusal to apply facts otherwise available with an adverse inference to Prochamp suffers from the same defect. *Id.* The court addresses each charge in turn.

### A

In challenging Commerce's choice of Germany, Giorgio first attacks the Department's stated reluctance (*see* Appx1081) to revisit that finding in its final determination. *See* ECF 25, at 35–41. But the agency went ahead—even if grudgingly, *see* note 10—and *did* reconsider that conclusion on the merits. *See*

Appx1081–1082. Thus, the company's quarrel is with its own strawman.

Giorgio next assails Commerce's initial finding that the "slight difference in product weights" that supported using France as the comparison market did not "outweigh[] the significantly larger overall quantity" of such mushrooms "sold to the German market." Appx1004. *See* ECF 25, at 44–47. The American company asserts that the agency's conclusion that the difference in product weights was slight is "clearly erroneous," *id.* at 46, and "no reasonable mind could reach the Department's conclusion" that Prochamp's German sales "outweighed [the] differences in product characteristics," *id.* at 46–47.

Giorgio's argument fails. To begin with, the company reads the agency's decision out of context. Commerce found

> that Prochamp's sales to France have the most similar product weights to match with U.S. sales. Nevertheless, the record reflects that the products sold in each of the third-country markets *all appear to be very similar* to the [merchandise under consideration]. Thus, we do not find that the slight difference in product weights outweighs the significantly larger overall quantity of [merchandise under consideration] sold to the German market.

Appx1004 (emphasis added). The second sentence is key. Given that the Department found that five of the six relevant characteristics were identical or nearly so, Appx1003–1004, it apparently (and reasonably) concluded that *on balance* the products sold in all three markets were very similar. *Cf. Commc'ns Workers of Am. Local 4123 ex rel. Former Emps. of AT&T Servs., Inc. v. U.S. Sec'y of Labor*, 518 F. Supp. 3d 1342, 1351 (CIT 2021) (stating that a court "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned") (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).

Giorgio also asks the court to second-guess Commerce's balancing of product likeness with sales volume. Given that weight was only one of six relevant product characteristics, the Department reasonably determined that the significantly larger volume of German sales—assuming for the moment the reliability of that data—more than offset the *overall* slight difference in product similarity that pointed toward using France as a comparison market.[12] That the court might reach a different conclusion were it weighing

---

[12] Giorgio further attacks Commerce's decision to stick with Germany as the comparison market by essentially rehashing its critique of the agency's initial choice. *See* ECF 25, at 47–49. Those attacks fail for the same reason.

the evidence de novo does not permit it to substitute its own judgment for the agency's.[13]

Giorgio's final swing at Commerce's choice of comparison market is that even if the Department otherwise properly weighed the competing considerations of product similarity and sales volume, inconclusive German data compromised that balancing. ECF 25, at 54–56. As described above, most of Prochamp's ostensible "German" sales were to a multinational retailer, which received them at a warehouse outside of that country. Appx10071–10072. From there, the agency found that the mushrooms "likely" made their way to retail outlets in Deutschland and one other country, but it was impossible to determine the relative apportionment between the two. Appx10073. It's thus unknown the extent to which mushrooms sold to that retailer were in turn resold *in Germany* for consumption. *Cf.* 19 U.S.C. § 1677b(a)(1)(B)(ii) (requiring the Department to examine "the price at which the foreign like

---

[13] Giorgio also claims the record does not support the Department's characterization of Prochamp's sales channels and customers in its initial choice of Germany. ECF 25, at 50–54. As described above, the agency agreed with the company, *see* note 11, but explained that mistake was at most corroborative rather than determinative. *Id.* As Commerce's balancing of product similarity versus sales volume was plainly dispositive, this asserted error was at most harmless.

product is . . . sold (or offered for sale) *for consumption*" in the third country) (emphasis added).[14]

The government admits that Prochamp's "German" sales data are inconclusive, ECF 28, at 56–58, but appears to contend—echoing the Dutch company—that because the retailer was German-based, "it was reasonable to consider it a German sale." *Id*. at 57. Moreover, "there was no other information that would have allowed for more accurate identification of sales likely consumed in Germany." *Id*. at 58 (citing Appx10074). And insofar as Prochamp's German sales records are unreliable because of the absence of any basis on which to apportion the retailer's resales in Germany and another country, the government adds, its French sales data are plagued by the same issue. *Id*.[15]

Houston, we have a problem: "Congress has not authorized the [Department] to exercise its [Tariff Act] powers based on speculation, conjecture, divination, or anything short of factual findings based on substantial evidence." *Fla. Gas Transmission Co. v. FERC*, 604 F.3d 636, 641 (D.C. Cir. 2010); *see also OSI Pharms., LLC v. Apotex Inc.*, 939 F.3d 1375, 1382 (Fed. Cir.

---

[14] What matters is not where a product is ultimately consumed, but the country in which the product is "sold or offered for sale for consumption." 19 U.S.C. § 1677b(a)(1)(B)(ii).

[15] For its part, Prochamp is conspicuously silent on the issue of the reliability of its "German" sales data.

2019) ("'Mere speculation' is not substantial evidence.") (citing *Intell. Ventures I LLC v. Motorola Mobility LLC*, 870 F.3d 1320, 1331 (Fed. Cir. 2017)). Here, Commerce simply assumed that a multinational retailer that received Prochamp's mushrooms outside of Germany ultimately resold *all* of them in that country. Not only is that assumption mere speculation, it contradicts the Department's finding that the retailer "likely" resold the mushrooms in Germany *and* another country. Appx10073.

The inconsistency matters because Commerce's choice of comparison market rested entirely on its conclusion that Prochamp's "*significantly* larger overall quantity" of sales in Germany for consumption "outweigh[ed]" the "slight difference" in product similarity that otherwise pointed toward using France. Appx1004 (emphasis added). But on this record, we don't know the actual number of German sales. What we do know is that it must have been lower than what the retailer purchased because some of those mushrooms were "likely" sold to consumers in another country. Absent any better explanation, the Department could not reasonably conclude that the Dutch company's exports to Germany were "significantly" larger

than those to France.[16] The court must return this is-
sue to the agency for reconsideration.

## B

### 1

Giorgio challenges Commerce's refusal to apply
facts otherwise available in choosing a comparison
market. *See* 19 U.S.C. § 1677e(a). The American com-
pany maintains that Prochamp impeded the investiga-
tion by failing to timely notify the Department that its
home-market sales volume did not meet the statutory
threshold. ECF 25, at 60–61. In response, the agency
explained that regardless of whether it timely receives
that notification, the process is the same—it issues a
questionnaire about potential third countries and
must wait for a response. *Id.* Giorgio's argument, es-
sentially, is that Commerce could have sought Pro-
champ's third-country data sooner if the Dutch com-
pany had identified its home market as non-viable
within 14 days. *Id.* at 61. But given the Department's

---

[16] Insofar as Prochamp's French sales data are equally un-
reliable, as the government contends, *see* ECF 28, at 55, it
should go without saying that it's impossible to validate in-
conclusive evidence by comparing it to equally inconclusive
evidence. If the Department is unable to reasonably deter-
mine Prochamp's sales volumes in the comparison-market
candidate countries, nothing in the regulation requires the
agency to rely on that criterion. *See* 19 C.F.R. § 351.404(e);
*see also* note 2.

finding that the delay made no difference, the determination that it did not *significantly* hinder the proceeding is supported by substantial evidence.

Giorgio further argues that Prochamp significantly impeded the investigation by providing inaccurate information concerning product characteristics, sales volume, sales channels, and customer types. *Id.* at 61–63. Once again, the critical word in the statute is "significantly." *See* 19 U.S.C. § 1677e(a)(2)(C). Even if the Dutch company otherwise obstructed the investigation through the actions described by its American competitor—something that Commerce did not find—the court must uphold the agency's determination so long as substantial evidence supports the conclusion that such alleged impediments were not "significant." The Department explained at length why Prochamp's "handful" of reporting errors did not interfere with the proceeding. Appx1059; *see also* Appx1059–1065. The record here more than supports that subjective determination.

Finally, Giorgio's assertion that Prochamp withheld necessary information by "completely ignor[ing] a lengthy set of instructions regarding . . . each of the potential comparison markets," ECF 25, at 64 (citing Appx4859–4860), fails because it mischaracterizes what the questionnaire sought. Commerce asked the company to "provide the following breakdown *of all sales reported to Germany*" in a particular chart and then specified what to include. Appx4859 (emphasis

added). It requested similar data for sales where the German label "*also* included" a language other than German. Appx2765 (emphasis added); Appx4860. The agency's finding that the company provided what was requested, Appx1060–1061, is amply supported by substantial evidence.

2

Giorgio also objects to the Department's failure to apply facts otherwise available as to financial reporting. The American company challenges the agency's findings that Dutch law exempted Prochamp from preparing standalone statements and that the latter's internal statements were not responsive to the agency's requests.

Before Commerce, Giorgio submitted a PricewaterhouseCoopers report as "proof" that Dutch law requires Prochamp to prepare financial statements for adoption by shareholders, even if they need not be filed with government authorities. Appx5265–5266, Appx11465. In response, the Department issued a supplemental questionnaire, to which Prochamp responded by providing a screenshot from its parent company's financial statements' citation of Dutch law and then quoting the cited provisions. Appx5923–5926.

Commerce found that the record supported Prochamp's characterization of Dutch law as imposing only "minimal requirements" as to internal financial

statements. Appx1050. The Department was unwilling to fault the company "for not providing a document that it does not have, nor was it obligated to have," *id.*, and determined that it could not characterize Prochamp as "not acting to the best of [its] ability" by not maintaining statements Dutch law did not require, *id.* The agency also concluded that the company had consistently explained why it did not maintain standalone financial statements and proved why it was not required to do so. *Id.*

Giorgio now contends that "the record unequivocally demonstrates that Prochamp and its affiliates *were* required to maintain these types of financial documents." ECF 25, at 66 (emphasis in original) (citing Appx11459–11465, Appx11492, and Appx7772–7773). The first two sets of cited record pages are all part of the PricewaterhouseCoopers report. The company makes no effort to explain why the Department, and the court, should find that report more compelling than the quotations from Dutch law provided in Prochamp's questionnaire response—quotations that Giorgio, in turn, ignores. The final two cited pages, Appx7772–7773, are an auditor's letter that directly supports Commerce's characterization of Prochamp's internal statements.

In short, conflicting evidence on the record pointed in two directions as to the adequacy of Prochamp's financial reporting. The Department reasonably

weighed that evidence, and as such the court must sustain the agency's finding.

3

As described above, substantial evidence supports Commerce's determination not to use facts otherwise available as to its market-comparison choice and Prochamp's financial reporting. Consequently, the court need not consider Giorgio's argument that the Department abused its discretion in not applying an adverse inference. *See* 19 U.S.C. § 1677e(b)(1)(A).

*    *    *

The court sustains Commerce's final determination in part and otherwise remands for further proceedings consistent with this opinion.

Dated:  July 17, 2024              /s/ *M. Miller Baker*
        New York, NY              Judge

# Web page cited in the opinion

World Population Review



**Official language**

Yes     No

Click on a country for details.

# German Speaking Countries 2024

There are over 95 million people around the world that speak German as their primary language. The language is the official language of six countries, all of which are located in Europe. The most populous country where German is the official language is Germany. Germany has a total of more

than 81 million people. Of this total population, 91.8% speak German as their native language. This is over 74 million people. About 5.6 million people speak German as their second language.

The six countries that have German as their official language, in alphabetical order, are: Austria, Belgium, Germany, Liechtenstein, Luxembourg and Switzerland. Over 78% of the world's total German speakers live in Germany. Over 8% live in Austria, more than 5% reside in Austria, less than 1% live in Italy, and more than 7% live in other countries.

In addition to the six German-speaking countries, there are several dependent entities that have German as an official language. These regions are the Autonomous Province of South Tyrol in Italy, the Opole Voivodeship and Silesian Voivodeship in Poland, and the Espirito Santo, Santa Catarina and Rio Grande do Sul in Brazil. German is also considered a co-official language under Slovak law in the villages of Krahule/Blaufuss and Kunesov/Kuneschhau.

⌧ CSV   ⌧ JSON

| Country | Official language ⌄ | # of Speakers | | % of Population | | Addition |
|---------|----------------------|----------------|------|------------------|------|----------|
| Search... (39) | ☐ yes ☐ no | Min | Max | Min | Max | Search... |
| Germany | ✓ | 69.5M | | 84.8% | | |
| Belgium | ✓ | 76.9K | | 0.7% | | |
| Austria | ✓ | 7.1M | | 88.6% | | |
| Switzerland | ✓ | 5.2M | | 62.8% | | |
| Luxembourg | ✓ | 14.7K | | 3.1% | | |
| Liechtenstein | ✓ | 34.4K | | 91.5% | | |
| United States | ✕ | 964.4K | | 0.3% | | |
| Brazil | ✕ | 5M | | 2.3% | | |
| Russia | ✕ | 2.1M | | 1.4% | | |
| France | ✕ | 1.2M | | 1.77% | | |
| South Africa | ✕ | 30K | | 0.07% | | |
| Italy | ✕ | 275.8K | | 0% | | German sp are concer South Tyro 2014, a rep So... |

**Official**

**showing: 39 rows**

**Frequently Asked Questions**

## How many countries speak German?

Six countries have Germany as their official language, but it is also a language spoken in many other countries: Austria, Belgium, Germany, Liechtenstein, Luxembourg, and Switzerland.

**Sources**

1. Geographical distribution of German speakers - Wiki
2. German around the world - deutschland.de
3. German speaking countries

© 2024 World Population Review    Privacy Policy    Terms    Contact    About

**TAB 2**

**Remand Scheduling Order (July 17, 2024)**

**Appx00060-00061**

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| GIORGIO FOODS, INC.,<br><br>    *Plaintiff*,<br><br>v.<br><br>UNITED STATES,<br><br>    *Defendant*,<br><br>and<br><br>PROCHAMP B.V.,<br><br>    *Defendant-Intervenor*. | Ct. No. 23-00133-MMB |

## ORDER

For the reasons stated in Slip Opinion 24-79 (ECF 43), the court remands to the Department of Commerce for further proceedings consistent with that decision, including reconsideration of its finding that Prochamp sold a "significantly larger overall quantity" of mushrooms in "the German market" than in France or Israel. Appx1004.

This case will proceed with the following schedule:

1.    Commerce must file its remand determination on or before 90 days after entry of this order.

2.    Defendant must file the administrative record on or before 14 days after the date on which it files the remand determination.

3.     The court's instructions governing joint appendix preparation[1] govern the Remand Appendix.

4.     No later than 14 days after the government files the administrative record, the parties are to file a proposed scheduling order advising the court of which appendix preparation option the parties have selected and proposing due dates for the parties' comments, the Remand Appendix, and any motions for oral argument. The proposed due dates should reflect the appendix preparation option the parties choose.

5.     The parties' proposed scheduling order must prescribe a deadline for Prochamp's comments that is later than the government's deadline and must include a word-count limitation for Prochamp's comments that is one-half of the words available to the government.

Dated:     July 17, 2024                     /s/ *M. Miller Baker*
           New York, New York           M. Miller Baker, Judge

---

[1] https://www.cit.uscourts.gov/sites/cit/files/2023-10-11%20Instructions%20to%20Counsel%20in%20158%20(34%29%29%20Cases%20Assigned%20to%20Judge%20Baker.pdf.

**TAB 3**

**Final Results of Redetermination Pursuant to Court Remand;**
**Giorgio Foods, Inc. v. United States, Ct. No. 23-00133 (Dep't Commerce Nov. 14, 2024)**

**Appx00062-00098**

A-421-815
Remand
Giorgio Foods
**Public Version**
E&C/OIII:  BQ

***Giorgio Foods, Inc. v. United States*, Court No. 23-00133, Slip Op. 24-79**
**(CIT July 17, 2024)**
**Certain Preserved Mushrooms from the Netherlands**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.     SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the remand opinion and order of the U.S. Court of International

Trade (the Court) issued in *Giorgio Foods, Inc. v. United States,* Court No. 23-00133 (CIT July

17, 2024).[1]   This action arises out of Commerce's final affirmative determination in the

investigation of sales at less than fair value (LTFV) on certain preserved mushrooms

(mushrooms) from the Netherlands covering the period of investigation (POI) January 1, 2021,

through December 31, 2021.[2]

The Court remanded the *Final Determination* for reconsideration of Commerce's finding

that respondent Prochamp B.V. (Prochamp) "sold a 'significantly larger overall quantity' of

mushrooms in 'the German market' than in France or Israel."[3]   The Court specifically found that

> {the quantity and value of sales consumed in the German third-country market}
> must have been lower than {the amount reported and relied upon by Commerce in
> its third country selection determination} because some of those mushrooms were
> "likely" sold to consumers in another country.   Absent any better explanation,
> {Commerce} could not reasonably conclude that the Dutch company's exports to

---

[1] *See Giorgio Foods, Inc. v. United States*, Court No. 23-00133, Slip Op. 24-79 (CIT July 17, 2024) (*Remand Opinion*); *see also Giorgio Foods, Inc. v. United States*, Court No. 23-00133, ECF No. 44 (CIT July 17, 2024) (*Remand Order*).
[2] *See Certain Preserved Mushrooms from the Netherlands:  Final Affirmative Determination of Sales at Less Than Fair Value*, 88 FR 18115 (March 27, 2023) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM).
[3] *See Remand Order* at 1.

Germany were "significantly" larger than those to France. The court must return this issue to the agency for reconsideration.[4]

In light of the Court's opinion and order, on remand, Commerce re-examined the information on the record regarding its third-country market selection to reconcile the conclusion that Germany reflected a significantly larger market than that of France with statements acknowledging that German-market information contained a subset of transactions likely not ultimately consumed in Germany, including information submitted to the record of this remand proceeding which Commerce re-opened for the narrow purpose of addressing the Court's concerns.

Upon reexamination, Commerce finds it is appropriate to continue to rely upon the German third-country comparison market data, as submitted, as the record allows for Commerce to reasonably estimate the percentage of German-language-labelled products sold to Prochamp's largest German customer, which may have then been sold downstream by this customer for retail consumption in another German-speaking country (*i.e.*, Austria). Commerce also reconsidered the relative size of the German market accounting for potential Austrian consumption and finds that it does not conflict with the prior conclusion that Prochamp's shipments of merchandise consumed in Germany were significantly larger than the shipments of merchandise consumed in France (or Israel). As a result, we have not altered our decision to use the prices of the foreign like product destined for the German market as the basis for normal value (NV), and we have made no changes to the margin calculations in the *Final Determination*. Thus, the weighted-average dumping margin assigned to Prochamp continues to be 0.00 percent.

---

[4] *See Remand Opinion* at 20-21.

## II.     BACKGROUND

On March 31, 2022, Giorgio Foods, Inc. (the petitioner) filed with Commerce an antidumping duty petition concerning imports of mushrooms from the Netherlands.[5]  On April 20, 2022, Commerce initiated an LTFV investigation on mushrooms from the Netherlands.[6]  On May 17, 2022, following initiation, Commerce determined to individually examine Prochamp as one of the mandatory respondents in this investigation,[7] and on May 19, 2022, Commerce issued Prochamp the initial questionnaire.[8]

The Tariff Act of 1930, as amended (the Act), requires Commerce to compare the export price or constructed export price of the subject merchandise with the NV.[9]  Typically, NV will be the price at which subject merchandise is sold in the exporting country, *i.e.* the home market.[10] However, under section 773(a)(1)(C)(ii) of the Act, Commerce will base NV on third-country market prices when, *inter alia*, Commerce determines that the home market is not viable, *i.e.* the aggregate volume of sales in the home market is less than five percent of the volume of U.S. sales.  When the home market is not viable, section 773(a)(1)(B)(ii) of the Act directs Commerce to base NV on prices in a third-country market if:  (1) prices in that market are representative; (2) the aggregate quantity (or, if quantity is not appropriate, value) of sales in the third-country market is five percent or more of the aggregate quantity (or value) of U.S. sales; and (3) no "particular market situation" exists that would prevent appropriate comparisons with U.S. prices. To this end, Commerce, in its initial questionnaire, instructs the respondent to report whether there is a viable home market for the subject merchandise and, if there is not, to provide sales

---

[5] *See* Petitioner's Letter, "Petition for the Imposition of Antidumping Duties," dated March 31, 2022.
[6] *See Certain Preserved Mushrooms from France, the Netherlands, Poland, and Spain:  Initiation of Less-Than-Fair-Value Investigations*, 87 FR 24941 (April 27, 2022).
[7] *See* Memorandum, "Respondent Selection," dated May 17, 2022.
[8] *See* Commerce's Letter, "Request for Information," dated May 19, 2022 (Initial Questionnaire).
[9] *See generally* section 773 of the Act.
[10] *See* section 773(a)(1)(B)(i) of the Act.

information for the respondent's three largest third-country markets, provided each meets the five percent threshold.[11]

Where prices in more than one third-country market satisfy the requirements of section 773(a)(1)(B)(ii) of the Act, Commerce will generally select the third-country market on the basis of the following criteria set forth in 19 CFR 351.404(e): (1) whether the foreign like product exported to a particular third-country market is more similar to the subject merchandise exported to the United States than the foreign like product exported to other third-country markets; (2) whether the volume of sales to a particular third-country market is larger than the volume of sales to other third-country markets; and (3) other factors that Commerce considers appropriate.

Information presented by Prochamp showed that it did not have a viable home market within the meaning of section 773(a)(1)(C) of the Act during the POI.[12] Accordingly, Commerce determined it appropriate to base Prochamp's NV on its sale prices to a third-country market.[13] Further, Commerce determined that all of the third-country markets for which Prochamp provided sales information (*i.e.*, Germany, France, and Israel) met the requirements set forth in section 773(a)(1)(C) of the Act, in that the aggregate quantity of sales in each of these markets is at least five percent of the volume of sales of subject merchandise, and may serve as a basis for NV.[14] Based on information provided to the record, Commerce determined that, when taken as a whole, the products shipped by Prochamp and consumed in Germany are sufficiently comparable to the products sold in the United States, and Germany provides the most robust data and most similar channel of distribution and customer type when compared to the French and Israeli

---

[11] *See* Initial Questionnaire at A-2.
[12] *See* Prochamp's Letter, "Submission of Prochamp B.V.'s Section A Response," dated June 21, 2022 (Prochamp's AQR).
[13] *See* section 773(a)(1)(B)(ii) of the Act; *see also* Memorandum, "Selection of Appropriate Third Country Market," dated August 26, 2022 at 4 (Third Country Selection Memorandum).
[14] *See* Third Country Selection Memorandum at 4.

markets.[15]  Commerce thus requested,[16] and Prochamp provided, information reflecting sales to the German market for the purposes of its comparison market "Section B" reporting throughout the investigation.[17]

Prior to the determination of the appropriate third-country market, Prochamp identified the method that it used to determine the relevant country for the purposes of reporting the quantity and value of sales "consumed" in each market, including the difficulties and presumptions involved due to the nature of the product and the operations of its customers.[18] Specifically, Prochamp noted that, because certain customers are large retailers which operate across national borders in the common European market (in particular, its largest customer in both the French and German market, [     ]), use of simply the customer's corporate address as listed on the invoice or the delivery address for each transaction as a basis for determining the market destination would not provide the most accurate account of where the merchandise was most likely consumed.[19]  For example, all sales to [     ], a German company, are invoiced to a German address and, as such, considered to be sales to a German customer for the purposes of Prochamp's internal recordkeeping.[20]  Moreover, while certain sales are shipped directly to the customer's warehouses in various markets, the majority are delivered to the customer's local distribution warehouse in the Netherlands from which the customer then distributes the merchandise downstream to its regional distribution warehouses or specific retail grocery

---

[15] *Id.* at 4-6.
[16] *See* Commerce's Letter, "Prochamp's Section B and C Supplemental Questionnaire," dated September 2, 2022.
[17] *See* Prochamp's Letter, "Submission of Prochamp B.V.'s Supplemental Sections B & C Response," dated September 23, 2022 (Prochamp's SBCQR).
[18] *See* Prochamp's Letter, "Submission of Prochamp B.V.'s Response to Supplemental Section A Questionnaire, Part Two," dated August 1, 2022 (Prochamp's SAQR2) at 2, 6, and 10; *see also* Prochamp's AQR at 3; and Prochamp's SBCQR at 7-9.
[19] *Id.*
[20] *Id.*  Third Country market identification methodology was reviewed at verification and detailed in Commerce's Memorandum, "Sales Verification of Prochamp B.V.," dated January 11, 2023 (Prochamp's Sales Verification Report), at 10-13.

locations all over the E.U., but Prochamp has no ability to determine actual delivery locations of the downstream distribution for retail sale.[21]  In addition, sales to the customer of identical mushroom products often differ only by the label applied to the product.[22]

Accordingly, two containers of mushroom products sold to one customer may reflect identical mushrooms in identical cans differing only by the label affixed, sold at the same price, to the same German customer (pursuant to the same underlying sales contract) and delivered to the customer's local distribution warehouse in the Netherlands.  From the perspective of Prochamp's internal recordkeeping, these simply reflect German sales (*i.e.*, sales of the same product with two different labels to a customer based in Germany and paid from that customer's German bank) but because the otherwise identical mushrooms are labeled with a German language label on one container and a French language label on the other container (and are ordered and invoiced based on the specific product codes given based on the label affixed to the product), the market of ultimate distribution/consumption may otherwise be reasonably inferred.  As such, Prochamp noted that the best estimation of country of consumption could otherwise be derived from the language labelling of the product itself, with French-language labels presumed to be consumed in France, German-language labels presumed to be consumed in Germany, Italian-language labels presumed to be consumed in Italy, *etc.*[23]  Accordingly, Prochamp's reporting of the quantity and value totals for the purposes of third-country market selection at the outset of the investigation, and subsequent submission of Prochamp's German-market sales data, reflected the sales of German language labeled products.  Notably, sales to [      ] reflected approximately [   ] percent by quantity and [   ] percent by value of merchandise attributed to the

---

[21] *See* Prochamp's Sales Verification Report at 10-13.
[22] *Id.* at SVE-9 and SVE-10.
[23] *See*, *e.g.*, Prochamp's SAQR2 at 2, 6, and 10; Prochamp's AQR at 3; and Prochamp's SBCQR at 7-9.

French market, and approximately [ ] percent of merchandise reported in the German comparison market sales data by quantity and value.[24]

Commerce generally accepted Prochamp's methodology and statements to the record regarding market identification in the initial record-building stage of the investigation for the purpose of third-country market selection, generally verified the reporting to be consistent with the methodology described, and found Prochamp's market identification to be accurate and reasonable. Therefore, Commerce continued to find its selection of Germany as the appropriate third-country comparison market to be reasonably supported in its *Final Determination*.[25] However, though Commerce concluded that Prochamp's market identification methodology based predominantly on label languages to be generally accurate and reasonable, and found Prochamp to be fully cooperative, observations over the course of the investigation revealed certain limitations in identifying the consumption market on the basis of label language, as recorded by the product label code in Prochamp's books and records.

First, at verification, Commerce observed that certain products with a product label code suffix "CH" were included in the German-market sales data due to German being the primary language on the label, but in fact reflected the Swiss country code and contained multiple languages and, as such, reflected Swiss consumption.[26] Such products were removed from the German-market sales data for the purposes of the *Final Determination*, and Commerce otherwise reviewed product labels of merchandise reported in the German-market sales data to all customers at verification and confirmed that the labels reflected primarily German language

---

[24] *See* Prochamp's SAQR2 at Exhibit A - 29.2 (Listing of Sales Orders for France Market); and Prochamp's November 29, 2022 "prochamptc03" comparison market sales database (prochamptc03).
[25] *See Final Determination* IDM at Comments 9 and 16.
[26] *See* Prochamp's Sales Verification Report at SVE-9.

labeling generally indicative of German-market consumption (or, at least, not suggestive of likely consumption in a market other than Germany).[27]

Second, sales of certain products to the largest customer, either delivered to the customer's local distribution warehouse in the Netherlands, or direct-shipped to Germany, which otherwise reflected a German-language label, were listed with a product code identifier in Prochamp's system identifying them with a "DE/AT" label code, implying that such sales could be distributed by the customer for ultimate consumption in retail locations either in Germany or Austria (shipping documents also indicated both German and Austrian country codes associated with the sale).[28]  Though all sales were to a German customer and shipped either to the local warehouse in the Netherlands or a warehouse located in Germany, and neither the internal code nor shipping documentation reflected that any such merchandise was definitively consumed outside of Germany, the existence of the combined DE/AT code strongly suggested that the customer treated the German and Austrian markets as a single German-language market for the purposes of its own distribution.  Commerce acknowledged that a conclusion could be reasonably made that at least some of the German total reported was comprised of an unspecified amount of Austrian-consumed merchandise.  However, Commerce did not find that the existence of information which suggested that the merchandise may be sold for retail consumption in Austria detracted from Commerce's initial third-country market selection nor the reliability of the German-market sales data subsequently submitted, stating the following in the *Final Determination*:

> Otherwise, we acknowledge that the German database contains sales of products which indicate on the face of their product descriptions, as well as other sales-specific documents, that they may be distributed to other German-speaking countries for final consumption, as well as a smaller amount of sales with multi-

---

[27] *See Final Determination* IDM at Comment 9; *see also* Prochamp Sales Verification Report at SVE-9.
[28] *See* Prochamp Sales Verification Report at 12 and SVE-10 and -11.

language labels, including German, which could be ultimately consumed in countries other than Germany.  We note, however, that Prochamp has been forthcoming regarding its inability to identify the final destination of consumption regarding German labeled products sold to German customers and delivered to distribution warehouses between Germany and German-speaking parts of Europe, or otherwise.  This issue has been identified on the record from early in the proceeding, and Prochamp has been cooperative with all requests in this regard.  We verified Prochamp's statements to be accurate and, as discussed above, did not find information which contradicted the reporting or otherwise suggested that pinpointing the destination of final consumption to a greater degree of accuracy was possible.  Notably, we did not find evidence that sales existed otherwise which could be attributable to likely German consumption and were not included in the database, nor – with the exception of the sales mentioned above which were removed – did we find instances of sales included in the third country database where the record suggested German consumption was unlikely or more likely in a non-German market.  As such, Commerce finds that the third country database submitted, which consists entirely of sales to German customers of products containing German language on their labels, reflects the best possible effort that Prochamp could reasonably make to construct a database which includes all sales which indicate likely consumption in Germany.  Further, there is no evidence which suggests that the any of the sales reported in the database were definitively consumed in a country, or even more likely to be consumed in a country, other than Germany.[29]

Both in the underlying record and in litigation, the petitioner argues that the record establishes a pattern of non-cooperation on behalf of Prochamp, which withheld information critical to the third-country market selection, resulting in the improper identification and selection of Germany as the comparison market.[30]  The petitioner further alleges that such issues persisted to the extent that the third-country sales data are unusable for the calculation of NV and that application of facts available with an adverse inference with respect to comparison market sales reporting is warranted.  Specifically, according to the petitioner:  A) Prochamp provided inaccurate, inconsistent, and constantly changing information concerning sales volumes in its third-country markets; B) Prochamp either disregarded highly relevant information in its

---

[29] See *Final Determination* IDM at Comment 9.
[30] See Petitioner's Letter, "Petitioner's Affirmative Case Brief Regarding Prochamp, B.V.," dated January 26, 2023, at 40-52.

possession or provided incomplete information concerning its knowledge of the country of consumption; C) the record establishes that various claims made by Prochamp regarding the destination of its sales based on varying combinations of the customer's address, the port destination, and the language on the label are false; and D) Prochamp's claim that it is not aware of the ultimate destination is undermined by evidence on the record and not disclosed prior to verification.[31]

On appeal, the petitioner challenged Commerce's *Final Determination* in two respects: 1) asserting the selection of Germany as the comparison market is not supported by substantial evidence (citing Commerce's stated reluctance to reconsider third-country market selection at a later stage of the investigation, the purportedly erroneous conclusion that slight difference in product weights that supported using France as the comparison market did not outweigh the significantly larger overall quantity of products sold in Germany, Commerce's reconsideration and retraction of statements that similarities in sales channels and customers supported the selection of Germany, as well as the inconclusive nature of the German-market sales data and potential inclusion of sales not consumed in Germany);[32] and 2) challenging Commerce's decision to decline to apply facts otherwise available with an adverse inference to Prochamp (citing Prochamp's allegedly uncooperative actions and withholding of information with respect to financial reporting and preparation of standalone financial statements, as well German-market sales data reporting accuracy).[33]

In the *Remand Opinion*, with respect to the second argument, the Court concluded that substantial evidence supports Commerce's determination not to use facts otherwise available as

---

[31] *Id.*
[32] *See Giorgio Foods, Inc. v. United States*, Court No. 23-00133, ECF No. 25, at 2-5 (CIT July 17, 2024).
[33] *Id.* at 6-8.

to its selection of the third-country market, and Prochamp's financial reporting, and sustained Commerce's final determination to calculate Prochamp's estimated weighted-average dumping margin from information submitted and not apply facts otherwise available with an adverse inference.[34]  Furthermore, with respect to the first argument, the Court also rejected the petitioner's arguments that Commerce's selection of Germany as the comparison third-country market is unsupported due to purported reluctance to reconsider third-country market selection at a later stage of the proceeding,[35] the conclusion that slight difference in product weights that supported using France as the comparison market did not outweigh the significantly larger overall quantity of products sold in Germany,[36] or Commerce's reconsideration and retraction of statements that similarities in sales channels and customers supported the selection of Germany.[37]  However, the *Remand Opinion* and *Remand Order* directed Commerce to reconsider its finding that Prochamp sold a significantly larger overall quantity of mushrooms in the German market than in the French or Israeli markets, as this conclusion is inconsistent with Commerce's acknowledgement that some quantity of the mushrooms sold in Germany was likely sold in another country.[38]  The Court concluded that "{a}bsent any better explanation, {Commerce} could not reasonably conclude that the Dutch company's exports to Germany were

---

[34] *See Remand Opinion* at 25.
[35] *Id.* at 15-16 ("the agency went ahead… and *did* reconsider that conclusion on the merits.").
[36] *Id.* at 16-17 ("Given that {Commerce} found that five of the six relevant characteristics were identical or nearly so, it apparently (and reasonably) concluded that *on balance* the products sold in all three markets were very similar."… Given that weight was only one of six relevant product characteristics, {Commerce} reasonably determined that the significantly larger volume of German sales—assuming for the moment the reliability of that data—more than offset the *overall* slight difference in product similarity that pointed toward using France as a comparison market.").
[37] *Id.* at 18, n. 13 ("As Commerce's balancing of product similarity versus sales volume was plainly dispositive, this asserted error was at most harmless.").
[38] *Id.* at 19-20 (citing, *e.g.*, *Fla. Gas Transmission Co. v. FERC*, 604 F.3d 636, 641 (D.C. Cir. 2010); and *OSI Pharms. LLC v. Apotex Inc.*, 939 F.3d 1375, 1382 (Fed. Cir. 2019) in support of the principle that mere speculation is not substantial evidence.).

'significantly' larger than those to France," and accordingly remanded this issue to Commerce for reconsideration.[39]

## III.  ANALYSIS

Commerce understands the *Remand Opinion* to require that Commerce reconcile its selection of Germany as the third-country market based on the volume of sales to the German market with record information suggesting that a least some portion of the German-market sales were "likely" distributed to other German-speaking countries for consumption.  In the *Final Determination*, Commerce reasoned that the record supported a presumption that the entirety of sales reported as German indeed reflected products consumed in Germany.  First, no information on the record allowed for the definitive conclusion that the sales with a product label identifier with a "DE/AT" code and shipping documentation suggesting the possibility that Prochamp's customer could distribute the products downstream to Austrian retail locations were *actually* sold outside Germany to retail locations in Austria.[40]  In other words, while the information supported that some subset *could* be distributed in Austria as well as Germany, no sales documents or knowledge otherwise available to Prochamp confirmed this to be the case for any specific sale.[41] Moreover, all such sales information otherwise available reflected sales to a German customer, of a German-language label product, delivered either to the customer's local distribution warehouse or direct shipped to the customer's facility in Germany.  However, as the Court notes,

---

[39] *Id.* at 20-21.
[40] *See Final Determination* IDM at Comment 9.
[41] The Court identifies this treatment of all reported sales as German as an assumption which irreconcilably contradicts with Commerce's finding that the retailer "likely" resold the mushrooms in Germany *and* another country.  *See Remand Opinion* at 20.  While we do not disagree that this was, ultimately, an assumption, our intent in pointing to the record information which otherwise identified only German addresses and points of contact associated with the sales, including sales of products with the DE/AT product identifier, and identifying that no information otherwise suggested for actual Austrian distribution (*i.e.*, it was only the internal label code itself which suggested for this likelihood), was not to ignore the "likelihood" otherwise recognized, but rather an attempt to point to the record evidence to support that the assumption had a reasonable basis in the record.

some record information suggests that at least some subset of the merchandise sold to the German market might have been distributed by the retailer for retail consumption in the Austrian market.[42] Thus, the most straightforward way to address the concerns identified by the Court is to quantify and account for the portion of the German market total which may reasonably reflect this heretofore unquantified amount of non-German consumed sales and evaluate whether Commerce's conclusions regarding Germany's relative advantage in size to other potential third-country markets remain supported with the non-German consumption accounted for and removed from the total. The issue at the outset of this remand proceeding, however, is that while the record of the investigation contains information suggesting that at least some subset of the sales reported in the German market may be distributed by Prochamp's customer for downstream retail consumption in the Austrian market, the record is devoid of information regarding the downstream distribution activities of the customer which could allow for any such quantification of this amount. As such, Commerce re-opened and placed new factual information on the record for this purpose, and provided interested parties the opportunity to do the same.[43] Specifically, Commerce noted:

> In its remand order, the Court remanded for further explanation Commerce's selection of Germany as the appropriate comparison market, in consideration of the information on the record that E&C could not know the actual number of German sales because orders with the German language label were delivered to a warehouse outside of Germany and could have been consumed in German-speaking countries other than Germany (specifically, sales to Prochamp's largest customer which were marked with the label "DE-AT" signaling that such sales could be destined for either Germany or Austria). Thus, the Court found that {Commerce} could not reasonably conclude that Prochamp's exports to Germany were "significantly" larger than those to France. Commerce is reopening the record for the narrow

---

[42] As noted in the *Final Determination*, the same concern could also arise for sales with French labeled cans where the assumption was that all such merchandise would be consumed in France, and not ultimately consumed in a different French-speaking market and, as discussed below, the limited information regarding the composition of the French market Q&V on the record indeed suggests that the similar assumptions were included in the initial reporting of French market volume. *See Final Determination* IDM at Comment 16.

[43] *See* Memorandum, "Release of Factual Information," dated September 3, 2024 (Commerce's Remand NFI Memo).

purpose of addressing the remand concerns and specifically Judge Miller Baker's statements regarding the German third country data being inclusive of at least some sales which may have been consumed not in Germany. [44]

For this purpose, Commerce placed the following information on the record:

A)    Information regarding the number of retail stores operated by Prochamp's largest customer in both Austria and Germany.[45]
B)    Population data for Germany and Austria.[46]
C)    Publicly-available information regarding mushroom consumption in Germany and Austria.[47]
D)    Information regarding French-speaking populations outside France (to complement Attachment I to the *Remand Opinion* re: German-speaking areas outside Germany).[48]

In response, Prochamp submitted:

A)    Email communications between Prochamp and [    ], which identify the item numbers (which correspond to specific product codes reported) which were sold exclusively in Germany in the POR and those which were distributed "mainly" but not exclusively in the German market (*i.e.*, which could have been distributed outside of Germany).[49]
B)    Email communications between Prochamp and another customer [        ] identifying products distributed exclusively in Germany and products distributed in Germany and other German-speaking countries.[50]
C)    The website of its third customer reported in the German-market sales data, [    ], reflecting its countries of operation.[51]

The petitioner did not submit further information in response to the new factual

information which Commerce placed on the record.

---

[44] *Id.*
[45] *Id.* at Attachment 1.
[46] *Id.* at Attachment 2.
[47] *Id.* at Attachment 3.
[48] *Id.* at Attachment 4.
[49] *See* Prochamp's Letter, "New Factual Information Related to the Ultimate Destination of German Labelled Merchandise," dated September 13, 2024 (Prochamp's NFI Memo), at Attachment 3 (Email communications with [    ]) and Attachment 2 (identifying the product codes which reconcile the product item numbers referenced in the email communications).
[50] *Id.* at Exhibit 5 (email communications between Prochamp and [        ]) and Exhibit 6 (the labels for products sold by Prochamp to [        ]).
[51] *Id.* at Exhibit 7 (portions of [        ] website showing that [    ] operates only in [    ]) and Exhibit 8 (reflecting that German is not an official language of either [            ].

*Analysis of Information Submitted*

Information placed on the record allows Commerce to now quantify an approximate amount of the reported German-market total quantity and value of sales which can reasonably account for the record information, which suggests that some sales may "likely" be distributed to non-German, including Austrian, retail locations for ultimate consumption.  The information placed on the record by Commerce reflects that the combined Austrian and German population of 92.156 million during the POI breaks down to 83.2 million Germans (90.28 percent) and 8.956 million Austrians (9.72 percent).[52]  Total mushroom consumption of both countries reflects 175,179 metric tons (MT) consumed in 2021, breaking down to 157,000 MT consumed in Germany (89.62 percent) and 18,179 MT consumed in Austria (10.38 percent).[53]  Lastly, of the 3,505 retail locations which Prochamp's largest German customer operates in both countries, Germany has 3,250 [    ] stores (92.72 percent) and Austria has 255 [    ] stores (7.28 percent).[54]  For the sake of simplicity, and due to the high level of consistency between these figures, we read these together to reasonably support that the Austrian market portion of the total volume of mushrooms sold by Prochamp to [    ] to be approximately 10 percent of the total sales of German-labeled mushrooms.  The German-market sales data (which reflects the same quantity of POI German market sales as reported in the Supplemental Section A response considered at the time of third-country market selection) reflects a total quantity of sales reported of [        ] kilograms (KG).[55]  Within this total, we then identify the total quantity of sales to [    ] of [        ] KG, and reduce that total by the quantity of Swiss merchandise previously

---

[52] *See* Commerce's Remand NFI Memo at Attachment 2.
[53] *Id*. at Attachment 3.
[54] *Id*. at Attachment 1.
[55] *See* prochamptc03, also provided to the remand record at Exhibit 1 of Prochamp's Remand NFI Memo.

removed in the *Final Determination* ([      ] KG),[56] further reduce the [      ] sales total by 10

percent to account for the sales which may likely have been distributed for retail consumption to

Austria pursuant to the information discussed above (approximately [      ] KG, and add back in

the non-[      ] total otherwise reduced to remove the sales of the specific product identified on

the record of this remand which may have been inclusive of sales to [          ].[57] This then nets

a German market consumption total of [      ] KG, which accounts and reasonably adjusts for

record information suggesting for the potential of non-German consumption.[58]

The French market quantity total as reported at the time of third country selection

([      ] KG) reflected [   ] percent of the German total by quantity.[59] When compared to the

revised total quantity of German sales discussed immediately above (*i.e.*, reduced to account for

to the [      ] sales of Swiss-labeled products, the potential amount of [      ] Austrian

distribution, and [

                    ]), the reported French market total reflects [   ] percent of the German

market total by quantity.[60] Accordingly, upon accounting for all potential non-German

consumption identified on the record, the French market remains only approximately [

] the size of the German market for Prochamp, without accounting for consumption of

French-labeled merchandise outside of France. We do not find that an approximately [      ]

percent relative decrease to the German total found to be "significantly" larger than France in the

---

[56] *See Final Determination* IDM at Comment 9; *see also* Prochamp's Final Analysis Memo.
[57] *See* Prochamp's NFI Memo at Exhibit 5, where Prochamp's customer, [          ] identifies that [

           ]. The sales database reflects only a few sales of this product during the POI totaling [      ] KG of a
[      ] Euro value.
[58] For further detail of the calculations discussed throughout this section, *see* Memorandum, "Third Country
Consumption Analysis Memorandum," dated October 7, 2024 (Third Country Consumption Analysis Memo), at
Attachment.
[59] *See* Prochamp's SAQR2 at Exhibit A-15.
[60] *See* Third Country Consumption Analysis Memo.

underlying third country selection determination supports a reconsideration of that finding.  This analysis, which reflects a German market at least [          ] larger in a relative sense and reflecting [                    ] more kilograms exported in absolute volume when compared to an unadjusted and unscrutinized French market total reported initially (*see* discussion below), continues to be significantly larger than the French market with potential non-German sales taken into account.

Furthermore, we note that the analysis above reflects conservative presumptions which likely overstate the amount of Austrian [               ] sales presumed "likely" in the total German-market sales volume used in the selection of the comparison market, as this analysis applies the 10 percent presumption to <u>all</u> of Prochamp's German language label sales to [       ], without applying the presumption only to the sales for which the product descriptions include the "DE-AT" notation nor contending with the information that Prochamp placed on the record which suggests that the specific products potentially sold in Austria were restricted to an even narrower subset of  the merchandise sold by Prochamp to [       ].[61]  Furthermore, the above analysis conservatively presumes that <u>all</u> sales of [



].[62]

Moreover, the analysis reflects a comparison of German-market sales information verified and scrutinized (with Swiss [     ] sales excluded, potential Austrian consumption within the [     ] total accounted for, and potential [           ] consumption within the [          ] total excluded) compared to a French total submitted early in the proceeding and

---

[61] *See* Prochamp's NFI Memo at Exhibit 3; and Third Country Consumption Analysis Memo at Attachment.
[62] *See* Prochamp's NFI Memo at Exhibit 5; and Third Country Consumption Analysis Memo at Attachment.

which has encountered no such comparable scrutiny of its constituent transactions.  Indeed, a cursory analysis of sales order information provided to support the French total reported prior to the third-country market selection in the early stages of the investigation reflects that the French market total is inclusive of:  A) sales with an "NL/BE" market/language label (indicating likely consumption outside of France in French-speaking areas of Belgium and the Netherlands); and B) sales to a company with the acronym SAM as a suffix, indicating that it is incorporated as a Société Anonyme Monégasque (*i.e.*, sales of French-labeled products to a Monaco-based company, not a French company).  Furthermore, sales support information reflects that its largest sales of subject merchandise to France were to French Overseas Territories,[63] and unlikely to have been consumed in mainland France itself.[64]  As such, the record of both the underlying

---

[63] *See* Prochamp's Letter, "Submission of Prochamp B.V.'s Response to Supplemental Section A Questionnaire, Part Two," dated August 1, 2022 (SSAQR2), at Exhibit A - 29.2 (Listing of Sales Orders for France Market) and 28.2 (5 Highest Invoices for Sales to France).

[64] With respect to the latter information, Commerce takes no position as to whether or not sales distributed to a specific French Overseas Territory should or should not be considered "French" market consumption, but notes this only to further identify that the ability to disambiguate "consumption" is complex in this case, regardless of the market selected.  As such, we continue to find that Prochamp's use of language labelling reflected the best available information to determine consumption generally and, even where certain issues were identified subsequently, remained a reasonable and well-supported proxy for consumption throughout this proceeding particularly given that the appropriate third country market must necessarily be determined early in a case.  *See Certain Oil Country Tubular Goods from Saudi Arabia:  Final Determination of Sales at Less Than Fair Value*, 79 FR 41986 (July 18, 2014), and accompanying IDM at Comment 2 (establishing that Commerce must necessarily identify a viable and appropriate third country as a concrete basis for normal value early in a proceeding and detailing the its rationale to not subsequently revisit the initial viability determination regardless of whether some, all, or no sales are subsequently determined to be usable in the calculation of normal value); *see also Notice of Final Determination of Sales at Less Than Fair Value:  Bottle-Grade Polyethylene Terephthalate (PET) Resin from Indonesia*, 70 FR 13456 (March 21, 2005), and accompanying IDM at Comment 11 ("We disagree with the petitioner that {Commerce} should revisit its market viability determination, as a matter of policy, after completing its analysis of the comments received at the time of the final determination.  The decision of which comparison market to use is normally made at an early stage in an investigation in order 'that respondents can provide the necessary sales information and {Commerce} can meet its statutory deadlines.  If issues decided in the course of the case *e.g.*, date of sale, cause the viability of the comparison market to change, it is simply too late to request, analyze and verify another database.'" (citing *Antidumping Duties; Countervailing Duties; Proposed Rule*, 61 FR 7307, 7334 (February 27, 1996)).  *See Final Results of Redetermination Pursuant to Court Remand, Stupp Corporation et al. v. United States*, Consol. Court No. 15-00334, Slip Op. 19-134, dated January 14, 2020, in response to *Stupp Corporation et al. v. United States*, Consol. Court No. 15-00334, Slip Op. 19-134 (CIT 2019); and *Final Results of Redetermination Pursuant to Court Remand, Stupp Corporation et al. v. United States*, Consol. Court No. 15-00334, Slip Op. 19-2, dated May 2, 2019, in response to *Stupp Corporation et al. v. United States*, Consol. Court No. 15- 00334, Slip Op. 19-2 (CIT 2019).

investigation and the new information provided on the remand record indicates that the identifiable volume of Prochamp's sales to the German market, relative to its sales to the French market, is equal to, if not increased from, what Commerce estimated from the record evidence at the time of the selection of the third-country market. This is the case even when accounting for potential Austrian and [      ] sales discussed herein, were the French market total reported to be given the same level of scrutiny. Finally, we note that the revised German market consumption quantity of [     ] KG remains nearly double that of the [   ] KG reported for Israel (the third largest non-U.S. market reported by Prochamp, but for which no party advocated for selection as the appropriate third country comparison market in the investigation). This similarly continues to support Commerce's underlying conclusion that the German market is significantly larger than the Israeli market.[65]

## IV. INTERESTED PARTY COMMENTS

Commerce released its draft results of redetermination on October 7, 2024, in which we provided interested parties the opportunity to submit comment for consideration in these final results of redetermination.[66] Prochamp and the petitioner submitted timely comments on the Draft Redetermination on October 19, 2024.[67] Prochamp's Comments indicated support for the Draft Redetermination, concluding that "Commerce's Draft Remand Results provide a more comprehensive explanation for its selection of Germany as Prochamp's third-country comparison market. Accordingly, Commerce's Draft Remand Results fully comply with the Court's Order,

---

[65] *See* Prochamp's SAQR2 at Exhibit A-15; *see also* Third Country Consumption Analysis Memo at Attachment.
[66] *See* Draft Results of Redetermination Pursuant to Court Remand, *Giorgio Foods, Inc. v. United States,* Court No. 23-00133, Slip Op. 24-79 (CIT July 17, 2024), dated October 7, 2024 (Draft Redetermination). The Third Country Consumption Analysis Memo accompanied release of the Draft Redetermination.
[67] *See* Prochamp's Letter, "Certain Preserved Mushrooms from Netherlands: Comments on Draft Remand Results," dated October 18, 2024 (Prochamp's Comments); and Petitioner's Letter, "Certain Preserved Mushrooms from the Netherlands – Petitioner's Comments on Draft Redetermination Pursuant to Court Remand," dated October 18, 2024 (Petitioner's Comments).

are supported by substantial evidence and are otherwise in accordance with law," and otherwise

identified no substantive issues for Commerce to address.[68]  In providing substantive comment in

opposition to the findings in the Draft Redetermination, the petitioner asserts that:  (1) the "draft

redetermination fails to address the issue remanded by the Court – and continues to rely on

speculation instead of facts that are specifically relevant to the sales activities of respondent

{Prochamp}"; (2) "the agency's draft remand is unlawful";[69] and (3) Commerce should request

an additional extension of time to submit its final results of redetermination, and instruct

Prochamp to submit a French sales data.[70]

After considering these comments, we disagree with the petitioner that the Draft

Redetermination fails to address the issue remanded by the Court, and have made no changes to

the Draft Redetermination.  We summarize and address the petitioner's comments below.

**Comment 1:   Whether Information Relied upon is Inconclusive and Irrelevant and Fails to
Remedy the Fundamental Issue Remanded by the Court**

The petitioner did not provide the requested executive summary regarding its comments on the
Draft Redetermination.  Accordingly, the petitioner's arguments may be found at pages 2
through 6 of its comments.[71]

**Commerce's Position:**

We disagree with the petitioner.  The Draft Redetermination did note that the record does

not contain information which allows for precise quantification of downstream distribution

activities of Prochamp's unaffiliated customer, [     ].  However, identification of this purported

"flaw" sets up a strawman which ignores the critical fact that the central issue is not Prochamp's

sales activities, but those of its unaffiliated customer and that customer's downstream sales

---

[68] *See* Prochamp's Comments at 3.
[69] *See* Petitioner's Comments at 1-2.
[70] *Id.* at 9.
[71] *Id.* at 2-6.

activities. While Prochamp does not have specific knowledge of [      ]'s distribution activities to [      ] own downstream locations, that type of information is maintained by [      ], the respondent's unaffiliated customer. Commerce maintains no expectation that respondents have access to details of their unaffiliated customers' downstream distribution operations. Thus, in this investigation, Commerce could not expect that Prochamp would know how [      ] distributes the mushrooms that it purchased from Prochamp to its retail stores to the level of detail which can reasonably pinpoint likely market of final sale for consumption because that information was not known to Prochamp in the normal course of business and unlikely to be obtained to the record by Prochamp, much less at the early stages of the proceeding prior to the comparison market selection decision.

    Without knowing exactly where each sale was ultimately consumed, Prochamp's methodology for reporting third-country market sales used a combination of customer address, language-labelling, and product coding as the best proxy for the country of consumption. Indeed, more standard methods such as customer address or shipping destination would have been even less precise to determine the appropriate third-country market. For example, if only customer address was used, the third-country market would have been Germany, because all sales would have been to the German [      ] customer regardless of language label, despite record evidence plainly demonstrating that final consumption would have been outside of Germany. Similarly, if shipping destination had been used, the fact that [      ] used a local warehouse in the Netherlands would have resulted in finding that Prochamp had a viable home market despite the record evidence suggesting that those sales would not have been consumed in the Dutch market. In other words, Prochamp identified language-labeling as the best proxy for consumption early in the investigation and prior to the third country selection decision as an

attempt to acknowledge and address precisely the issues identified by the petitioner over the course of the investigation and litigation.

Still, the petitioner equates the fact that the record lacks Prochamp's *unaffiliated customer's* downstream distribution and sales information with an impermissible flaw in Prochamp's underlying reporting and Commerce's subsequent analysis and determination—a flaw which would exist for the record information for the French market as well.  Based on this false equivalency, the petitioner argues that Commerce's finding that Germany is the appropriate third-country market is unsupported and that Commerce, to satisfy the Court's concerns, must necessarily make a finding that the German market is not usable and select France as the comparison market in the alternative.  The petitioner reasons that the lack of Prochamp's unaffiliated customer's downstream distribution and sales information created an impermissible gap in part due to Commerce's choice to not request this information ("agency chose not to collect such relevant information from Prochamp directly").[72]

In so arguing, the petitioner effectively is setting a standard where any alternative explanation or information relied upon, other than the precise information of a customer's downstream distribution and sales information, is impermissible and thus compels the petitioner's desired result, even if the same information is equally not available for sales to the alternative French market.  However, by conflating Commerce's request for *Prochamp's* sales activities with a request for Prochamp's *customer's* downstream distribution and sales activities, the petitioner incorrectly suggests that such information was, and is, reasonably available, and as a result should have been expected to have been provided at the time of third country selection. In supporting this position, the petitioner repeatedly mischaracterizes the purportedly critical

---

[72] *See* Petitioner's Comments at 2.

information as evidence related to "Prochamp's sales activities,"[73] "{information related to the} mix of Prochamp's sales marked with German and Austrian product code"[74] and "record evidence relevant to Prochamp's sales,"[75] again obscuring the fact that any such information referenced is not Prochamp's own sales information, which the record otherwise contains, in full, but sales information for the unaffiliated customer which would only be available to that unaffiliated customer.[76]

Among other issues, the petitioner's arguments equate to an expectation that Commerce should have brought to bear the full *post hoc* comprehension of the record of the investigation in applying scrutiny to the record as it existed at the time of the selection of the viable, third-country comparison market, whereby it could have identified the size of the German market vis-à-vis other third-country markets based on information not typically available at the time but submitted by Prochamp to explain and further substantiate its identification of the market of consumption. We disagree that the record as further developed as a result of this remand proceeding supports any such conclusion, and thus the record available to Commerce at the

---

[73] *Id.*

[74] *Id.* at 3. It is unclear what information Commerce or Prochamp could have further placed on the record to address this, nor what gap exists at present regarding the mix of Prochamp's sales to [    ] of the two products with a "DE/AT" country code in the product description. All such sales data regarding the sale of the products by Prochamp to [    ] is contained on the record. The record is clear that Prochamp has label coding designated with a DE/AT tag which identifies a German language labeled product for its largest German customer and ships products with this label to either the customer's locations in Germany or the customer's local distribution warehouses in the Netherlands. The record contains complete information regarding the "mix" of sales executed by Prochamp and its customer. Again, the record lacks information regarding how the unaffiliated customer then distributes these products downstream in Germany or Austria, which is a commercial choice of the customer, not Prochamp.

[75] *Id.* at 5.

[76] Imprecise characterization detracts from the petitioner's comments elsewhere. For example, the petitioner states that "reported *sales* may be sold to Germany or Austria with no way of determining which sales are made in either country". *Id.* at 5. However, this is flatly incorrect: all sales are made to German customers and delivered to locations in Germany or to [    ]'s local distribution warehouse. This fact is not disputed. The central question involves downstream distribution and final consumption of sales executed to the German customer. There are no sales "sold to" Austria in question. If the question simply involved disambiguating sales made to German customers, invoiced to German addresses, delivered in Germany or to a local warehouse operated by the German customer, of German language labeled mushrooms, from sales made to Austrian customers or delivered to Austria, there is no issue to resolve.

beginning of the investigation certainly did not compel such scrutiny or lead to the conclusion the petitioner asserts. Indeed, the instant record was atypical in that it contained an unusually large amount of information regarding sales in potential third country comparison markets at the time of selection resulting from the identification of this consumption issue early and Prochamp's fulsome responses regarding questions addressing this issue and the market identification methodology used.

The selection of the third-country comparison market typically relies on quantity and value worksheets tallying market sales totals with some reconciliation to relevant export sales accounts, as appropriate, informed in certain cases by further supplemental responses with respect to the products sold in the comparison markets. However, the information which allows the petitioner to argue that potential non-German sales for consumption may have been included within the reported German market total (*i.e.*, language label codes, product codes, screenprints of actual labels, transportation documents, *etc.*) and that information should have been taken into consideration at the time of the decision to select Germany as the comparison market, is possible only because of Prochamp's fulsome responses to questions in support of the methodology it used to disambiguate the market of likely sale for consumption.

The petitioner's argument takes for granted that any such information was available on the record at the time to identify the opacity of consumption, and with the full benefit of the record as further developed, including explanations which further illuminated the record with respect to Prochamp's level of knowledge of its unaffiliated customer's downstream distribution. We have taken certain observations gained by the later understanding of the record into account, to the extent appropriate to address the concerns of the Court in consideration of whether facts were observable and could have been considered at the time of third-country comparison market

selection. However, we note that the petitioner's arguments, generally, advocate for an unrealistic standard whereby Commerce is expected to identify potential issues immediately, deduce the potential impact from limited information, make presumptions based on hypotheticals, and hold respondents to a standard whereby they must either fully substantiate final market of sale for consumption with a customer's information they cannot reasonably be expected to obtain, otherwise Commerce will determine the market ineligible for selection as the appropriate comparison country if any record information contains a suggestion of potential consumption outside that primary market. Following the petitioner's logic, in the instant investigation, no information or explanation could ever have been provided to sufficiently address the Court's concerns, even as part of this redetermination which is far removed from the time Commerce must select the comparison market in the underlying investigation, short of that which relies on specific information which cannot reasonably be obtained (for any of Prochamp's third-country markets, including Germany, France, or Israel) and, thus, the only permissible conclusion is to find the German market unusable, and to find France usable with the same gaps in the record information.

Thus, we fundamentally disagree with this characterization of the record and of the petitioner's interpretation of the *Remand Order* and *Remand Opinion*. Commerce does not interpret the Court's *Remand Order* as holding that the only permissible avenue to allow Commerce to further support its conclusion regarding the substantially larger nature of the German market required consideration of only transaction-specific information from Prochamp's customer identifying market consumption of its customers. Indeed, the Court only instructed that Commerce reconcile the conclusion that "Prochamp's 'significantly larger overall quantity' of sales in Germany for consumption 'outweigh{ed}' the 'slight difference' in product similarity

that otherwise pointed toward using France," holding that "{a}bsent any better explanation, {Commerce} could not reasonably conclude that the Dutch company's exports to Germany were 'significantly' larger than those to France."[77]

The Court does not identify specific information required as support for Commerce's determination. Thus, Commerce understands the Court's *Remand Order* as requiring that Commerce reasonably explain why it determined the German market to be significantly larger than that of France, when some portion of the German sales could have been ultimately consumed in Austria, which Commerce acknowledged but did not fully analyze in selecting Germany.

For that purpose, we provided information to the record which further supports the underlying conclusion and reasonably accounts for potential third country consumption.[78] This information consists of country population data, mushroom consumption data, and the number of [    ] retail stores in the German and Austrian market to allow for a reasonable estimate of the amount of sales identified as consumed in the German market for the purposes of Commerce's initial third country selection determination which may have been distributed and consumed in the Austrian market.[79] We then used the resulting 10 percent estimate to adjust the German quantity totals used for the purpose of third country selection to determine whether – accounting for the reasonable estimate of constituent transactions which may reflect potential non-German consumption – Commerce's initial conclusion regarding the significantly larger size of the German market over the French alternative remains supported, and confirmed that this conclusion indeed remains supported.[80]

---

[77] *See Remand Opinion* at 20-21.
[78] *See* Remand NFI Memo.
[79] *Id.*
[80] *See* Part III. Analysis, above; *see also* Third Country Consumption Analysis Memo.

Notably, the petitioner identifies no actual flaw in the calculation or application of our analysis, does not contend that use of any inference supporting the conclusion is unreasonable or lacks support, nor claims that the 10 percent presumption used fails to provide a reasonable estimate of potential Austrian consumption, nor that the conclusion that the German market total less 10 percent to account for potential Austrian consumption remains significantly larger than the volume of the French market is unreasonable.  Rather, the petitioner dismisses the analysis merely because it is not based on specific sales information by Prochamp's unaffiliated customers.  However, as noted above, there is no reasonable basis to expect that Prochamp (or Commerce) would have access to any such information that could unequivocally determine whether merchandise was distributed downstream for sale for consumption to Austria and, if so, the actual amount of sales for consumption in Austria, much less at the time of comparison market selection.[81]  As such, Commerce employed a reasonable solution to address the Court's concerns, *i.e.*, to utilize information in the public domain which might reasonably estimate the volume of Austrian consumption "baked-in" to the German market total to then determine whether Commerce's conclusion regarding the relative significance of the German market compared to the French market remained supported once accounting for this information.  We maintain that this information and analysis is sufficient to address the *Remand Opinion* and *Remand Order*.

---

[81] Even if precise information from [     ] regarding how it distributes mushrooms downstream to retail locations were available, because the mushrooms are delivered to distribution warehouses, distributed in partial amounts from the amount delivered and potentially co-mingled, it is unlikely this information could be disambiguated in a sales database such that it would reflect only German consumption of each reported transaction.  Thus, detailed information from [     ] would serve only to provide a more precise figure with respect to the amount of sales to be removed to account for Austrian consumption, but could only be used for the same purpose.  Thus, as the petitioner fails to argue that Commerce's estimate reflects an unreasonable proxy for the customer's actual distribution activities, it fails to substantiate how use of such a proxy reflects an irrelevant and inconclusive alternative to information which would be used for the same purpose.

27

With respect to the petitioner's assertions that the information submitted on the remand record by Prochamp is wholly inconclusive or raises notable further concerns not already addressed, we disagree. Regarding the sales to [       ], and that customer's indication in correspondence (wherein Prochamp requested further detail regarding downstream distribution markets) that certain sales of [     ] branded mushrooms could be sold downstream to Slovenia,[82] we conservatively accounted for this information in our analysis. The petitioner suggests that this reflects even further evidence of the inaccuracy of final consumption market identification further suggesting that the German comparison market is unusable. However, we do not find that this statement raises significantly greater concern that the German market contains a potentially greater amount of sales for consumption in non-German markets not previously considered. The quantity of the affected transactions is small and accounted for conservatively in our analysis, and the identification of this potential by this one relatively minor customer is mitigated otherwise by responses from [     ], discussed below, which reflects that the proportion of [     ] "DE/AT" product sales distributed downstream and potentially sold outside of Germany may be considerably smaller than Commerce's analysis presumes.

Moreover, [       ]'s statement merely serves to reinforce that the details regarding Prochamp's unaffiliated customers' distribution activities are not generally communicated to Prochamp or known to the respondent in the normal course of business. Indeed, the correspondence suggests that, up to the point where Prochamp queried its customer for the purposes of this remand segment regarding downstream distribution of products sold during the POI over three years after such transactions took place, it had no knowledge, nor reason to suspect that German language labeled mushroom products to a German customer and shipped to

---

[82] *See* Prochamp's NFI Memo at Exhibit 5.

the customer's location in Germany would be consumed in a non-German market.  This supports that Prochamp made its best effort to identify German consumption in the initial stages of the investigation and could not be expected to reasonably provide more accurate information of its customers' distribution activities not known in the normal course of business.

The petitioner also dismisses the [     ] correspondence provided to the record by Prochamp as merely "confirm{ing} that Prochamp's reported sales… include sales for consumption in countries other than Germany."  It is important, however, to contextualize the correspondence.  No one disagrees that some merchandise with the "DE/AT" label was sold outside of Germany.  We summarize [     ]'s correspondence in terms of specific products reported in the following table:

| Sales of [   ] Products | | | | | | |
|---|---|---|---|---|---|---|
| Product Label Code | Product Description | CONNUM | Total QTYU Sold | % Total [   ] Quantity | [   ] Identifier | Prochamp NFI Exhibit 3 |
| [ | | | | | | ] |
| [ | | | | | | ] |
| [ | | | | | | ] |
| [ | | | | | | ] |

*See* Prochamp's NFI Submission at Exhibit 3.

To the extent this information "confirms" non-German consumption it does so only by indicating that sales of one product, which reflected a small fraction of total volume of German sales reported, was distributed [                                    ].[83]  Granting that the word [         ] reflects an unambiguous indication that a minority of sales of a product were distributed to Austria, this acknowledgement pertains to only one product with a "DE/AT" product label coding reflecting [     ] percent of the sales database.

---

[83] *See* Prochamp Remand NFI Memo at Exhibit 3.

Furthermore, if the petitioner impliedly takes [      ]'s response at face value to indicate conclusively non-German sale for consumption of that product, in part, it must apply that same reading of the plain language for the remainder of the responses provided by [      ] for the other products, which each indicated they were sold for consumption "[                    ]" and provided no indication or inference otherwise of non-German distribution or sale for consumption.  This evidence then plainly indicates that for all other constituent transactions, comprising over 98 percent of the German market total sales volume reported for the purpose of third country selection, [      ] confirmed the sales were "[                    ]" and properly attributed to the German market.  Critically, this includes the DE/AT labeled product which comprises the vast majority of [      ]'s German sales database, and does so with information provided directly from [      ], consistent with the petitioner's own standard.  Thus, to accept that the [      ] correspondence definitively indicates non-German distribution and consumption of one DE/AT labeled product, necessarily accepts that [      ]'s responses for each product otherwise are also accurate and unambiguous.

Commerce notes that the statements provided by [      ] are brief and could not serve as definitive indicators of final distribution/consumption if they were the only information on the record.  However, to the extent that the petitioner dismisses this correspondence because of language stating that one product was "mainly" intended for Germany, that conclusion would have to be taken together with the other language clearly stating that the other product codes were intended only for Germany, as the correspondence indicates.  Under that reasoning, [      ]'s response in Exhibit 3 of its NFI submission otherwise unambiguously confirms that over 99 percent of Prochamp's sales to [      ] are consumed in Germany.  Accordingly, direct evidence provided by the customer reflects that non-German consumption in Austria for DE/AT

30

labeled sales is miniscule, and Commerce's 10 percent adjustment used in the Draft

Redetermination likely overstated the potential Austrian consumption. Thus, substantial

evidence supports Commerce's conclusion that the German market is substantially larger than

the French market.

**Comment 2:   Whether Record Information Supports Selection of France as the Appropriate Comparison Market and Whether Commerce's Statements Regarding Potential Issues with French Sales Information Improperly Disparaged France Without Record Support**

The petitioner did not provide the requested executive summary regarding its comments on the Draft Redetermination. Accordingly, the petitioner's arguments may be found at pages 7 through 8 of its comments.[84]

**Commerce's Position:**

We disagree with the petitioner. The petitioner mischaracterizes our statements regarding

the French sales order data and invoices and labels provided for the French market submitted to

the record prior to the third country selection determination, which noted that similar issues with

respect to precise identification of final consumption market identified by the petitioner with

respect to German market information could also be observed in the French market information.

Observations regarding *potential* issues flagged by the limited French sales order information

(and handful of accompanying invoices) on the record are not made to "disparage" a hypothetical

French dataset but, as plainly stated, serve only to identify the challenges in identifying final sale

for consumption in either comparison country, given the nature of the product (a canned food

product), the customers and sales channel involved (large supermarket chains with many levels

of warehousing and distribution), and the potential comparison markets in question (large

economies in the E.U. common market with open, contiguous, borders with other markets which

share the same primary language, all of which contain the same customer's downstream retail

---

[84] *See* Petitioner's Comments at 7-8.

stores). The petitioner states that these observations cannot be used to infer any definitive conclusions with respect to whether or not the French market total reported (and any hypothetical sales database later submitted) would or would not contain similar issues with respect to market of sale for consumption identification, as no such market was selected, and thus further scrutiny cannot be applied and the observations remain speculative.

Here too the petitioner's logic ignores the proper context that must be applied, *i.e.*, the record at the time of the comparison market selection decision. Limited information from either market was available at the time (though Prochamp submitted an initial German section B database pending the decision, this database was not yet revised to reflect the third-country market identification methodology later applied), and comparative information generally limited to information provided in the SSAQR2 Exhibits A-28 and A-29, and which contained equivalent information for each country. At the time Commerce made its selection, it also made reasonable presumptions and observations with respect to the information provided for each country by the time of that decision.

As an initial matter, Commerce's analysis and further explanation in support of the conclusions regarding the relative advantage of the German market, over the French market in terms of quantity, are not reliant on Commerce's observations otherwise regarding transactions attributable to French market consumption. Even if the reported French sales quantity and value perfectly matches actual volume of sales for consumption in France, the decision to select Germany as the comparison market due to is relative size was appropriate at the time of selection and remains appropriate in consideration of the further developed record and remand record. Our revised analysis determined that the conservatively adjusted German total remained substantially larger that the French total which was conservatively applied as reported.

The petitioner's arguments generally appear to be inconsistent in that the petitioner argues that certain sales can be attributed to France because purchase orders indicate that the sales were intended for France, even though further record evidence demonstrates those sales were actually consumed in other French-speaking areas, but with respect to German sales under identical conditions, the petitioner argues that Commerce cannot assume those sales were consumed in Germany. With respect to statements Commerce made in the Draft Redetermination on whether certain sales were to mainland France, the petitioner stated that "the agency has not identified any evidence that such sales may have been consumed in France despite the fact the company is located in Monaco" and {for sales to a company in New Caledonia} "the record does not in fact indicate these sales were not consumed in mainland France."[85] The petitioner further argues that mainland French consumption should be presumed for these sales because the purchase order database "consistently reported these companies' country ("Customer Country") as "France" and the port of destination country as "France."[86] Accepting this logic, it is not then clear why transactions reported as attributable to the German market, to a German customer, delivered to Germany (or to a local warehouse of the German customer), with a German language label, with no direct evidence[87] on the record that the sales

---

[85] This statement is directly contradicted by the record. Both invoices provided to the record for such sales in the SSAQR2 at Exhibit 28 specifies that such products are to be delivered by ocean freight shipment to "NOUMEA Nieuw-Caledonië" and the label information also provided reflects English, French, Greek, German, and Italian. Even if sales to French Overseas Territories properly classify as French consumption, all direct evidence supports consumption outside mainland France, regardless of the customer or port of destination country otherwise listed.
[86] *See* Petitioner's Comments at 8.
[87] The DE/AT product coding of certain products may suggest for the possibility that such products could have been consumed in Austria but otherwise identifies the customer country and port of destination as Germany. Despite this, the petitioner argues that Commerce cannot presume those sales were consumed in Germany. Yet, with respect to French sales, the petitioner argues that certain sales suggesting a non-mainland-France customer location or delivery address on the face of the invoice serves as inadequate basis to presume consumption outside of mainland France where the purchase order database otherwise identified the customer country and port of destination country as France. If the petitioner's logic is to be applied consistently, then mere indication of the AT in the "DE/AT" country label code similarly would not serve as any such definitive evidence to suggest against German-market classification where Prochamp otherwise identified the customer country and port of destination country as Germany.

were not consumed in Germany, served as an appropriate basis to conclude the German market total was incorrectly identified.[88]  Thus, the petitioner suggests Commerce should apply a different interpretive framework and draw different conclusions for similar types of evidence regarding the French and German markets.

The petitioner then states that other French-market transactions for which transaction-specific information detail was provided in Exhibit 28 of the SSAQR to customer [                    ] were properly reported as France.  The petitioner asserts that all evidence on the record reflects that this reporting is correct, as the customer country and delivery location are reported as France in the purchase order database at Exhibit 29.2, and this is consistent with the information on the face of the invoice provided in Exhibit 28.2.  However, the relevance of these [                    ] sales is unclear, because Commerce did not identify any potential issues with the reporting of these sales in the Draft Redetermination.  Yet, even here, the record with respect to [                ] sales is not unambiguous.  Specifically, though the sales invoice reflects the customer and delivery address in France, the label itself for the [                    ]-branded products is equal parts French and German and lists both [                ]'s French and German corporate addresses as contact information on the label, thus suggesting the downstream distribution of these products by [                    ] could, potentially, involve final retail sale for

---

[88] In this way, if the accuracy of Prochamp's initial reporting is given the same deference the petitioner proposes be extended to the French market identification, the CH label description sales later removed from the third country sales database based on evidence that such sales were intended for the Swiss market and Slovenian sales removed based on the [          ] statement on remand did not, by mere virtue of the country code identified on the product code itself or the customer's *post hoc* statement not known to Prochamp at the time, reflect compelling evidence that such transactions should be removed from the German market total for the purpose of third country selection, since such transactions were reported with country and port of delivery as Germany.  Nevertheless, Commerce's analysis on remand conservatively removed or adjusted for all sales reported in the comparison database which identified non-German consumption or the likelihood thereof for the purpose of assessing whether the German market total quantity remained substantially larger than that of the French market total.

consumption in Germany (though the existing record fully supports that Prochamp attributed these sales to the correct market based on information available).

### Comment 3:   Whether Commerce Should Select France as the Comparison Market and Instruct Prochamp to Submit French Sales Data

The petitioner did not provide the requested executive summary regarding its comments on the Draft Redetermination.  Accordingly, the petitioner's arguments may be found at pages 6 through 7 and page 9, of its comments.[89]

**Commerce's Position:**

We disagree that the Court's *Remand Opinion* and *Order* require Commerce to request Prochamp's French sales database.  As noted above, the Court remanded Commerce's third-country market determination based on Commerce's conclusion that the German market volume was substantially higher than the other potential third-country markets, despite evidence indicating that some of those sales were consumed in Austria, and instructed Commerce to further explain this finding.  As explained in detail above, we have done so in this remand redetermination.

It is Commerce's general practice to identify a viable and appropriate third-country market early in a proceeding and to not subsequently revisit the initial viability determination. However, the issue in this remand is whether Commerce's decision to select Germany as the comparison market in the underlying investigation was supported by substantial evidence, given evidence on the investigation record indicating that some sales may not have been consumed in Germany.  In reevaluating the record and assessing evidence collected during the course of this remand, Commerce accounted for the likelihood of potential Austrian consumption and adjusted for a reasonable estimation of the amount of any such consumption.  Based on this analysis,

---

[89] *See* Petitioner's Comments at 6-7 and 9.  The petitioner did not brief this as a distinct comment.  However, statements in Part I.C of the first comment and Part III (the conclusory paragraph) are best addressed together as a distinct comment.

Commerce continues to find that the record supports the conclusion that the German market is substantially larger than the French market, and that Commerce's selection of Germany as the third-country market for calculating NV was based on substantial evidence.

During the course of an investigation or review, it is not Commerce's practice to request that two complete comparison market sales datasets be submitted and compared side-by-side as a prerequisite to determine which market is appropriate for selection. Rather, selection of the appropriate third-country comparison market can be reasonably determined based on broad market and product information from the respondent in response to section A of the questionnaire. Once Commerce selects the third-country market, it then requests the respondent submit the selected third-country sales information. Requiring a respondent to submit sales information for all potential third-country market prior to the selection of the third-country market is both burdensome and unnecessary. The petitioner cites no precedent where two full sales databases are available on the record and evaluated on their relevant merits at the time of selection. The petitioner's proposal that the issue in this remand proceeding may only be resolved upon submission and comparative evaluation of a French sales data vis-à-vis the German sales data effectively establishes a standard which requires respondents to submit multiple complete comparison markets sales data from which Commerce later identifies and later selects the appropriate comparison market. This is not only contrary to Commerce's practice, but it is also unnecessary for the purposes of this remand. As explained in detail above, record evidence collected during the course of this remand proceeding demonstrates that Prochamp's sales to Germany, even conservatively adjusted for potential sales to Austria, are substantially larger than its sales to France.

## V.     FINAL RESULTS OF REDETERMINATION

We find that a reexamination of the record, in consideration of information placed on the record in this remand segment, allows Commerce to quantify and reasonably account for the proportion of sales reported in the German market by Prochamp which reflect mushrooms which were "likely" to have been sold for downstream retail consumption in a German-speaking market outside of Germany.  Accordingly, the record allows Commerce to continue to reasonably conclude that the volume of Prochamp's sales to Germany remain significantly larger than the volume of sales to France (or Israel), and to find that the selection of Germany as the appropriate third-country comparison market is supported.  Therefore, we have made no changes to the margin calculations from the *Final Determination*, and Commerce determines that the following estimated weighted-average dumping margin exists:

| Producer or Exporter | Estimated Weighted-Average Dumping Margin (percent) |
|---|---|
| Prochamp B.V. | 0.00 |

11/14/2024

X   *Elouaradia*

Signed by: ABDELALI ELOUARADIA

Abdelali Elouaradia
Deputy Assistant Secretary
  for Enforcement and Compliance

**TAB 4**

**Judgment (July 16, 2025)**

**Appx00099**

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| GIORGIO FOODS, INC., <br>     *Plaintiffs*, <br> v. <br> UNITED STATES, <br>     *Defendant*, <br> and <br> PROCHAMP B.V., <br>     *Defendant-Intervenor*. | Ct. No. 23-00133-MMB |

## JUDGMENT

For the reasons stated in Slip Opinion 25-90 (ECF 65), the court sustains

the Department of Commerce's redetermination (ECF 50).

Dated:     July 16, 2025         /s/ *M. Miller Baker*
             New York, New York    M. Miller Baker, Judge

**TAB 5**

**Giorgio Foods, Inc. v. United States, Slip Op. 25-90 (July 16, 2025)**

**Appx00100-00112**

**Slip Op. 25-90**

**UNITED STATES
COURT OF INTERNATIONAL TRADE**

**Court No. 23-00133**

GIORGIO FOODS, INC.,

*Plaintiff,*

v.

UNITED STATES,

*Defendant,*

and

PROCHAMP B.V.,

*Defendant-Intervenor.*

Before: M. Miller Baker, Judge

**OPINION**

[The court sustains Commerce's redetermination.]

Dated: July 16, 2025

*John M. Herrmann*, *Joshua R. Morey*, and *Julia A. Fox*, Kelley Drye & Warren LLP, Washington, DC, on the comments for Plaintiff.

*Yaakov M. Roth*, Acting Assistant Attorney General; *Patricia M. McCarthy*, Director; *Tara K. Hogan*, Assistant Director; and *Daniel Bertoni*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, on the

comments for Defendant. Of counsel for Defendant was *Ruslan Klafehn*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, Washington, DC.

*Lizbeth R. Levinson*, *Brittney R. Powell*, and *Alexander D. Keyser*, Fox Rothschild LLP, Washington, DC, on the comments for Defendant-Intervenor.

*Baker*, Judge: This case involving a challenge to the Department of Commerce's calculation of the dumping margin assigned to mushrooms from the Netherlands returns after remand. *See Giorgio Foods, Inc. v. United States*, Case 23-133, Slip Op. 24-79, 2024 WL 3534491 (CIT July 17, 2024). In that opinion, the court directed Commerce to reconsider its selection of Germany as the third country for determining normal value under 19 U.S.C. § 1677b(a)(1)(C)(ii) and 19 C.F.R. § 351.404(e). After reopening the record, the agency again picked that nation. This time, the court sustains that choice.[1]

I

An antidumping investigation requires Commerce to figure out, among other things, the "normal value"

---

[1] In so doing, the court declines to redact certain confidential record material that it finds does not qualify as "business proprietary information" under the applicable Commerce regulation, 19 C.F.R. § 351.105(c). *See* 19 U.S.C. § 1516a(b)(2)(B) (providing that the court "shall . . . preserve[] in any action under this section" the "confidential or privileged status accorded to any documents, comments, or information," except that it "may disclose such material under such terms and conditions as it may order").

of the merchandise in question. *See Giorgio Foods*, Slip Op. 24-79, at 2, 2024 WL 3534491, at *1. In most cases, "normal value" refers to "the price at which the foreign like product is first sold . . . for consumption in the exporting country." 19 U.S.C. § 1677b(a)(1)(B)(i). In other words, the agency calculates the commodity's retail price in the home market. *See Smith-Corona Grp. v. United States*, 713 F.2d 1568, 1573 (Fed. Cir. 1983) (explaining that "[t]he home market sales method is preferred" for ascertaining normal value).

When home-market transactions are less than five percent of the product's sales in the United States, *see* 19 U.S.C. § 1677b(a)(1)(C)(ii), Commerce determines normal value differently. In those circumstances, it examines "the price at which the foreign like product is . . . sold (or offered for sale) for consumption" in a third country, *id*. § 1677b(a)(1)(B)(ii), subject to several conditions, *see id*. § 1677b(a)(1)(B)(ii)(I)–(III).

The statute does not say what happens if more than one country satisfies those conditions. In such cases, the applicable regulation provides that the Department "generally will select the third country based on" certain "criteria." 19 C.F.R. § 351.404(e). Those are product similarity, *id*. § 351.404(e)(1), sales volume, *id*. § 351.404(e)(2), and "other factors as . . . appropriate," *id*. § 351.404(e)(3).

## II

At the request of domestic producer Giorgio Foods, Commerce opened an antidumping investigation into preserved mushrooms from the Netherlands. *Giorgio*

*Foods*, Slip Op. 24-79, at 6, 2024 WL 3534491, at *2. The Department selected Prochamp B.V., a Dutch producer, as a mandatory respondent. Appx13796. As home-market transactions fell below the five-percent threshold, the agency identified Germany, France, and Israel as candidates for calculating normal value. Appx13797. Commerce found that all three satisfied the requirements of § 1677b(a)(1)(B)(ii) and therefore turned to the factors specified in 19 C.F.R. § 351.404(e). *Id.*

Applying those criteria, the agency found that Prochamp's "significantly larger overall quantity" of sales in Germany "outweigh[ed]" the "slight difference" in product similarity that otherwise pointed toward using France. Appx1004. For this and other reasons, the Department ultimately assigned the Dutch company a dumping rate of zero. *Giorgio Foods*, Slip Op. 24-79, at 13, 2024 WL 3534491, at *5 (citing Appx1272).

Giorgio then filed this suit. Among other things, it attacked Commerce's selection of Germany as the third-country market. The agency's conclusion relied on Prochamp's sales data, which included purchases by "a multinational retailer that could just as easily have been distributed to other German-speaking countries." *Id.* at 12, 2024 WL 3534491, at *4 (cleaned up and citing Appx1064). The Department gave no justification for its assumption that the mushrooms likely made their way to stores in Germany—it was thus "unknown the extent to which mushrooms sold to that retailer were in turn resold *in Germany* for consumption" as required by the statute. *Id.* at 18, 2024 WL 3534491, at *6 (emphasis in original); *cf.* 19 U.S.C.

§ 1677b(a)(1)(B)(ii). Since "any better explanation" for Commerce's decision was "absent," the court "return[ed] this issue to the agency for reconsideration." *Id.* at 20–21, 2024 WL 3534491, at *7.

On remand, the Department read this court's opinion as requiring it to "reconcile its selection of Germany as the third-country market based on the volume of sales to [that country] with record information suggesting that . . . some portion of the German-market sales were likely distributed to other German-speaking countries for consumption." Appx13805 (internal quotation marks omitted).[2] Commerce noted the record had no information detailing "downstream distribution activities" of Prochamp's customer such that it could reliably determine what portion of sales

---

[2] Commerce mischaracterized the court's opinion, which did not describe Prochamp's sales to a multinational retailer as "German-market sales." Instead, the court said that most of that company's "*ostensible* 'German' sales were to a multinational retailer, which received them at a warehouse outside of that country." *Giorgio Foods*, Slip Op. 24-79, at 18, 2024 WL 3534491, at *6 (emphasis added). The problem was that the record did not indicate "the extent to which mushrooms sold to that retailer were in turn resold *in Germany* for consumption." *Id.* (emphasis in original). Under the statute, "[w]hat matters is not where the product is ultimately consumed," but where "the product is *sold or offered for sale* for consumption.'" *Id.* at 19 n.14, 2024 WL 3534491, at *6 n.14 (emphasis added). A sale *to* a retailer is not a sale "for consumption," in contrast to a sale *by* a retailer. *See* 19 U.S.C. § 1677b(a)(1)(B)(ii). Thus, while the *Department* initially considered the sales to the retailer to be "German-market" sales, the court did not.

were made in German versus Austrian retail outlets. Appx13806–13807.

The agency thus reopened the record to collect new data allowing it to approximate the proportion of retail sales made in those countries. *Id.* It added new evidence, including information about (1) the number of retail stores operated by Prochamp's largest customer in Germany and Austria, the other German-speaking country where the customer potentially sold the product; (2) population data for those two countries; and (3) publicly available figures "regarding mushroom consumption" in those countries. Appx13807.[3]

The Department analyzed the new data and found that, as to each set, the ratio between Germany and Austria was around 90 percent to 10 percent. Appx13808. The agency found this evidence "reasonably support[s]" the conclusion that "the Austrian market portion" of the Dutch company's sales to its largest customer was around 10 percent of "German-labeled mushrooms" because of the "high level of consistency between these figures." *Id.*

Commerce then approximated Prochamp's total sales for consumption in Germany. It did so by adding together (1) total sales of German-labeled mushrooms

---

[3] Prochamp similarly added new record information, submitting emails between it and two of its customers identifying product numbers sold exclusively in Germany and those also sold in other countries. *Id.* It also provided website data from a third customer showing that it did not operate in any other countries where German is an official language. *Id.* & n.51.

to the Dutch company's largest customer, reduced by 10% to account for the Austrian market; and (2) sales to other customers, excluding (i) those products known to be sold only in Switzerland and (ii) a "specific product" identified on remand that may have been sold in Germany or yet another country. Appx13808–13809. The net result was somewhat lower than the estimate in its original determination. *See* Appx13809.

The agency next compared this revised German consumption estimate to the French total. It found the latter to be around two-thirds of the former, "without accounting for consumption of French-labeled merchandise outside of France"—meaning that the French total was not subject to the same scrutiny as its German counterpart. *Id.* The Department thus preliminarily found once more that the total for Germany was "significantly larger" than that for France, even with a bullish estimate of "potential non-German sales" removed. Appx13810. It also observed that the French total was potentially inflated through inclusion of French-label sales outside that country. Appx13810–13811. Even so, it used that figure. Appx13809–13810.

Giorgio contested that renewed finding, arguing the agency used inconclusive and irrelevant information to make its calculation and failed to remedy the problem for which the court remanded in the first place. Appx13813. It also argued that the evidence supported France as the appropriate comparison market, and that the agency "disparaged" that country as a potential comparator "without record support." Appx13824.

Commerce considered and rejected Giorgio's attack on the new evidence. Appx13818. First, the agency noted that alternative estimation methods would have been "even less precise." Appx13814. Next, it found the company's insistence that the Department must calculate actual sales set an implausibly high standard where no information "other than the precise [data detailing] a customer's downstream distribution" would suffice. Appx13815. Commerce then stated that the information Giorgio demanded for Germany was "equally not available" for France. *Id.* It also observed that the company neither argued that the agency's inferences were "unreasonable or lack[ing] support" in the record, nor identified an "actual flaw" in the analysis. Appx13820. Finally, the Department defended its use of the new record information, finding that it showed "[t]he quantity of the affected transactions is small and accounted for conservatively," Appx13821, such that the 10-percent adjustment "likely overstated" Austrian consumption (and understated the same in Germany), Appx13824.

The agency also responded to Giorgio's complaint that it had unfairly "disparaged" the French dataset. *Id.* It said the company had "mischaracterize[d]" its analysis, which simply pointed out that Giorgio's critique of the German sales figures equally applied to "the French market information." *Id*. Commerce explained that its "[o]bservations regarding *potential* issues" with the latter were made not to "disparage" that data, but rather only to note "the challenges in identifying [the] final sale[s] for consumption in either comparison country." *Id*. (emphasis in original).

The Department emphasized that its "conclusions regarding the relative advantage of the German market" over its French counterpart "in terms of quantity" were "not reliant" on its observations regarding potential issues in the latter dataset. Appx13825. "Even if the reported French sales quantity . . . perfectly matche[d] actual volume of sales for consumption" there, selecting "Germany as the comparison market" was still "appropriate" due to its "relative size" despite the adjustments to account for non-German sales. *Id*. "[T]he conservatively adjusted German total remained substantially larger than the French total which was conservatively applied as reported," Appx13826, that is, unadjusted for potential non-French sales. Commerce thus declined to select France as the comparison market. Appx13830.

Giorgio now challenges the agency's redetermination. It argues that the Department failed "to identify accurately the volume" of Prochamp's sales for consumption in Germany. ECF 56, at 3. It also asserts that the French data "do not suffer from the same flaws as" the German figures. *Id*. at 4. Giorgio thus asks the court to "direct Commerce to reconsider France as an alternative." *Id*. at 16.

III

This time, the Department supported its finding that the German market was the largest by volume with record evidence. The agency reopened the record and considered additional data to calculate what portion of its sales Prochamp made in that market. Appx13806–13807. Using that information, it approxi-

mated the share of German-labelled products sold to other countries and then used that estimate to calculate the Dutch producer's sales in Germany. Appx13808–13809.

The agency's estimate of German-market sales was purposely conservative. Commerce applied the 90-percent presumption to *all* of Prochamp's German-language-label sales to its largest customer, even those transactions where the record cast no doubt that they were made in Germany. Appx13810. It also excluded all sales of one product code that could have been made in a different country, even though evidence showed at least some of that line was sold in Germany. *Id.* The Department observed that its approximation thus likely understated the volume of sales in that country while overstating it for other countries. *Id.* Even with these adjustments, the German market "continue[d] to be significantly larger" than its "unadjusted and unscrutinized" French counterpart. *Id.*

Based on old and new record evidence, Commerce approximated the total sales of Prochamp's mushrooms in Germany and accounted for potential downstream sales in other German-speaking countries that it included in its prior calculation. The agency has now provided a "better explanation" that moves its decision out of the realm of "mere speculation," *cf. Giorgio Foods*, Slip Op. 24-79, at 20, 2024 WL 3534491, at *7 (cleaned up), into one with evidence "a reasonable mind might accept as adequate to support" its conclusion, *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003). That satisfies the substantial-evidence standard of review.

Giorgio attacks the Department's collection and use of the new information, arguing that evidence is "inconclusive" and the agency's analysis rests on a "faulty premise." ECF 56, at 12. The company asserts these failures are fatal because Commerce's task on remand was to "quantif[y] the volume of preserved mushrooms that Prochamp sold . . . in Germany." *Id.* at 10; *see also id.* at 11 (the agency's method "does not—and cannot—answer the question [it] set [out] to answer"). It contends that since the new record information does not allow Commerce to quantify the retailer's sales in Germany, the Department "commit[ted] a logical error by generalizing" from the new data. *Id.* at 12.

The court declines the company's invitation to reweigh the augmented record evidence. The new data, and the agency's reasonable inferences from them, support its decision. The Department compared the population, mushroom consumption,[4] and relevant retail outlet totals of Germany and Austria[5] to arrive at

---

[4] Giorgio asserts in passing that "Commerce erred in generalizing population and fresh mushroom consumption data to" the retailer's "sales of *preserved* mushrooms" in Germany and Austria. ECF 56, at 12 (emphasis in original). The record about consumption in those countries, however, is ambiguous as to whether it pertains to fresh, preserved, or both types of mushrooms. *See* Appx13857–13858. In any event, even if that information is limited to fresh mushrooms, it's a reasonable proxy for the consumption of preserved mushrooms.

[5] Giorgio imagines that "Austrian stores may stock mushrooms in higher quantities compared to German ones." ECF 56, at 12. But just as "speculation, conjecture, [or]

(footnote continues on next page)

its estimate. Appx13808. In so doing, it applied conservative presumptions that, if anything, undercounted German retail sales. Appx13810. It then compared that conservative estimate "to a French total submitted early in the proceeding and which [was given] no such comparable scrutiny of its constituent transactions." *Id.*; *see also* Appx13825–13826 (same). In other words, the French total used for the comparison—unlike its German counterpart—received the benefit of the doubt.[6]

In short, the American company is simply wrong to claim that Commerce's redetermination suffers from the same flaws as before. At first, the Department ignored its own finding that Prochamp's customer "likely resold the mushrooms in Germany *and* another country" and insisted on using the German data anyway. *Giorgio Foods*, Slip Op. 24-79, at 20, 2024 WL 3534491, at *7 (cleaned up and emphasis in original). On remand, the agency used the preexisting record and new information to reasonably and conservatively approximate total sales in Germany, compared them to total sales in France that were not subject to such scrutiny, and continued to rely on the former country's data consistent with its policy and 19 C.F.R.

---

divination" cannot support agency action, *Giorgio Foods*, Slip Op. 24-79, at 19, 2024 WL 3534491, at *7 (quoting *Fla. Gas Transmission Co. v. FERC*, 604 F.3d 636, 641 (D.C. Cir. 2010)), neither is it a basis for remand.

[6] Precisely because Commerce used the unadjusted French sales data in making its comparison, Giorgio's grumbling about the Department's purported "disparagement" of that information is irrelevant. *See* ECF 56, at 16–20.

§ 351.404(e). That's all the court required Commerce to do. *See SSIH Equip. S.A. v. U.S. Int'l Trade Comm'n*, 718 F.2d 365, 382 (Fed. Cir. 1983) (if the Department makes a choice based on substantial evidence between "two fairly conflicting views," the court may not substitute its judgment even if its view would have been different "had the matter been before it *de novo*") (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

\*    \*    \*

The court sustains Commerce's redetermination. A separate judgment will issue. *See* USCIT R. 58(a).

Dated:  July 16, 2025          /s/ *M. Miller Baker*
        New York, NY          Judge

**TAB 6**

**Memorandum from USDOC, Re: Less-Than-Fair-Value Investigation of
Certain Preserved Mushrooms from the Netherlands: Selection of Appropriate Third
Country Market (Aug. 26, 2022)**

**Appx03084-03090**

Barcode:4278828-01 A-421-815 INV - Investigation

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-421-815
Investigation
POI: 01/01/2021 – 12/31/2021
**Public Version**
E&C/Office III: AC/BAS

August 26, 2022

**MEMORANDUM TO:**    Brendan Quinn
                      Acting Director, Office III
                      Antidumping and Countervailing Duty Operations

**FROM:**             Benjamin A. Smith
                      International Trade Compliance Analysts, Office III
                      Antidumping and Countervailing Duty Operations

**RE:**               Less-Than-Fair-Value Investigation of Certain Preserved
                      Mushrooms from the Netherlands: Selection of Appropriate Third
                      Country Market

---

## I.      SUMMARY

On April 20, 2022, Commerce initiated the above-referenced investigation of certain preserved mushrooms (preserved mushrooms) from the Netherlands.[1] On May 17, 2022, Commerce selected Prochamp B.V. (Prochamp) as a mandatory respondent.[2] In its June 21, 2022, response to section A of the antidumping duty (AD) questionnaire, Prochamp reported that it did not have viable home market sales during the period of investigation (POI).[3]

This memorandum analyzes the data on the record with respect to the comparison market selection issue for Prochamp. Based on our analysis and the available record data, we recommend finding that Germany constitutes the most appropriate comparison market for Prochamp for purposes of calculating normal value (NV) pursuant to section 773(a)(1)(C) of the Tariff Act of 1930, as amended (the Act).

Not only are Prochamp's sales to Germany substantial, but the products sold to Germany are similar to the products Prochamp sold to the United States.

## II.     BACKGROUND

---

[1] See Certain Preserved Mushrooms from France, the Netherlands, Poland, and Spain: Initiation of Less-Than-Fair-Value Investigations, 87 FR 24941 (April 27, 2022) (Initiation Notice).
[2] See Memorandum, "Respondent Selection," dated May 17, 2022.
[3] See Prochamp's Letter, "Submission of Prochamp B.V.'s Section A Response," dated June 21, 2022 (Prochamp's Section A Response) at 4.



In its June 21, 2022, Section A response, Prochamp stated that it had home market sales of the foreign like product of less than five percent of the volume of sales of the merchandise under consideration (MUC) to the United States during the POI, and, therefore, reported information on the volume and value of its sales to France, Germany, and Israel.[4]

On June 23, 2022, we requested additional information from Prochamp related to its third-country markets.[5] Prochamp submitted its response to this questionnaire on June 30, 2022.[6] Prochamp provided information demonstrating the quantity and value breakdown of sales of MUC to the United States, France, Germany, and Israel, broken down by product characteristics, *i.e.*, Container, Weight, Style, Certification, Label, and Brine.[7] Prochamp argues that Commerce should select Germany as the appropriate third-country market in this investigation because sales by quantity and value to Germany are more specific to merchandise sold to the United States than any other third-country market, and "the sales channel for exports to Germany and {the United States} are similar *i.e.* in both the countries the sales are made directly to unrelated customers, and {t}he product characteristics and specifications are the same for both markets."[8]

On July 5, 2022, the petitioner[9] submitted deficiency comments where it argued that Commerce should select France as the third-country market because the reported product characteristics show that MUC to France contains the most similar products to those sold by Prochamp to the United States.[10] On July 28, 2022, the petitioner submitted additional deficiency comments reiterating that Commerce should select France as the third-country market, and further suggesting that sales to the German market are [
                                    ][11]

On August 1, 2022, Prochamp significantly revised the total quantity and value reported with respect to comparison market sales in France and Germany.[12] On August 19, 2022, Commerce issued Prochamp another third-country market supplemental questionnaire asking for revised comparison market data with regard to physical characteristics.[13] On August 25, 2022,

---

[4] *Id*. at 4 and Exhibit A-1.
[5] *See* Commerce's Letter, "Third-Country Market Supplemental Questionnaire," dated June 23, 2022.
[6] *See* Prochamp's Letter, "Submission of Prochamp B.V.'s Third Country Market Supplemental Response," dated June 30, 2022 (Prochamp's Third-Country Market Response).
[7] *Id*. at 3-7.
[8] *Id*. at 2.
[9] The petitioner in this investigation is Giorgio Foods, Inc.
[10] *See* Petitioner's Letter, "Petitioner's Comments on Prochamp B.V.'s Supplemental Third-Country Response," dated July 5, 2022 (Petitioner's Third-Country Market Comments) at 5.
[11] *See* Petitioner's Letter, "Less-Than-Fair-Value Investigation of Certain Preserved Mushrooms from the Netherlands – Petitioner's Comments on Prochamp B.V.'s Response to Sections B and C," dated July 28, 2022 (Petitioner's BC Comments) at 2-10.
[12] *See* Prochamp's Letter, "Certain Preserved Mushrooms from the Netherlands: Submission of Prochamp B.V.'s Response to Supplemental Section A Questionnaire," dated August 1, 2022 (Prochamp's Section A Supplemental) at Exhibit A-15.
[13] *See* Commerce's Letter, "Less-Than-Fair-Value Investigation of Certain Preserved Mushrooms from the Netherlands: Prochamp Third Country Market Supplemental Questionnaire," dated August 19, 2022.

2

Prochamp submitted a Revised Third-Country Market Supplemental Response to reflect the updated total quantity and value reported.[14]

**Data for Prochamp**[15]

| Country | Sales Volume in Kilograms | Percentage of U.S. Sales Volume |
|---------|---------------------------|---------------------------------|
| France | [        ] | [        ] |
| Germany | [        ] | [        ] |
| Israel | [        ] | [        ] |

## III.    ANALYSIS

### A.    Analytical Framework

Under section 773(a)(1)(C) of the Act, Commerce will base normal value on third-country market prices when the foreign like product is not sold (or offered for sale) for consumption in the exporting country; when Commerce determines that the aggregate quantity (or if quantity is not appropriate, value) of the foreign like product sold in the exporting country is insufficient to permit a proper comparison to U.S. sales; or when a "particular market situation" in the exporting country does not permit a proper comparison with U.S. price.  When the home market is not viable, section 773(a)(1)(B)(ii) of the Act directs Commerce to base normal value on prices in a third-country market if:  (1) prices in that market are representative; (2) the aggregate quantity (or, if quantity is not appropriate, value) of sales in the third country market is five percent or more of the aggregate quantity (or value) of U.S. sales; and (3) no "particular market situation" exists that would prevent appropriate comparisons with U.S. prices.

Where prices in more than one third-country market satisfy the requirements of section 773(a)(1)(B)(ii) of the Act, Commerce will generally select the third-country market on the basis of the following criteria set forth in 19 CFR 351.404(e):  (1) whether the foreign like product exported to a particular third-country market is more similar to the subject merchandise exported to the United States than the foreign like product exported to other third countries; (2) whether the volume of sales to a particular third-country market is larger than the volume of sales to other third countries; and (3) other factors that Commerce considers appropriate.

Commerce's practice is to consider all of the criteria under 19 CFR 351.404(e) when determining the appropriateness of a third-country comparison market.[16]  If all other factors are equal, it is Commerce's practice to select the largest third-country market by volume.[17]

---

[14] *See* Prochamp's Letter, "Certain Preserved Mushrooms from the Netherlands: Submission of Prochamp B.V.'s Revised Third Country Market Supplemental Response," dated August 25, 2022 (Prochamp's Revised Third-Country Market Response).

[15] *See* Prochamp's Section A Supplemental at Exhibit A-15.

[16] *See Notice of Final Results of Antidumping Duty Administrative Review, Rescission of Administrative Review in Part, and Final Determination to Not Revoke Order in Part:  Canned Pineapple Fruit from Thailand*, 68 FR 65247 (November 19, 2003), and accompanying Issues and Decision Memorandum (IDM) at Comment 19c.

[17] *See Honey from Argentina:  Preliminary Results of Antidumping Duty Administrative Review*, 69 FR 621, 623-24 (January 6, 2004), unchanged in *Honey from Argentina:  Final Results of Antidumping Duty Administrative Review*, 69 FR 30283 (May 27, 2004).

B.    <u>Analysis</u>

As an initial matter, information presented by Prochamp shows that it did not have a viable home market within the meaning of section 773(a)(1)(C) of the Act during the POI.[18]  Therefore, we find it appropriate to base Prochamp's NV on its sales to a third-country market.

Further, all of the markets for which Prochamp provided third-country sales information (*i.e.*, Germany, France, and Israel) meet the requirements set forth in section 773(a)(1)(C) of the Act, in that the aggregate quantity of sales in each of these markets is sufficiently large enough to serve as a basis for comparison to U.S. sales.  Sales to these markets were [     ] percent of the U.S. sales volume for France, [     ] percent of the U.S. sales volume for Germany, and [     ] percent of the U.S. sales volume for Israel.  Further, all three markets satisfy the requirements set forth in section 773(a)(1)(B)(ii)(I) and (III) of the Act, as discussed below.

Because more than one third-country market satisfies the requirements of section 773(a)(1)(B)(ii) of the Act, we look to 19 CFR 351.404(e).  We find that the data on the record are sufficient to make a third-country market determination because Prochamp provided information regarding the composition of its U.S. market and its three viable third-country markets, France, Germany, and Israel in terms of the salient physical characteristics of the MUC (*i.e.*, Container Type, Net Drained Weight, Mushroom Style, Certified Organic, Product Labeling, and Packing Solution).

Based on information provided by Prochamp, we find that the products sold in France are the most similar to the products sold in the United States in terms of the net drained weight (NDW).[19]  However, Prochamp reports that the products sold in all three third countries are identically comparable in terms of container type, certified organic, and packing solution (the first, fourth, and sixth physical characteristics respectively).[20]

The data show that for the second physical characteristic, NDW, [     ] of Prochamp's U.S. sales have an NDW of [                    ].[21]  Prochamp states that [     ] of its sales to France had the same NDW, while [   ] of German sales and [   ] of Israeli sales had the same NDW.[22]  The [              ] volume of U.S. sales ([     ]) had NDW of [          ].  These U.S. sales could match with [            ].[23]

For the third physical characteristic, mushroom style, Prochamp reported mushrooms styles [                                                                                        ].[24]  As

---

[18] *See* Prochamp's Section A Response at Exhibit A-1.  Prochamp reports a home market sales quantity total of [     ] kilograms.
[19] *See* Prochamp's Revised Third-Country Market Response at 3-4.
[20] *Id*. at 3 and 5-7.
[21] *Id*. at 3-4.
[22] *Id*.
[23] *Id*.
[24] *See* Prochamp's Revised Third-Country Market Response at 4-5; *see also* Memorandum, "Antidumping Duty Investigation of Certain Preserved Mushrooms from France, the Netherlands, Poland, and Spain:  Product Characteristics," dated May 24, 2022 (Product Characteristics Memo) at Attachment.

such, we were able to [
                        ] to match Commerce's [                    ] product type, and [
                                                            ] to match Commerce's
[               ] product type.[25]  Prochamp reported that its U.S. sales consisted of [
                                                            ].[26]  Prochamp's sales to
France consisted of [                                        ].[27]  Prochamp's sales
to Germany consisted of [                                    ].[28]  Finally,
Prochamp's sales to Israel consisted of [                            ].[29]
Prochamp reported that [
                    ].[30]

For the fifth physical characteristic, product labeling,  Prochamp reported that [
                                                    ] were of
[                                            ], while [                        ] were
of [                            ].[31]

Based on the information on the record, we find that Prochamp's sales to France have the [
                        ] to match with U.S. sales.[32]  Nevertheless, the record reflects that the
products sold in each of the third-country markets all appear to be very similar to the MUC.
Thus, we do not find that the [                                    ] outweighs the
[                        ] overall quantity of MUC sold to the German market.[33]

Further, Prochamp states that the sales channel and type of customer in Germany is the most
similar to the sales channel and type of customer in the United States, as the sales in Germany
and the United States are made directly to unrelated customers, whereas in Israel and France,
Prochamp sold the subject merchandise through an unaffiliated agent, which further supports the
selection of Germany as the appropriate comparison market.[34]  Therefore, when taken as a
whole, we find that the products sold in Germany are sufficiently comparable to the products
sold in the United States in accordance with 19 CFR 351.404(e)(1), and Germany provides the

---

[25] *See* Prochamp's Revised Third-Country Market Response at 4-5; *see also* Product Characteristics Memo at
Attachment.  We note that Prochamp reported the [                        ] product types as instructed.  Finally,
Prochamp [
                    ].  However, the [                    ] compromises [                        ]; as
such, we have [                                        ].
[26] *See* Prochamp's Revised Third-Country Market Response at 5.
[27] *Id*.
[28] *Id*.
[29] *Id*.
[30] *Id*.
[31] *Id*. at 6.
[32] See Petitioner's Third-Country Comments at 6 (showing the total [                ] from France [            ],
Germany [        ], and Israel [        ] that would match to [        ] of the sales to the U.S. with NDWs of [
                    ].  We note that the [                    ] of U.S. sales that have NDWs of [
                    ], would match to [                ] of sales to France, [            ] of
sales to Germany, and [                ] of sales to Israel).
[33] *Id*.
[34] *See* Prochamp's Third-Country Market Response at 2.

most robust data and most similar channel of distribution and customer type when compared to the French and Israeli markets.

The petitioner asserts that Prochamp relied on an incorrect criterion when classifying sales to Germany.[35]  Specifically, the petitioner states that "instead of determining the market of consumption of the merchandise to classify sales in the appropriate third-country market" in accordance with section 773(a)(1)(B)(ii) of the Act, "Prochamp wrongly relied on the product label's language and 'considered the customer's address instead of the port of destination' when reporting German sales."[36]  The petitioner concludes by arguing that "since Prochamp failed to identify the market of consumption for sales delivered on free carrier (FCA) terms in the Netherlands, but instead relied on other inappropriate criteria, {Commerce} should also find that the German sales data are unreliable."[37]  The petitioner then provided rationale in a separate letter that Prochamp's use of customer address is, "not a valid indicator to confirm that Germany was the country where the merchandise was sold for consumption."[38]  However, as there is no record evidence that sales to Germany were not consumed in the German market, we do not find that the petitioner's concerns regarding market classification preclude the selection of Germany as the appropriate third country comparison market.

---

[35] See Petitioner's Third-Country Market Comments at 8 (citing Petitioner's Letter, "Less-Than-Fair-Value Investigation of Certain Preserved Mushrooms from the Netherlands – Petitioner's Comments on Prochamp B.V.'s Section A Response," dated June 30, 2022 at 5-8).
[36] See Petitioner's Third-Country Market Comments at 8-9.
[37] Id. at 9.
[38] See Petitioner's BC Comments at 5.

6

## IV.    RECOMMENDATION

In accordance with the above analysis, we recommend finding that Germany constitutes the appropriate comparison market for Prochamp because the market is viable, Prochamp's sales to Germany are similar to the products that Prochamp sold to the U.S. market during the POI, Germany provides the largest volume of the MUC, and sales are made through the most similar channel of distribution and to the most similar type of customers when compared to the French and Israeli markets.

☒                    ☐
_____            _____
Agree                Disagree


X    _Brendan Quinn_____
     Brendan Quinn


Brendan Quinn
Acting Director, Office III
  AD/CVD Operations

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2025-2090

**Short Case Caption:** Giorgio Foods, Inc. v. United States

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 12,236 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 11/10/2025

Signature: /s/ John M. Herrmann

Name: John M. Herrman