No. 2025-2090

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

———————————

GIORGIO FOODS, INC.,

Plaintiffs-Appellant,

v.

UNITED STATES; PROCHAMP B.V.,

Defendant-Appellees.

———————————

On Appeal from the United States Court of International Trade in Case No. 23-00133, Judge M. Miller Baker

———————————

## DEFENDANT-APPELLEE UNITED STATES'S NONCONFIDENTIAL RESPONSE BRIEF

———————————

*Of Counsel:*

RUSLAN KLAFEHN
  *Attorney*
  *Office of the Chief Counsel for*
  *Trade Enforcement & Compliance*
  *U.S. Department of Commerce*
  *1401 Constitution Ave.*
  *Washington DC 20230*
  *ruslan.klafehn@trade.gov*

BRETT A. SHUMATE
  *Principal Deputy Assistant Attorney General*

PATRICIA M. McCARTHY
  *Director*

REGINALD T. BLADES, JR.
  *Assistant Director*

TATE N. WALKER
  *Attorney, Commercial Litigation Branch*
  *Civil Division, U.S. Department of Justice*
  *P.O. Box 480, Ben Franklin Station*
  *Washington, DC 20044*
  *(202) 307-0163*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ iii

CONFIDENTIAL MATERIAL OMITTED .............................................................. vi

STATEMENT OF RELATED CASES ...................................................................... vii

INTRODUCTION ....................................................................................................... 1

STATEMENT OF JURISDICTION ........................................................................... 1

STATEMENT OF THE ISSUE .................................................................................. 1

STATEMENT OF THE CASE ................................................................................... 1

I.      Statutory Background for Third-Country Market Selection .................................. 1

II.     Commerce's Administrative Review ...................................................................... 3

        A.      Initiation of the Investigation ..................................................................... 3

        B.      Verification ................................................................................................. 7

        C.      Final Determination .................................................................................... 9

III.    Proceedings Before The Trial Court ..................................................................... 10

IV.     Commerce's Remand Redetermination ................................................................. 12

V.      Proceedings Before The Trial Court After Remand ............................................. 15

SUMMARY OF ARGUMENT ................................................................................... 15

I.      Standard of Review ............................................................................................... 17

II.     Commerce's Selection Of Germany As The Comparison Market Is
        Supported By Substantial Evidence And Otherwise In Accordance With
        Law ......................................................................................................................... 19

A. Commerce Reasonably Determined That Slight Superiority In Product Characteristic Specificity Did Not Outweigh Total Sales Volume In Selecting The Third-Country Comparison Market ...............19

B. Giorgio's Arguments As To Product Characteristics Do Not Undermine Commerce's Remand Results ....................................................25

    i. Net Drained Weight Does Not Detract From Commerce's Decision ............................................................................................26

C. Giorgio's Reliance On 19 U.S.C. § 1677(16) Is Misplaced........................29

D. Giorgio's Attachment 1 Should Not Be Considered ................................30

E. Giorgio's Reliance On *Viraj Forging* is Misplaced ......................................31

III. Commerce Reasonably Determined That Similarity In Sales Channels And Customer Types Between The French And U.S. Market Did Not Compel Commerce To Reconsider Its Third-Country Comparison Market Determination ................................................................................. 33

IV. Commerce Reasonably Relied On New Record Information To Select Germany As The Third-Country Comparison Market........................................ 36

V. Commerce's Final Third-Country Market Determination Is Reviewable ......... 42

CONCLUSION ............................................................................................. 45

# TABLE OF AUTHORITIES

## CASES

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
    802 F.3d 1339 (Fed. Cir. 2015) .............................................. 18

*Atl. Sugar, Ltd. v. United States*,
    744 F.2d 1556 (Fed. Cir. 1984) .............................................. 19

*Axiom Res. Mgmt., Inc. v. United States*,
    564 F.3d 1374 (Fed. Cir. 2009) .............................................. 31

*Cleo Inc. v. United States*,
    501 F.3d 1291 (Fed. Cir. 2007) .............................................. 18

*Consol. Edison Co. v. NLRB*,
    305 U.S. 197 (1938) .............................................................. 18

*Consolo v. Fed. Mar. Comm'n*,
    383 U.S. 607 (1966) .............................................................. 18

*Daewoo Elecs. Co. v. Int'l Union of Elec. Elec., Tech., Salaried & Mach. Workers, AFL-CIO*,
    6 F.3d 1511 (Fed. Cir. 1993) ................................................. 37

*Dillinger France S.A. v. United States*,
    981 F.3d 1318 (Fed. Cir. 2020) .............................................. 29

*Downhole Pipe & Equip., L.P. v. United States*,
    776 F.3d 1369 (Fed. Cir. 2015) .............................................. 19

*Dupont Teijin Films USA, LP v. United States*,
    407 F.3d 1211 (Fed. Cir. 2005) ......................................... 17, 18

*Gov't of Argentina v. United States*,
    542 F. Supp. 3d 1380 (Ct. Int'l Trade 2021) ....................... 26

*Matsushita Elec. Indus. Co. v. United States*,
    750 F.2d 927 (Fed. Cir. 1984) .......................................... 18, 38

*McKart v. United States*,
    395 U.S. 185 (1969) .............................................................. 31

Mosaic Co. v. United States,
    160 F.4th 1340 (Fed. Cir. 2025) ............................................ 26

*Nippon Steel Corp. v. United States,*
    458 F.3d 1345 (Fed. Cir. 2006) ......................................................... 18

*Sandvik Steel Co. v. United States,*
    164 F.3d 596 (Fed. Cir. 1998) ........................................................... 31

*Sao Ta Foods Joint Stock Co. v. United States,*
    475 F. Supp. 3d 1283 (Ct. Int'l Trade 2020) ..................................... 31

*Smith–Corona Group v. United States,*
    713 F.2d 1568 (Fed. Cir. 1983) ......................................................... 21

*SNR Roulements v. United States,*
    402 F.3d 1358 (Fed. Cir. 2005) ......................................................... 17

*Stupp Corp. v. United States,*
    413 F. Supp. 3d 1326 (Ct. Int'l Trade 2019) ............................... 43, 44

*Stupp Corp. v. United States,*
    435 F. Supp. 3d 1307 (Ct. Int'l Trade 2020) ..................................... 43

*Thai Pineapple Pub. Co. v. United States,*
    187 F.3d 1362 (Fed. Cir. 1999) ......................................................... 29

*Torrington Co. v. United States,*
    881 F. Supp. 622 (Ct. Intl. Trade 1995).............................................. 20

*Z.A. Sea Foods Priv. Ltd. v. United States,*
    606 F. Supp. 3d 1335 (Ct. Int'l Trade 2022) ..................................... 43

*Universal Camera Corp. v. NLRB,*
    340 U.S. 474 (1951).......................................................................... 18

*Viraj Forgings, Ltd. v. United States,*
    283 F. Supp. 2d 1335 (Ct. Intl. Trade 2003)................................ 20, 30

*Viraj Forgings, Ltd. v. United States,*
    350 F. Supp. 2d 1316 (Ct. Intl. Trade 2004)....................... 20, 25, 31, 32

## STATUTES

19 U.S.C. § 1677(16) ...................................................................... ii, 29

19 U.S.C. § 1677(16)(C)...................................................................... 30

19 U.S.C. § 1677(33) .................................................................................................. 38, 43

19 U.S.C. § 1677b(a) ..................................................................................................... 2

19 U.S.C. § 1677b(a)(1)(C) ....................................................................................... 5, 6

19 U.S.C. § 1677m(i) ................................................................................................ 7, 8, 9

28 U.S.C. § 1295(a)(5) ................................................................................................... 1

## REGULATIONS

19 C.F.R. 351.404(e)(1) ........................................................................................ passim

19 C.F.R. § 351.404(e) .......................................................................................... passim

19 C.F.R. § 351.404(e)(2) ........................................................................... 21, 22, 35, 36

## OTHER AUTHORITIES

*Antidumping Duties; Countervailing Duties, Final Rule*, 62 Fed. Reg. 27,296 (Dep't of
   Commerce May 19, 1997) ......................................................................................... 20

*Notice of Final Results of Antidumping Duty Administrative Review, Rescission of Administrative
   Review in Part, and Final Determination to Not Revoke Order in Part: Canned Pineapple
   Fruit from Thailand*, 68 Fed. Reg. 65,247 (November 19, 2003) ............................... 3

*Honey from Argentina: Preliminary Results of Antidumping Duty Administrative Review,* 69 Fed.
   Reg. 621 (January 6, 2004) ........................................................................................ 3

*Honey from Argentina: Final Results of Antidumping Duty Administrative Review,* 69 Fed. Reg.
   30,283 (May 27, 2004) ............................................................................................... 3

# CONFIDENTIAL MATERIAL OMITTED

Confidential material in this brief is identified as enclosed in brackets ([ ]). The brief contains confidential information on pages 5-10, 14, 22, 24-25, 27-29, 37, 41-42. The confidential material, on page 5, constitutes six different percentages; on page 6, a percentage; on page 7 describes, in order, a location, a location, a customer name, description, a location, a location, a location; on page 8, a customer name, a customer name, a customer name, a number, a customer name and description; on page 9, number; on page 10, a number, location; on page 14, a percentage; on page 22, a percentage, a percentage, a percentage; on page 24, weight, weight, a percentage, number, a number, a number, a number; on page 25, a percentage; on page 27, a percentage, weights, a percentage, weight, percentages, weight, a percentage; on page 28, weights, a percentage, weight; on page 29, a number; on page 37, weight, a percentage; on page 41, a percentage; on page 42, a percentage, a percentage, weights.

## STATEMENT OF RELATED CASES

No other appeal in or from the present civil action has previously been before this or any other appellate court. The government is not aware of any related cases within the meaning of Federal Circuit Rule 47.5(b).

# INTRODUCTION

Appellant, Giorgio Foods, Inc. (Giorgio) challenges on appeal the United States Court of International Trade's opinions in *Giorgio Foods, Inc v. United States,* No. 23-00133. On appeal, Giorgio primarily focuses its arguments on the trial court's order affirming Commerce's findings that Germany was the proper comparison market for the purposes of determining normal value for the mandatory respondent, Prochamp B.V. (Prochamp), in Commerce's less-than-fair-value investigation of certain preserved mushrooms from the Netherlands.

# STATEMENT OF JURISDICTION

Giorgio appeals the decisions of the United States Court of International Trade. This Court possesses jurisdiction to review the trial court's final judgment. 28 U.S.C. § 1295(a)(5).

# STATEMENT OF THE ISSUE

1. Commerce determined that Germany was the proper comparison market to determine normal value for the preserved mushrooms from the Netherlands at issue. The issue in this case is whether Commerce's choice of Germany as the proper comparison market is supported by substantial evidence, was not arbitrary and capacious, and was in accordance with the law.

# STATEMENT OF THE CASE

## I. Statutory Background for Third-Country Market Selection

Commerce evaluates potential dumping of merchandise by comparing the product's export price or constructed export price with its normal value. 19 U.S.C. § 1677b(a). To determine whether a product is "being . . . sold at less than fair value," Commerce must make a "comparison . . . between the export price or constructed export price and normal value." 19 U.S.C. § 1677b(a). Commerce will typically find normal value to be the price at which the foreign like product is sold in the exporting country. *Id.* § 1677b(a)(1)(B)(i). However, when the aggregate quantity of the foreign like product sold in the exporting country is less than five percent of the quantity of subject merchandise sold in the United States, Commerce may base normal value on the price at which the foreign like product is sold in a third-country. *Id.* § 1677b(a)(1)(C). Commerce may use the price of third-country sales only if such prices are representative and when "the *administrating authority* does not determine that the particular market situation prevents a proper comparison with the export price or constructed export price. *Id.* § 1677b(a)(1)(B)(ii)(I), (III) (emphasis added).

Although the statute does not provide guidance on how Commerce should choose between two or more viable third-country markets, the applicable regulation provides that Commerce generally will choose a third country based on the following criteria:

> (1)  The foreign like product exported to a particular third country is more similar to the subject merchandise exported to the United States than is the foreign like product exported to other third countries;

2

(2)     The volume of sales to a particular third country is
        larger than the volume of sales to other third
        countries;

(3)     Such other factors as the *Secretary considers appropriate.*

19 C.F.R. § 351.404(e) (emphasis added).

In the administrative proceeding, Commerce explains that its "practice is to consider all of the criteria" listed in this regulation "when determining the appropriateness of a third-country comparison market." Appx03086 (citing *Notice of Final Results of Antidumping Duty Administrative Review, Rescission of Administrative Review in Part, and Final Determination to Not Revoke Order in Part: Canned Pineapple Fruit from Thailand*, 68 Fed. Reg. 65,247 (November 19, 2003), and accompanying Issues and Decision Memorandum (IDM) at Comment 19c.). "If all other factors are equal, it is Commerce's practice to select the largest third-country market by *volume.*" Appx03086 (citing *Honey from Argentina: Preliminary Results of Antidumping Duty Administrative Review,* 69 Fed. Reg. 621, 623-24 (January 6, 2004*), unchanged in Honey from Argentina: Final Results of Antidumping Duty Administrative Review,* 69 Fed. Reg. 30,283 (May 27, 2004) (emphasis added)).

## II.     Commerce's Administrative Review

### A.     Initiation of the Investigation

Following the filing of a petition by Giorgio, Commerce initiated a less-than-fair-value investigation of certain preserved mushrooms (mushrooms) from the Netherlands in April of 2022. Appx00122. Commerce selected Prochamp as a

mandatory respondent and issued it the antidumping questionnaire. Appx00149; Appx00152-00153.

To calculate normal value, Commerce solicited information from Prochamp regarding its home market viability in section A of the antidumping questionnaire. *Id.* In its response, Prochamp reported it did not have viable home market sales during the period of investigation because its volume of sales in the home market was less than five percent of its volume of sales in the United States. Appx00319-00320.

Prochamp, as instructed by Commerce, instead reported information on the volume and value of its sales to France, Germany, and Israel–its three largest third-country markets. Appx00319; Appx00347-000348. Prochamp later provided the quantity and value of sales of mushrooms to the United States, France, Germany, and Israel, broken down by product characteristics in response to a supplemental questionnaire. Appx00868-00871; Appx00879-00884. Prochamp also included copies of its product labels. *See, e.g.,* Appx00352.

Prochamp later revised the total quantity and value reported with respect to comparison-market sales in France and Germany after Commerce issued a supplemental questionnaire instructing Prochamp to "{p}rovide the quantity and value of all sales with German as the sole language identified on the label." Appx00952. In response, Prochamp explained that it had "earlier reported the quantity and value of sales to Germany on the basis of the port of destination as the sales are made on an FCA i.e. Free Carrier or Ex-Works basis." Appx02552. But

"while analyzing the labels printed for the product sold to the German market,"

Prochamp "found that the product was delivered to other countries as well." *Id.*

Accordingly, following Commerce's instructions, Prochamp revised its reported sales

for these products based on the printed label on the mushrooms and not by the port

of destination. *Id.*

In August of 2022, Commerce selected Germany as the proper third-country

comparison market. Appx03084; Appx03090. Commerce listed Prochamp's final

revised total sales to Germany, France, and Israel as follows:

| Country | Sales Volume in Kilograms | Percentage of U.S. Sales Volume |
|---------|---------------------------|---------------------------------|
| France | [ Percentages ] | [ Percentages ] |
| Germany | [ ] | [ ] |
| Israel | [ ] | [ ] |

Appx03086.

When selecting Germany, Commerce concluded that Prochamp does not have

a viable home market and that Israel, Germany, and France each met the

requirements for a third-country market that are set forth in 19 U.S.C.

§ 1677b(a)(1)(C) and (a)(1)(B)(ii). Appx03087. Further, Commerce found that,

although the products sold in France were the most similar to those sold in the

United States in terms of net drained weight, the products sold in Germany, France,

and Israel were all very similar in their characteristics and differences in product

weight between countries were not significant. Appx03088. Commerce reasoned

"that the slight difference in product weights" as compared with sales in the United States—only one of the six relevant physical characteristics—did not outweigh the "significantly larger overall quantity of MUC {merchandise under consideration} sold to the German market." *Id.* (bracketing removed). Thus, because sales to Germany were identical to sales in the United States in five out of six of the product characteristics and because German sales represented [**percentage**   ] of U.S. sales volume, Commerce found that Germany was the most appropriate comparison market. *Id.*[1]

Giorgio urged Commerce to reconsider its third-country market selection, claiming that Commerce's analysis was not supported by substantial evidence for three main reasons. Appx03091-03102. First, Giorgio claimed that Prochamp had overstated the volume of its sales to Germany by relying on the language of the product label to determine the product's country of consumption. Appx03093-03095. Second, Giorgio argued that sales to France were more similar to sales to the United States based on product weight. Appx03099-03100. Third, Giorgio disagreed with

---

[1] In the preliminary memorandum, Commerce also found that the types of customer and sales channel in Germany were more similar to the types of customer and sales channel in the United States, supporting Commerce's analysis "taken as a whole." Appx03088-03089. As we discuss below, Commerce later clarified that this finding was "not determinative" for its third-country market determination and that it was of no consequence that the fully developed record no longer supported the finding that the sales channel and type of customer were more similar in Germany than in France. Appx05468. In any event, the majority of Prochamp's sales to both France and Germany were made to the same ultimate customer. Appx00067-00068.

Prochamp's claim that its German sales were sold through a similar channel of distribution to the United States.  Appx03101.

B.    Verification

Pursuant to 19 U.S.C. § 1677m(i), Commerce also conducted in-person verifications of Prochamp's reported cost and export price sales in late 2022. Appx05231.  During verification, Commerce inquired of Prochamp how it determined the ultimate destination for its third-country sales.  Appx05233. Prochamp explained that it records European sales in a dedicated sales journal and uses customer address to identify the destination country of the sale.  Appx05240. Commerce observed that "{f}or some [ location ] sales, Prochamp arranges freight to a customer's warehouse" and maintains a document "that shows the goods were shipped from Prochamp's factory and delivered to [ location ]."  Appx05240-05242. However, [ customer ], Prochamp's largest German customer, "arranges pick-up of the finished merchandise using [ description ] and transports it to a [ location ] in [ location ]."  Appx05240-05241.  Because pick-up and delivery occur in the [ location ], Prochamp had no record of the ultimate country of the consumption of the merchandise.  Appx05241.  Instead, Prochamp inferred the third-country of consumption based on the language of the label applied to the merchandise sold.  *Id.*  In other words, Prochamp reviewed all sales of mushrooms to this customer and removed from consideration labels that were not printed in German.  *Id.*

Commerce verified this practice, observing that most German language labels for this customer had a label code "DE-AT", meaning for either Germany or Austria. Appx05849. Because these labels appear on mushrooms sold to the same German customer, [ customer ], Prochamp considered these sales to be German. *Id.* Prochamp could not separate sales amongst the two countries because there is no [ " customer " ] or [ " customer ]. Appx05241-05242. Thus, Prochamp reasoned most of these sales to its largest customer were German sales because it is a German company with a German address. *Id.* Prochamp also used this approach in determining the country of consumption for French sales because products with French labels may also "be sold in French-speaking areas of other countries." Appx05243 (brackets removed). This is clear when examining a label of a can of mushrooms written in French, English, and Hebrew, Appx02754, with a customer located in New Caledonia, that was used as an example invoice for a French sale. Appx01080; Appx02555.

Although Commerce found that virtually all of Prochamp's mushroom sales were reported as accurately as possible, acknowledging that Prochamp "has no record of where its customers ultimately distribute their products for retail sale," Commerce discovered that certain sales reported to be German were not likely to be German. Appx05243. [ number ] sales categorized as German included the label [ customer and description ] and the associated product code. Appx05242-05243. CH is unique labelling for the Swiss market and DE/IT indicates a multilingual label that further

8

suggests these sales were Swiss. *Id.* When asked about these sales, Prochamp maintained that its approach–looking to the language of the label for the likely country of consumption–was reasonable, especially given that the sales were to an unaffiliated German customer. Appx05242-05243.

Commerce ultimately concluded that Prochamp reported virtually all German sales as correctly as possible because these sales were unable to be separated between Germany and Austria, although the small subset of [ number ] sales did conflict with Prochamp's reporting. Appx05243; *see* Appx04582-04584.

## C.    Final Determination

After considering the parties' case briefs and arguments, on March 20, 2023, Commerce published its final affirmative determination (Final Determination). Appx05393. In its final determination, with respect to Prochamp's third-country sales reporting, Commerce found applying facts available with an adverse inference, as urged by Giorgio, was inappropriate because Prochamp was cooperative with all requests for information regarding market viability, and Prochamp answered and resolved Commerce's questions regarding the methodology Prochamp used to identify potential third-country markets. Appx05436-05438. Ultimately, Commerce found that the record with respect to sales volume and product characteristics, that was established at the time Commerce selected Germany as the appropriate comparison market was consistent with what Commerce officials reviewed at verification. Appx05440-05441.

Commerce reaffirmed its preliminary finding that Germany, not France, provided the most robust third-country market. Appx05465-05469. Commerce found that the products sold in Germany were "very similar" to those sold in the United States, that is, they matched five of six product characteristics, and that Germany provided the most robust data compared to the French market in terms of volume. Appx05468. Further, Commerce rejected Giorgio's suggestion that the German market database was "overreported." Appx05467-05468. Before calculating Prochamp's margin, Commerce removed the [ number ] sales to [ location ] that had been included in Prochamp's German database. Appx05471. Commerce additionally recognized that the record no longer reflected that Germany was similar to the United States market based on sales channels and customer types, but found that this similarity was not determinative of its decision to select Germany, citing to the regulatory standard set forth in 19 C.F.R. 351.404(e)(1) that does not require consideration of this factor. Appx05468.

## III.   Proceedings Before The Trial Court

On July 17, 2024, the trial court affirmed, in part, and remanded in part, Commerce's final determination. Appx00031 (*Giorgio I*).

Giorgio advanced two primary arguments to the trial court. Appx00045. First, it argued "that the Department's selection of Germany as the comparison market is not supported by substantial evidence." Appx00045. Second, Giorgio argued that the "agency's refusal to apply facts otherwise available with an adverse inference to

Prochamp suffers from the same defect {not being supported by substantial evidence}." Appx00045.

First, the trial court rejected Giorgio's argument that Commerce's determination that the larger quantity of mushrooms sold to the German market outweighed the slight product differences between the American market and Germany market. Appx00046. The court found that Giorgio's contention that French sales featured a large set of sales with identical weights to American sales was not persuasive to override Commerce's determination because Commerce found that all products produced by Prochamp were similar. Appx00045-00047.

Second, the trial court rejected Giorgio's argument that weight was a determining factor in the product characteristics test because Commerce relied upon record evidence regarding product similarly and found that it was only a slight difference that did not outweigh the other five factors that indicated that Germany should be the selected third-country market. Appx00047.

Nevertheless, the trial court remanded Commerce's selection of Germany as the third-country market. The court reasoned that Commerce's selection of Germany did not adequately account for the quantity of mushrooms—-as yet unknown from the record—-that were likely sold for consumption in Austria. Appx00048-0051. Accordingly, the trial court instructed Commerce to reconsider its finding that Prochamp sold a "significantly larger overall quantity" of mushrooms in the German market. Appx00050-00051.

## IV. Commerce's Remand Redetermination

In light of the trial court's remand opinion, Commerce decided to quantify and account for the portion of Prochamp's German sales that might have been consumed in Austria. Appx00074. Commerce reopened and placed on the record German and Austrian population data, retail store data, mushroom consumption data, and data regarding French-speaking populations outside France. Appx00074-00075. Commerce then invited parties to comment on the new factual information, and Prochamp, the only party who responded, submitted new factual information in emails from Prochamp's customers that detail where its customers distributed the German labeled product, either, exclusively in Germany, or "mainly" but not exclusively in Germany. Appx00075; *see also* Appx05887-05889; Appx05915-5916; Appx05932-05933.

After releasing a preliminary remand determination and then considering the parties' comments, Commerce decided that Germany remained the appropriate third-country market. Appx00078. Based on the new information in the record, Commerce was able to account for potential Austrian sales contained in Prochamp's German sales database. Appx00076. Commerce observed that the combined Austrian and German population in 2021 of 92.156 million comprised 83.2 million Germans (90.28 percent) and 8.956 million Austrians (9.72 percent). Appx00076; Appx05872-05873. Commerce then observed that in 2021-22, the two countries consumed a total of 175,179 metric tons of mushrooms, of which 157,000 metric tons

(89.62 percent) were consumed in Germany and 18,179 metric tons (10.38 percent) were consumed in Austria.  Appx00076; Appx05875-05876.  Finally, Commerce recognized that, of a total of 3,505 retail locations that Prochamp's largest German customer operates in the two countries, 3,250 (92.72 percent) were located in Germany and 255 (7.28 percent) were in Austria.  Appx00076; Appx05862.

Commerce therefore adopted the conservative presumption that ten percent of Prochamp's reported German sales to its largest customer were actually consumed in Austria–roughly in line with the number of stores located in Austria.  Appx00076-00077.  Commerce then further reduced Prochamp's reported German sales by the amount that had previously been identified as destined for Switzerland and also deducted a set of Prochamp's sales to another customer that the customer reported were distributed in both Germany and another European country.  *Id.*

Commerce's remand redetermination results were bolstered by emails provided by Prochamp between it and its largest customers which indicated that at least to its largest customer, the DE/AT label indicated that some 99 percent of all sales were consumed in Germany.   Appx00090-00092.  Only a small amount of non-German consumption was reported by the largest customer.  Appx00090.  Commerce also accounted for potential sales to Slovenia by Prochamp' s other large customer and determined that any such sales were relatively small.  Appx00089.

After completing its review, even with these downward adjustments to German sales by volume data, Commerce found that the quantity of Prochamp's mushrooms

consumed in Germany was approximately [percentage] more than in France. Appx00077. Commerce further observed that its calculation of German consumption was likely an underestimate, because Commerce had applied the presumption of ten percent Austrian consumption to all of Prochamp's German-coded sales to its largest customer, not just those that bore the DE/AT label. Appx00078. Further, Commerce had removed from the total all sales to another customer of a specific line of mushrooms that the customer indicated were distributed in both Germany and another European country. *Id.*; *see also* Appx05933.

Commerce then observed that Prochamp's reported French sales were likely an overestimate, because some sales bore "NL/BE" labelling (indicating consumption in Francophone regions of the Netherlands and Belgium), and some sales reported as French were made to a company incorporated in Monaco. Appx00079-00080; *see, e.g.,* Appx001032. Commerce also observed—without taking a position on the scope of the French market—that Prochamp's largest French invoices detailed sales to a company incorporated in Overseas France, which would be unlikely to be consumed in France.[2] Appx02727-02728; Appx02555.

Therefore, because the German market, despite the slight decline after adjusting out additional non-German consumption, still remained "significantly larger" than both the French and Israeli markets, Commerce continued to find that

---

[2] These labels for the French market also seemed to reflect other languages on the labels. *See, e.g.,* Appx02757-02761.

Germany was the appropriate third-country market, and Commerce did not alter Prochamp's final margin.  Appx00079-00080.

## V.    Proceedings Before The Trial Court After Remand

After Commerce's remand results, the trial court affirmed Commerce's remand decision.  Appx00100 (*Giorgio II*).  The trial court found that Commerce's finding that Germany was the appropriate third-country comparison market is supported by substantial evidence because "Commerce's estimate" was conservative and reasonably provided an explanation for its decision that is outside "of the realm of 'mere speculation.'"  Appx00109.  The trial court found support for Commerce's determination of approximately how many sales could be attributed to Austria and Germany in its placement of new record evidence regarding the number of stores Prochamp's largest purchaser had in each country and population figures for each country.  Appx00110-00111.

The trial court rejected Giorgio's arguments accusing Commerce of guesswork and found that Commerce appropriately relied upon the new data in the record to make the calculations supporting its third-party country determination, while refusing to reweigh the evidence on the record.  Appx00109-00112.

## SUMMARY OF ARGUMENT

Commerce's selection of Germany as the third-country comparison market is supported by substantial evidence and otherwise in accordance with law.  Under 19 C.F.R. § 351.404(e), Commerce must analyze product similarity between each

respective third-country market and the U.S. market, as well as sales volume to each respective third-country market in determining the appropriate third-country comparison market. Commerce identified six product characteristics applicable to mushrooms and determined that mushrooms sold to each record market were very similar, albeit France was more like the United States in one respect–net drained weight. Instead of fixating on simply one difference, Commerce examined Prochamp's sales to each market and determined that the German market reflected a significantly higher sales volume than the other two comparison markets. Although the trial court remanded Commerce's original estimation of the German sales volume, Commerce, on remand, further explained its estimation of the sales volume, aided by new factual information, and the trial court affirmed Commerce's rational determination under the 19 C.F.R. § 351.404(e) criteria.

Giorgio continues to argue that Commerce's selection of Germany is improper. Giorgio contends that the similarity of the net drained weight criterion between the United States and France as well as the sales channels and customer type similarities, made France the most appropriate market. Giorgio also contends that Commerce's estimation of the German sales volume is an unreliable extrapolation from unspecified sources and uncertain tracing.

Giorgio's arguments continue to urge this Court to impermissibly reweigh the record evidence by having this Court draw new conclusions based on record evidence that Commerce considered in reaching its determination. As the trial court

concluded, Commerce properly balanced product characteristics to determine product similarity and did not give disproportionate weight to a single product characteristic in finding that the mushrooms are similar across all markets. Commerce agrees with Giorgio that France provides more similar sales channel and customer type to the United States than Germany's different channels and customer types, but Commerce reasonably explains that this fact is not determinative under 19 C.F.R. § 351.404(e), which looks not to distribution similarity but to product similarity and sales volume.

Finally, Commerce's estimation of the German sales volume is based on reasonable inferences from record information. Further, the issues that Giorgio claims plague the German data are also present in the French data with no definitive way to separate sales to French overseas territories or sales to French speakers in other countries besides France from general French sales data. Thus, on balance, Commerce reasonably determined that the German data covered very similar products to those sold in the United States and provided the most robust set of data by volume, such that it was the appropriate third-country market.

## ARGUMENT

### I. Standard of Review

This Court applies the same standard of review as was applied by the Court of International Trade, without deference. *Dupont Teijin Films USA, LP v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005); *SNR Roulements v. United States*, 402 F.3d 1358, 1361 (Fed. Cir. 2005). Accordingly, the Court will uphold Commerce's determination

unless it is "unsupported by substantial evidence . . . or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *Dupont Teijin*, 407 F.3d at 1215. Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951); *accord Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). However, the Court "will not ignore the informed opinion of the {trial court}." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1348 (Fed. Cir. 2015) (citations and quotation marks omitted).

Substantial evidence connotes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Substantial evidence may also be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions from the record does not render Commerce's findings unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). Nor is it proper to overturn an agency determination under the substantial evidence standard "simply because the reviewing court would have reached a different conclusion based on the same record." *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007). Hence, a party disputing Commerce's determination as unsupported by substantial evidence "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted), and the Court sustains Commerce's determinations if they are reasonable and supported by the record as a whole, even if

some evidence detracts from them.  *See Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).  The Court may not "reweigh th{} evidence" that was before Commerce.  *Downhole Pipe & Equip., L.P. v. United States,* 776 F.3d 1369, 1376 (Fed. Cir. 2015).

## II. Commerce's Selection Of Germany As The Comparison Market Is Supported By Substantial Evidence And Otherwise In Accordance With Law

Commerce reasonably selected Germany as the appropriate third-country comparison market.  After evaluating the record, as further developed on remand, Commerce reasonably determined that mushrooms sold in France, Germany, and the United States shared physical characteristics and that the significantly larger volume of sales to Germany militated toward selecting Germany as the appropriate third-country comparison market.  Giorgio contends that Commerce still has not properly quantified the volume of German mushrooms sales, and that the French mushroom's physical characteristics were closer in similarity to United States's mushrooms sales based primarily on one product characteristic–weight.  As described below, Giorgio's arguments do not cut against Commerce's finding that Germany is the appropriate third-country comparison market.

### A. Commerce Reasonably Determined That Slight Superiority In Product Characteristic Specificity Did Not Outweigh Total Sales Volume In Selecting The Third-Country Comparison Market

Commerce's determination that the German market's total sales volume outweighed the French market's slight product specificity superiority as to weight is lawful and supported by substantial evidence. By statute, when the home market is not viable, Commerce may use the price of third-country sales if the third-country sales prices are representative, the third country is viable, and Commerce does not determine there is a particular market situation that prevents a proper comparison with the United Staes price. 19 U.S.C. § 1677b(a)(1)(B)(ii). Because one or more third-countries may satisfy the criteria of 19 U.S.C. § 1677b(a)(1)(B)(ii), and the statute does not address this situation, Commerce promulgated 19 C.F.R. § 351.404(e) to establish criteria for determining which of the third-countries it will select to meet its statutory mandate. As explained in the regulatory preamble, however, "no single criterion is dispositive" and "not all three criteria need be present." *Antidumping Duties; Countervailing Duties, Final Rule*, 62 Fed. Reg. 27,296, 27,358 (Dep't of Commerce May 19, 1997); *see also Viraj Forgings, Ltd. v. United States*, 350 F. Supp. 2d 1316, 1323 (Ct. Intl. Trade 2004) ("Commerce must thus choose a third country comparison market that meets *one or more* of these enumerated criteria {present in 19 U.S.C. § 351.404(e)}" (emphasis added)). Thus, in selecting among potential third-country comparison markets, Commerce exercises discretion in evaluating these factors. *Viraj Forgings, Ltd. v. United States*, 283 F. Supp. 2d 1335, 1354 (Ct. Intl. Trade 2003) ("Commerce has broad discretion to determine similar merchandise"); *Torrington Co. v. United States*, 881 F. Supp. 622, 634 (Ct. Intl. Trade 1995), *aff'd*, 127 F.3d 1077

(Fed. Cir. 1997) ("Commerce has been granted broad discretion to devise a methodology for determining what constitutes "similar" merchandise." (citing *Smith–Corona Group v. United States*, 713 F.2d 1568, 1571 (Fed. Cir. 1983), cert. denied, 465 U.S. 1022 (1984))).

Because Prochamp reported that its home market was not viable, Commerce determined, in accordance with the statute, that it was "appropriate to base Prochamp's normal value on its sales to a third-country market." Appx05965; *see* Appx00319-00320. Commerce found all three reported third-country markets to have representative prices, to be viable, and not to have a particular market situation. *Id.* Therefore, and consistent with its regulations, Commerce analyzed the criteria under 19 C.F.R. § 351.404(e) to determine whether France, Germany, or Israel was the appropriate third-country comparison market under 19 U.S.C. § 1677b(a)(1)(B)(ii)(I), (III).

Relevant to this proceeding, under 19 C.F.R. § 351.404(e)(1), Commerce evaluates whether a "foreign like product exported to a particular third country is more similar to the subject merchandise exported to the United States than is the foreign like product exported to other third countries." Under 19 C.F.R. § 351.404(e)(2), Commerce evaluates whether the "volume of sales to a particular third country is larger than the volume of sales to other third countries."

Commerce's selection of Germany is supported by substantial evidence and in accordance with law. Consistent with 19 C.F.R. § 351.404(e)(1), Commerce identified

six product characteristics to determine similarity: (1) Container Type; (2) Net Drained Weight; (3) Mushroom Style; (4) Certified Organic; (5) Product Labeling; and (6) Packing Solution. Appx03087-03088. As explained in the *Final Determination*, mushrooms sold in all three third countries are identically comparable in terms of (1) container type, (4) certified organic, and (6) packing solution. Appx03087-03088. For (3) mushroom style and (5) product labeling, Commerce observed that the style of mushroom sold in each of the third country markets was very similar. Appx03087-03088. Only for the (2) net drained weight criterion were Prochamp's sales to France more similar to its sales to the United States than its sales to other third country markets. Appx03087. Accordingly, Commerce found that "products sold in each of the third-country markets all appear to be very similar to the MUC." Appx03088; *see also* Appx00047 ("{T}he Department found that five of the six relevant characteristics were identical or nearly so").

Consistent with 19 C.F.R. § 351.404(e)(2), Commerce found that sales of mushrooms to third-country markets were [ percentage ] percent of the U.S. sales volume for France, [ percentage ] percent of the U.S. sales volume for Germany, and [ percentage ] percent of the U.S. sales volume for Israel.[3] Appx03086. On balance, Commerce found that "the products sold in Germany are sufficiently comparable to the products sold in the United States." Appx03088. In making this decision, Commerce did not

---

[3] On remand in *Giorgio I*, Commerce revised the total volume of sales to Germany. Appx00077.

rely upon the earlier purported similarity in channels of sales between the United States and Germany.  Appx00048.  As a result, Commerce reasonably selected Germany as the third-country market, and affirmed such in the Remand Results, within its discretion under the statute.

On remand, Commerce placed new evidence on the record to quantify the volume of sales attributed to Germany and to other German speaking countries like Austria.  Appx00075.  Commerce placed information regarding the number of stores operated by Prochamp's largest customer in Austria and Germany along with population data for both countries, mushroom consumption data for both countries, and "{i}nformation regarding French-speaking populations outside France." Appx00075.

Commerce also evaluated new evidence from Prochamp where Prochamp contacted its three major German customers to ascertain where their customers sold the German labeled mushrooms.  Appx00075.  Commerce noted that these communications, with Prochamp's largest German customer, "which identify the item numbers (which correspond to specific product codes reported) which were sold exclusively in Germany in the POR and those which were distributed 'mainly' but not exclusively in the German market (*i.e.,* which could have been distributed outside of Germany)."  Appx00075.  Additional email communications with other German customers of Prochamp "identif{ied} products distributed exclusively in Germany and products distributed in Germany and other German-speaking countries."

Appx00075; *see also* Appx00090.  Notably, no new data was submitted by Giorgio.

Appx00075.

Commerce looked to the number of stores of Prochamp's main German

customer and the population data for each country.  Appx00076.  Using this data,

estimated how what percentage of mushrooms would be sold in each country out of

the total German sales volume.  Appx00076.  For example, Commerce found that

because Austrian market had approximately 10 percent of all stores for Prochamp

largest German customer, that the German-market sales data for the largest customer

should be reduced by 10 percent.  Appx00076-00077.  Thus, Commerce reduced the

German market consumption total to [ weight         ] from [ weight          ] it had

found prior, still representing around [      ] percent of United States sales volume.

Appx03086.  Thus, Commerce concluded:

> Accordingly, upon accounting for all potential non-German
> consumption identified on the record, the French market
> remains only approximately [ number    ] the size of the
> German market for Prochamp, without accounting for
> consumption of French-labeled merchandise outside of
> France.  We do not find that an approximately [number]
> percent relative decrease to the German total found to be
> 'significantly' larger than France in the underlying third
> country selection determination supports a reconsideration
> of that finding.

Appx00077-00078.  Commerce found that the record reflects "at least [ number ]

larger in a relative sense and reflecting more than a [number] more kilograms

exported . . . when compared to an unadjusted and unscrutinized French market

total." Appx00078.

In making this comparison, Commerce drew a conservative estimate of what percentage of mushrooms were sold to Austria, but reported as general German sales, out of the total sales volume data for Germany. Appx00076. Commerce's conservative estimate, under accounting for likely Austria sales by around [ **percentage**

], is supported by substantial evidence. Appx00076, Appx00078.

## B. Giorgio's Arguments As To Product Characteristics Do Not Undermine Commerce's Remand Results

Georgio disputes Commerce's remand results citing two primary grounds: product weight and volume. Appl. Br. at 32. Giorgio does not contend that Commerce's remand redetermination, and by extension the trial court's decision, failed to comply with *Giorgio I*, but instead argues that Commerce's determination is erroneous "based on the second most important product matching characteristic", (2) net drained weight. Appl. Br. at 34. Citing to *Viraj Forgings*, 350 F. Supp. 2d 1316, Giorgio asserts that Commerce's selection of Germany results from a lack of robust identical comparisons between Prochamp's sales of preserved mushrooms in Germany and the United States. Appl. Br. at 37-38. Giorgio's argument is flawed for two reasons.

First, Giorgio's argument is based on the drained weight criterion but that narrow perspective ignores that Commerce must examine *all relevant product* characteristics to ascertain similarity in determining the appropriate third-country

market.  Second, Giorgio's conclusion presumes a statutory preference for identical matches.  But the statutory language does not demand identical matches in Commerce's selection of the appropriate third-country market.  Giorgio's conclusion is further flawed because it misreads *Viraj Forgings*, as the trial court in *Giorgio I* explains.  Appx00034.  Both of Giorgio's arguments represent mere disagreement with the trial court's affirmation of Commerce's balancing of the characteristics and are not a basis to overturn Commerce's lawful determination.  *See Gov't of Argentina v. United States*, 542 F. Supp. 3d 1380, 1395 (Ct. Int'l Trade 2021); *Mosaic Co. v. United States*, 160 F.4th 1340, 1349 n.4 (Fed. Cir. 2025) ("{T}his mere disagreement is not a developed argument challenging the reasonableness of Commerce's action.").

### i.   Net Drained Weight Does Not Detract From Commerce's Decision

Giorgi's argument reveals simple disagreement as to how Commerce weighed the relevant evidence.  As the trial court held in *Giorgio I*, "{Commerce} found that five of the six relevant characteristics were identical or nearly so . . . it apparently (and reasonably) concluded that on balance the products sold in all three markets were very similar."  Appx00047 (emphasis omitted).  Indeed, Giorgio's napkin math regarding matching based on net drained weight demonstrates only what Commerce already had considered, that "products sold in France are the most similar to the products sold in the United States in terms of the net drained weight," but that the mushrooms sold to the third-country markets were all very similar because they were all mushrooms of

comparable weight.  *See* Appl. Br. at 33-34; Appx03088 ("the record reflects that the products sold in each of the third-country markets all appear to be very similar to the {merchandise under consideration}"); *see also* Appx00046.

Substantial evidence supports Commerce's observations as to the various products' weights for the mushrooms and mushrooms pieces that Prochamp exports. Commerce found that the vast majority, some [ percentage ], of Prochamp's United States mushrooms sales had a product weight between [ weights ]. Appx03087, Appx030888 n.32.  For all the sales to the French market that Giorgio advocates for, Prochamp sold only [ percentage ] in this same weight range. Appx03087.  Thus, as far as sales volume, only [ weight ] were sold in France that the same weight as the United States product that Prochamp exported.[4]  That is an insignificant amount in the grand scheme of the statutory and regulatory scheme and considers only one of six product comparison characteristics.  Compared to Germany, it is true that German sales did not offer any mushrooms in this particular weight category, but as Commerce found, the difference between [ percentages ] in sales volume did not offer conclusive evidence of a proper third market country when it is only one of the six characteristics considered for the one statutory factor. Appx03087-03088.

---

[4] The figure, [ weight ] is calculated by taking the [ percentage ] of sales to France with the same net drained weight as the United Staes mushrooms multiplied by the number of French sales.  Appx03085.

Commerce's analysis also examined the remaining 15 percent of United States sales of a product whose weight fell between a weight of [ weights ]. German sales of a product in this weight range represented [ percentage ] of total German sales. Appx03087. This sales volume percentage is expressed as [ weights ] of basically identical quantities of mushrooms sales between the United States and Germany. Appx03085.

However, this one product characteristic, net drained weight, is not as important as the entire regulatory scheme. Giorgio's emphasis on this product characteristic is only one criterion under the 19 C.F.R. § 351.404(e) regulatory analysis, and Giorgio's argument belies the wholistic analysis that Commerce must, and did, complete to select the appropriate third-country market, that is, a balancing of product characteristics, volume of sales, and other relevant considerations. As the trial court held, on balance "{Commerce} reasonably determined that the significantly larger volume of German sales – assuming for the moment the reliability of that data – more than offset the overall slight difference in product similarity that pointed toward using France as a comparison market." Appx00047 (emphasis omitted). Giorgio's emphasis on the net weight criterion would render the other characteristics meaningless and frustrate Commerce's third-country market selection methodology.

In essence, Commerce chose between the German database with more voluminous comparisons for mushrooms to those sold in the United States

with respect to five of the six product characteristics over the French database

that offered roughly [    number    ] the data relative to the U.S. database that was

identical with respect to these same five product characteristics.  Appx03086;

Appx00077.  This decision falls squarely within the "particular expertise" that

Commerce brings to "complex and complicated" antidumping investigations.

*See Thai Pineapple Pub. Co. v. United States*, 187 F.3d 1362, 1367 (Fed. Cir. 1999),

*superseded by statute as stated by Dillinger France S.A. v. United States*, 981 F.3d 1318,

1322 (Fed. Cir. 2020).

    In this product comparison, while the shipping weight of the can

changes, the mushrooms contained therein remain fundamentally the same

product.  Appx03088.

### C.    Giorgio's Reliance On 19 U.S.C. § 1677(16) Is Misplaced

    At a more basic level, Giorgio's argument that the "statute's preference for

identical matches" renders Commerce's determination erroneous also fails because

Giorgio misreads the statute.  App. Br. at 34 (citing 19 U.S.C. § 1677(16)).  Section

1677(16) governs Commerce's designation of a "foreign like product."  Commerce,

however, is not required to compare only identical products.  Indeed, the Section

1677(16) defines "foreign like product" to include both identical and similar

merchandise.  19 U.S.C. § 1677(16)(B)(i)-(ii).  The statute does not require identical

merchandise.  In fact, 19 U.S.C. § 1677(16) explains that "'foreign like product' means

merchandise in the first of the following categories."  One such category, listed

equally with identical merchandise is merchandise that is "produced in the same country and by the same person and of the same general class or kind as the subject merchandise." 19 U.S.C. § 1677(16)(C). The administering authority is granted discretion to identify similar merchandise that qualifies as a foreign like product. *Id.* § 1677(16)(C)(iii). *See Viraj Forgings, Ltd.,* 283 F. Supp. 2d at 1344-45 ("Commerce is not required to choose the appropriate comparison market solely because the goods are identical, any more than it is required to choose the appropriate comparison market solely because the market is the largest available."). Giorgio's "preference" argument is inconsistent with the statute and regulation and ignores the fact that Germany had nearly double the sales of very similar products of France. Appx03085-03086.

### D.    Giorgio's Attachment 1 Should Not Be Considered

Giorgio also argues at length about its own preferred dumping margin calculation, Attachment 1 of its opening brief, that Giorgio would assign to Prochamp. The Court should not consider Giorgio's arguments on this point. Giorgio argues that Attachment 1 to its brief demonstrates that the "impact" of Commerce's analysis and provides their own chosen analysis of what a antidumping order should accomplish. Appl. Br. at 36-37. Pointedly, the data in Attachment 1 were available to Giorgio only after Commerce made its final determination because the data is from Commerce's calculation memorandum. Appx05652; *see* Appl. Br. at 36 n.4 ("Attachment 1 summarizes information contained on the confidential

electronic files accompanying the Commerce Department's final determination.").

Thus, Giorgio never provided its analysis to Commerce to allow the agency to apply its expertise and, if necessary, further develop the record. *McKart v. United States*, 395 U.S. 185, 194 (1969) ("{J}udicial review may be hindered by the failure of the litigant to allow the agency to make a factual record, or to exercise its discretion or apply its expertise."); *Sandvik Steel Co. v. United States*, 164 F.3d 596, 600 (Fed. Cir. 1998). Nor did Giorgio submit this calculation as part of the remand record. Appx05983 ("The Petitioner submitted no new factual information"). The Court consider asserted factual materials outside the administrative record because "reviewing extra-record evidence could convert the court's standard of review into de novo review." *Sao Ta Foods Joint Stock Co. v. United States*, 475 F. Supp. 3d 1283, 1287 n.5 (Ct. Int'l Trade 2020) (declining to consider attachments to a brief) (citing *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1380 (Fed. Cir. 2009)). The Court should decline to entertain Giorgio's arguments supported by Attachment 1, which was not provided to Commerce and was not relied upon by the trial court.[5]

E.    **Giorgio's Reliance On *Viraj Forging* is Misplaced**

Further, Giorgio's reference to *Viraj Forgings* misreads that decision. 350 F. Supp. 2d 1316. Giorgio cites that the trial court in *Viraj Forgings* remanded

---

[5] If the Court were to consider Attachment 1, the analysis provides nothing to help the Court because the *effect* of Commerce's choice of third market comparison market is not at issue. Instead, the issue is whether Commerce properly adhered to the statutory and regulatory criteria in the selection of Germany over France.

to Commerce because Commerce "based its third country selection on the second enumerated criteria without indicating whether it considered the other enumerated criteria in making its determination." *Id.* at 1324; Appl. Br. at 37-38. In this case, however, Commerce expressly considered all relevant criteria, including looking at both product characteristics and volume of sales. [6]

In any event, the trial court in *Giorgio I*, while rejecting any such hierarchy being present in 19 C.F.R. § 351.404(e), held that even the *Viraj Forgings* court "recognized that the regulation directs the agency to weigh the enumerated benchmarks" and concluded that "Commerce is not required to choose the appropriate comparison market solely because the goods are identical, any more than it is required to choose the appropriate comparison market solely because the market is the largest available." Appx00034 (quoting *Viraj Forgings,* 350 F. Supp. 2d at 1344-45) (emphasis omitted).

Although identical products make characteristic matching easier, identical products are not required. Appl. Br. at 39-40. On balancing the

---

[6] If this Court were to read 19 C.F.R. § 351.404(e) hierarchically as espoused by the trial court in *Viraj Forgings* and as argued by Giorgio, Commerce's determination is in accordance with law. The *Viraj Forgings* trial court read the regulation to provide a "seriatim instruction" that requires Commerce to look first to product similarity and then to sales volume if product similarity "is not feasible." 350 F. Supp. 2d at 1324. The trial court therefore rejected Commerce's selection of a third-country market on the basis of sales volume "without indicating whether {Commerce} considered the other enumerated criteria" in the regulation. *Id.* In this case, Commerce first determined that products were "very similar" in all possible comparative markets and then proceeded to select Germany on the basis of sales volume. Appx03088-03089.

enumerated criteria under 19 C.F.R. § 351.404(e), Commerce reasonably

determined that Germany was the appropriate third-country market because

the products consumed in Germany were sufficiently comparable to the

products sold in the United States in accordance with 19 C.F.R. § 351.404(e)(1),

and "Germany provides the most robust data . . . when compared to the

French . . . {market}" because it offers nearly twice as many sales, as the trial

court affirmed in *Giorgio I and Giorgio II*. Appx05965; Appx00041; Appx00046-

00047; Appx00109-00110.

### III. Commerce Reasonably Determined That Similarity In Sales Channels And Customer Types Between The French And U.S. Market Did Not Compel Commerce To Reconsider Its Third-Country Comparison Market Determination

When Commerce initially selected the third-country market, Commerce, based

on Prochamp's reporting, concluded that the sales channel and type of customer in

Germany were most similar to the United States's market because sales made in

Germany and the United States are made directly to unrelated customers, whereas in

Israel and France, Prochamp uses a selling agent. Appx03088; *see* Appx00879-00880.

On that basis Commerce found that the similarity of sales channel and customer type,

both directly selling to an unrelated customer, between the German and U.S. markets

further supported its previous finding that "the slight difference in product weights

outweighs the significantly larger overall quantity of MUC sold to the German

market." Appx03088. Sales channel and customer type were only used to

corroborate Commerce's conclusion. Appx03088 ("which further supports the selection of Germany as the appropriate comparison market."); ("when taken as a whole, we find that the products sold in Germany are sufficiently comparable to the products sold in the United States").

However, Prochamp later revised its reporting to explain that United States's sales were also made with a selling agent as with the other two comparison markets. Appx05468. Thus, the record no longer supported that Germany and the United States had the most similar sales channel and customer type. However, in the *Final Determination*, Commerce found that whether a particular third-country had more similar sales channels or customer types is not determinative for the purposes of third-country selection under 19 C.F.R. § 351.404(e), and that any similarity was at most corroborative. Appx05468 ("{t}his additional finding was similarly not determinative, and merely provided additional corroboration for the selection of Germany and the later revision did not result in the record supporting that another proposed third country market to be more similar than Germany with respect to sales channel and type of customer.").

In other words, Commerce had already reasonably determined under 19 C.F.R. § 351.404(e) that Germany was the appropriate third-country market based on product characteristics and sales volume, any similarity in sales channel or customer type would only further support that finding but an absence of similarity in those areas would not detract from that finding. Accordingly, Commerce reasonably

determined that, because Germany was the appropriate third-country market under 19

C.F.R. § 351.404(e), Commerce did not need to reanalyze whether the further

information about United States sales supported an alternative finding because the

regulatory criteria were still met, as found in the remand results.

Giorgio contends that Commerce's dismissal of similarity in sales channel and

customer type as corroborative but not determinative "presents an even greater

problem that the {trial court} overlooked." Appl. Br. at 45. Specifically, Giorgio

argues that the "factor was not neutral and instead supported the selection of France

as the most appropriate comparison market." *Id.* Giorgio misunderstands

Commerce's conclusion and the purpose of third-country market selection.

Commerce's task is to conduct the third-country market selection process and

focus on *product* similarity and sales volume, not sales channel and customer

similarity.[7] *See* 19 C.F.R. § 351.404(e). There is no absolute requirement to examine

---

[7] The purpose of third-country market selection is to find a market that can act as a substitute to the non-viable home market. *See* 19 U.S.C. § 1677b(a)(1)(B)(ii). There are often differences in customer type and sales channels between home-markets (or third-country markets) and the U.S. market. Thus, 19 C.F.R. § 351.404(e) seeks to ensure a third-country's representativeness by ensuring similarity in product characteristics and adequate volume. Giorgio does not appear to make the argument that sales channels and customer type are other factors under § 351.404(e)(3), but under its own interpretation that § 351.404(e)'s criteria should be hierarchically examined, Commerce's determination is in accordance with law because Commerce found its analysis of product characteristics and volume dispositive to selecting a third-country market. In other words, Giorgio's own reading of § 351.404(e) makes its sales channel and customer type argument irrelevant.

customers and sales channel. To the extent that Commerce did examine such evidence, it was simply a corroborative explanation that turned out to be harmless error in a preliminary decision that was amended in the final results when the entire record was developed with additional responses from Prochamp.[8] Appx05468; Appx01305. *Giorgio I* observed, in rejecting Giorgio's identical argument, that:

> Giorgio also claims the record does not support the Department's characterization of Prochamp's sales channels and customers in its initial choice of Germany. As described above, the agency agreed with the company, *see* note 11, but explained that mistake *was at most corroborative rather than determinative. Id.* As Commerce's balancing of product similarity versus sales volume was *plainly dispositive*, this asserted error was at most harmless.

Appx00048 n.13 (citation omitted)(emphasis added).

Accordingly, Commerce reasonably determined that sales channel and customer type similarity was at most corroborative, and Commerce need not revisit its third-country market determination when its analysis of the § 351.404(e) criteria is otherwise determinative.

## IV. Commerce Reasonably Relied On New Record Information To Select Germany As The Third-Country Comparison Market

As explained above, Commerce's selection of Germany as the third-country comparison market is supported by the remand record and responds directly to the

---

[8] To the extent that Giorgio argues that France's similar sales channels to the United States is determinative, Giorgio's argument is undermined by the fact that Prochamp sells its mushrooms products to the same ultimate customer in both countries. Appx05241.

trial court's concerns about the portion of Prochamp's reported German sales that might be consumed in Austria. Specifically, in *Giorgio I*, the trial court faulted Commerce for including some potential sales for Austrian consumption in its calculation of German sales and instructed Commerce to reconsider its determination, "{a}bsent any better explanation," that "exports to Germany were 'significantly' larger than those to France." Appx00050-00051. On remand Commerce reopened the record, obtained additional information, examined the population of Austria and Germany, mushroom consumption statistics, and relative number of stores to yield a *conservative* estimate of Prochamp's German sales. Appx00074-00077. Commerce also evaluated email correspondence from Prochamp's customers confirming that mushrooms, sorted by product code, were distributed downstream either exclusively in Germany, or mostly in Germany during the relevant timeframe. Appx00078-00079.

Lastly, Commerce has applied a conservative adjustment that likely overstates the volume of sales to countries other than Germany, and even with this conservative adjustment, Prochamp's sales to the German market still exceed its sales to the French market by more than [ weight ], or approximately [percentage]. Appx00078. As such, Commerce complied with the trial court's remand order, and Commerce's selection of Germany as the third-country comparison market is supported by "the evidence and reasonable inferences from the record." *Daewoo Elecs. Co. v. Int'l Union of Elec. Elec., Tech., Salaried & Mach. Workers, AFL-CIO*, 6 F.3d 1511,

1520 (Fed. Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984)).

Giorgio contends that the new record information "does not answer the question Commerce sought to answer – what quantity of Prochamp's preserved mushrooms were sold or offered for sale in Germany," because German and Austrian population and mushroom consumption data and data concerning the relative number of stores in the two countries do not permit a reasonable approximation of the proportion of Prochamp's sales consumed in Germany.  Appl. Br. at 48-49. Instead, Giorgio continues to maintain that requiring an *unaffiliated customer's* downstream distribution and sales information is not an unrealistic standard.[9]  Appl. Br. at 49-50.  Giorgio's argument stems from unsupported speculation rather than reasonable inferences from record information and an impugnment of emails from Prochamp's major German customers that Commerce treated cautiously.  Appx00089 (Prochamp's customer's "statement merely serves to reinforce that the details

---

[9]  Giorgio's argument is really a false equivalency.  According to Giorgio, because Commerce's regulations require Commerce to consider product similarities, volume of sales, and other factors in selecting a third-country, Commerce also should be able to quantify a respondent's customer's downstream distribution and sales information. However, product similarities and volume of sales are knowable by the respondent and can be reported.  A respondent would have no ability to require an *unaffiliated customer* to give the respondent its downstream distribution and sales information because it exercises no control over that unaffiliated customer.  *See* 19 U.S.C. § 1677(33).

regarding Prochamp's unaffiliated customers' distribution activities are not generally communicated to Prochamp or known to the respondent in the normal course of business").

Giorgio argues that (1) "Austrian stores may stock mushrooms in higher quantities compared to German ones and vice versa," (2) "Commerce simply extrapolated based on information concerning fresh mushroom consumption," and (3) "Commerce erred in generalizing population and fresh mushroom consumption data to German Customer 1's sales of *preserved* mushrooms in those two countries." Appl. Br at 49. As the trial court explained, these speculative arguments are not a basis for remand, and indeed, "{t}he record about consumption in those countries, however, is ambiguous as to whether it pertains to fresh, preserved, or both types of mushrooms. "{E}ven if that information is limited to fresh mushrooms, it's a reasonable proxy for the consumption of preserved mushrooms." Appx00110. But other than speculation, Giorgio has not provided any facts to contradict Commerce's analysis.[10]

---

[10] Giorgio also contends that the French data do not suffer from the same issues as the German data because those sales were not made on FCA incoterms. However, as Commerce found on remand, certain French-labeled products were sold to a Monaco based company or intended for French Overseas Territories. Commerce observed that Prochamp's reported French sales were likely an overestimate, because some sales bore "NL/BE" labelling (indicating consumption in Francophone regions of the Netherlands and Belgium), and some sales reported as French were made to a company incorporated in Monaco. Appx00079; *see, e.g.,* Appx001032. Commerce also observed—without taking a position on the scope of the French market—that Prochamp's largest French invoices detailed sales to a company incorporated in

Commerce analyzed that Giorgio dismissed Commerce's remand analysis only because "it is not based on specific sales information by Prochamp's unaffiliated customers." Appx00088. However, Giorgio asks for something that is not possible because, as Commerce explained, there is "no reasonable basis to expect that Prochamp (or Commerce) would have access to any such information that could unequivocally determine whether merchandise was distributed downstream for sale for consumption to Austria and, if so, the actual amount of sales for consumption in Austria, much less at the time of comparison market selection." Appx00088. On appeal, Giorgio presents nothing else to refute this point because Prochamp tracks sales only by the language label on its sold products and cannot micromanage its unrelated customers who distribute products as they will and as their unique needs require it. Appx00088-00090. Therefore, Giorgio's argument is meritless.

Indeed, the emails from two customers provided by Prochamp are relevant because they indicate sales of mushrooms (sorted by product code) to Prochamp's customers were either exclusively distributed in Germany or mainly distributed in Germany. Appx00090. Taken at face value, the emails indicate that almost 99 percent of sales made to Customer X, Prochamp's largest customer, with the DE-AT

---

Overseas France, which would suggest that the product would be unlikely to be consumed in France. Appx02727-02728; Appx02555. Thus, Giorgio appears eager to overlook facts that facially cast doubt on the country of consumption when that country would be France but does not extend the same courtesy to Germany. *See* Appx00094.

label were offered for sale or sold in Germany, and that for Customer Y, sales of mushrooms were distributed in an unspecified amount to Germany and Slovenia. Appx00089-00092; *see also* Appx05887-05889; Appx05915-5916; Appx05932-05933. The emails Prochamp submitted, even if they do not provide exact clarity as to the dates and amounts of mushrooms sold in each country, nevertheless support Commerce's conclusion that Prochamp's sales for the German market were significantly larger than its sales to the French market during the relevant time based on the product codes associated with the emails. In any event, Commerce's reliance on the emails was simply to state that the 10 percent conservative adjustment likely overstated the volume of non-German sales. Appx00089 ("we conservatively accounted for this information in our analysis.").

Giorgio concludes that "{e}ven if Commerce's approximated volume of Prochamp's German sales is reasonable, the smaller volume of German sales identified in the remand redetermination further demonstrates that the difference in sales volumes between the French and German markets does not outweigh the much greater percentage of identical matches between preserved mushrooms that Prochamp . . ." Appl. Br. at 51. This conclusion is nothing more than *ipse dixit* and fails to engage with the fact that, even by Commerce's conservative analysis, Prochamp's sales volume for consumption in Germany remains nearly [percentage] larger than in the French market. Moreover, Commerce applied the ten percent downward adjustment to all of Prochamp's German language label sales to its largest

customer, not just those carrying the DE/AT label. Thus, Commerce's ten percent presumption likely overstates the volume of sales to other countries and thus reasonable on this record. Appx00105-00106. This is exactly what the trial court focused on when it concluded that Commerce's conservative approach satisfied "the substantial evidence standard of review." Appx00109.

Giorgio's arguments lie flat, as they did to the trial court, simply because Giorgio requests this Court to reweigh the evidence and come to an independent conclusion. *See, e.g.,* Appl. Br. at 41 ("Commerce's *weight* of the evidence is contrary to the purpose of the comparison market selection."); *see* Appl. Br. at 51 (discussing certain evidence in French versus German sales that Commerce allegedly did not properly weigh).[11] The trial court, in *Giorgio II*, properly declined Geiorgio's "invitation to reweigh the augmented record evidence. The new data, and the agency's reasonable inferences from them, support its decision." Appx00110. This Court should conclude the same.

## V. Commerce's Final Third-Country Market Determination Is Reviewable

Giorgio argues that Commerce unlawfully "insulated" its choice of Germany

---

[11] Prochamp reports that for French products with NL/BE codes for the Netherlands or Belgium "only [ percentage ] percent of the volume reflected on purchase orders identified by those country codes." Appl. Br. at 51. However, Giorgio argued before Commerce that "Sales with the 'NL/BE' country code account for [ percentage ] of Prochamp's reported French sales (*i.e.,* [ weights ])." Appx03095 (bracketing omitted).

from reconsideration or judicial review. Appl. Br. at 52-55. As an initial matter, we do not dispute that third-country market selection determinations in investigations and administrative reviews are subject to judicial review. Nevertheless, in support of its argument, Giorgio simply reiterates the general substantial evidence standard and concludes that, because Commerce stated that it is not revisiting its comparison market viability determination, Commerce's determination is unsupported. *Id.* Giorgio's argument misreads Commerce's *Final Determination* and, without more, is not a basis for the Court to remand Commerce's determination. *See Z.A. Sea Foods Priv. Ltd. v. United States*, 606 F. Supp. 3d 1335, 1343 (Ct. Int'l Trade 2022) ("In essence, Domestic Shrimp's argument and briefing consist of no more than repeated assertions that the statute should be interpreted and applied in a certain way, without identifying the relevant authorities supporting those bare assertions.").

As explained in the *Final Determination*, and as Giorgio recognizes, Commerce's practice is to determine questions of home market viability and third-country selection early in the proceedings, and Commerce generally does not reconsider its third-country selection decisions during a proceeding.[12] Appx05466-05467. Commerce,

---

[12] Giorgio contends that *Stupp I* and *Stupp II* do not support Commerce's stated practice. *Stupp Corp. v. United States*, 413 F. Supp. 3d 1326, 1332 (Ct. Int'l Trade 2019) (*Stupp I*) and *Stupp Corp. v. United States*, 435 F. Supp. 3d 1307 (Ct. Int'l Trade 2020) (*Stupp II*). Giorgio is correct in part. In *Stupp I*, the trial court remanded Commerce's refusal to reconsider market viability solely based on timing without explaining how timing would affect the viability analysis. *Stupp I*, 413 F. Supp. 3d at 1333. However, the trial court did consider that timing could be a circumstance in which Commerce alters its sufficiency analysis for third-country market viability

however, did not rely solely on this practice.  Instead, Commerce observed that, at the

time of its final decision, "the record continue{d} to support {its} selection of

Germany as the appropriate third country market in this investigation" such that there

was no need to reconsider the initial selection.[13]  Appx05467.  Commerce further

explained its selection of Germany on remand, which the trial court in *Giorgio II*

affirmed.  Commerce's determination is in accord with *Stupp II*.  *See Stupp II*, 435 F.

Supp. 3d at 1311 ("Importantly though, here, Commerce explains that information on

the record was sufficient to allow Commerce to engage in a proper

comparison.").  Thus, Commerce did provide a final and reviewable justification for

why it continued to choose Germany as the third country market.  That determination

is what the trial court, in *Giorgio II,* found lawful and supported by substantial

evidence, and that decision is what is at issue in this appeal.  Appx00045 ("Giorgio

first attacks the Department's stated reluctance to revisit that finding in its final

determination. But the agency went ahead—even if grudgingly—and *did* reconsider

---

determinations.  *Id.* at 1333-34.  In *Stupp II*, the trial court affirmed Commerce's
market viability determination reasoning that Commerce also explained that
information on the record was sufficient to allow Commerce to engage in a proper
comparison of the third country market and the U.S. market.  *See Stupp II*, 435 F.
Supp. 3d at 1311.

[13]  Giorgio's argument is also flawed given that the French market data suffer
from the same perceived issues as the German market data:  that record information
is unclear whether the French sales are sold or offered for sale only in France.  Taking
Giorgio's argument regarding the German market's viability to its logical conclusion,
France would equally not be a viable third-country market based simply on its French
product label being how Prochamp determined its sales volume to France.

that conclusion on the merits." (internal citations omitted)).

Giorgio's argument on this issue and throughout primarily fails to take its argument to its logical conclusion. Prochamp's sales reporting assigns sales to a country based on what country's language is on the label. Nevertheless, sales considered to be to France because the language on the labels is French may also "be sold in French-speaking areas of other countries." Appx05243 (brackets removed). This is clear when examining a can of mushrooms with a label written in French, English, and Hebrew, Appx02754, with a customer country name of New Caledonia, that was used an example invoice for French sales. Appx001080; Appx02555. Giorgio opining about what Commerce should have done in the early stages of the investigation does nothing to grapple with the deficiencies in Giorgio's argument for its chosen third-party country—France—without the benefit of additional record evidence that Germany benefited from the resulting remand is left as the least reliable option for a third country comparison market.

Because Commerce considered the entirety of the developed record in making its final decision, as further developed on remand, the Court should affirm the trial court's judgment.

## CONCLUSION

For these reasons, the Court should affirm the judgment of the trial court.

Respectfully submitted,

BRETT A. SHUMATE
 *Assistant Attorney General*

PATRICIA M. MCCARTHY
 *Director*

OF COUNSEL:

REGINALD T. BLADES, JR.
 *Assistant Director*

<u>/s/ Tate N. Walker</u>

Ruslan Klafehn
 *Attorney*
 *Office of the Chief Counsel for*
 *Trade Enforcement & Compliance*
 *U.S. Department of Commerce*
 *1401 Constitution Ave.*
 *Washington DC 20230*
 *ruslan.klafehn@trade.gov*

TATE N. WALKER
 *Trial Attorney*
 *Commercial Litigation Branch*
 *Civil Division*
 *U.S. Department of Justice*
 *P.O. Box 480, Ben Franklin Station*
 *Washington, DC 20044*
 *(202) 307-0163*
 *Tate.Walker@usdoj.gov*

January 21, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on January 21, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system. Service will be accomplished using the CM/ECF system.

*/s/ Tate N. Walker*
TATE N. WALKER

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,814 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ Tate N. Walker*
TATE N. WALKER